IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Sean DeCrane<br><br>        Plaintiff,<br><br>  vs.<br><br>Edward J. Eckart, Jr. et al.<br><br>      Defendants. | Case No. 1:16-cv-02647<br><br>Judge Christopher A. Boyko<br><br>Magistrate Judge William H. Baughman, Jr. |

**SECOND AMENDED COMPLAINT WITH JURY DEMAND**

### NATURE OF ACTION

1.　　This is a civil-rights action brought under 42 U.S.C. § 1983 and 1985(3) for violations of the First and Fourteenth Amendments, intimidation, and false light invasion of privacy. Retired City of Cleveland Division of Fire Battalion Chief Sean DeCrane alleges that Cleveland Assistant Safety Director Edward Eckart, with assistance from James Votypka and Christopher Chumita from the City's Office of Integrity Control and others, repeatedly retaliated against DeCrane based on Eckart's mistaken belief that DeCrane disclosed to a reporter that a previous fire chief—Daryl McGinnis—lacked the

required continuing education to maintain his professional certification, which led to McGinnis's resignation. Even though DeCrane had *not* shared McGinnis's lack of qualifications with the media, the defendants retaliated against DeCrane nevertheless.

2.     This retaliation, which led to DeCrane's constructive discharge, included repeated failures to promote him, seizing the Fire Training Academy's records while he served as Director of Training, making false allegations against him about deficient record keeping at the Academy and trying to get him criminally prosecuted, concocting false administrative charges against him about Academy records, delaying a state audit that would determine that the Academy's records are "exceptionally well kept and complete," failing to clear him formally of the false administrative charges after the audit confirmed the Academy's records were in order, relaying false information to the media about him, ignoring his emails and refusing to meet with him about City business, undermining his ability to perform his duties, trying to outsource the Academy's training activities, and otherwise trying to damage his reputation and career.

### PARTIES

3.     Plaintiff Sean DeCrane is a former Battalion Chief in the City of Cleveland Division of Fire. He resides in Cleveland, Ohio.

4.     Defendant Edward Eckart is the Assistant Safety Director of the City of Cleveland and resides in Cleveland, Ohio. He is sued in his individual and official capacities.

5.     Defendant James Votypka leads the City of Cleveland's Office of Integrity Control, Compliance, and Employee Accountability (OIC) and resides in Westlake, Ohio. He is sued in his individual and official capacities.

6.     Defendant Christopher Chumita works in the OIC and resides in Elyria, Ohio. He is sued in his individual and official capacities.

7.      Defendant City of Cleveland is a municipality located in Cuyahoga County, Ohio.

The City employs the individual defendants and is vicariously liable for their acts and

omissions taken under its customs, policies, or practices.

JURISDICTION AND VENUE

8.      Jurisdiction over federal claims under 42 U.S.C. § 1983 and under 42 U.S.C.

§ 1988, which provides for attorneys' and expert fees for vindication of civil rights, is

asserted under 28 U.S.C. §§ 1331, 1343(3) and (4).

9.      Jurisdiction over state law claims is asserted under 28 U.S.C. § 1367.

10.     The Court has jurisdiction over the defendants under 28 U.S.C. § 1391 because

the complained-of acts took place in this Court's jurisdiction.

FACTUAL NARRATIVE

**DeCrane has a long and distinguished career in the fire service including
national and international involvement and accolades.**

11.     Sean DeCrane is a 25-year veteran of the Cleveland Division of Fire. He is a

graduate of Lakewood St. Edward High School. In 1991, he became a fire fighter[1] with

the Cleveland Division of Fire. He retired on September 11, 2016. His most recent

posting was Battalion Chief covering Cleveland's Westside (Third Battalion).

12.     During his time in the Division of Fire, DeCrane served the people of Cleveland in

many capacities, including as an active fire fighter, as a paramedic, as manager for Fire

and EMT training, and as an instructor at the Fire Training Academy. DeCrane became

a lieutenant in 1997, a captain in 2000, and in 2007 was promoted to battalion chief. He

was chief of the EMT Training Office from 2011–12 when he became the Fire Academy's

---

[1] This term is spelled both as "fire fighter" and "firefighter" throughout the fire-service
industry. This complaint will use the former spelling, which is consistent with the usage
and practice of the International Association of Fire Fighters, the most-recognized fire-
fighter organization in the world. (http://client.prod.iaff.org/).

Director of Training. He was a member of the Standard Operating and General Order Committee and the Joint Apprenticeship Committee. He served as Acting Assistant Chief of Operations, Acting Chief of Special Services, and as Division of Fire Coordinator for the 2016 Republican National Convention.

13.     Throughout his career, DeCrane has worked both inside and outside the Division of Fire to serve and protect the people of Cleveland.

14.     DeCrane holds the following certifications: Ohio Department of Public Safety (ODPS) Fire Fighter I and II; ODPS Fire Life Safety Inspector; ODPS Fire Service Instructor; Emergency Medical Technician B; Federal Emergency Management Agency National Incident Management IS-100, IS-200, IS-700, IS-800; Incident Response to Terrorist Bombings Awareness and Operations; Hazardous Materials Awareness and Operations; National Fire Protection Association (NFPA) Fire Officer I, II, and III; and NFPA 1403 Live Burn Instructor.

15.     DeCrane has been involved in the national and international fire communities for decades working on setting worldwide standards and protocols for fire codes and fire-fighter education. Some of his unique accomplishments include presenting at the Underwriters' Laboratories (UL) European Fire Forum in Vienna, Austria (2015, 2016); presenting at the Netherlands Fire Service Fire Safety Congress in Arnhem, Netherlands (2015); participating in the UL Lithium-Ion Battery Conference in Beijing, China (2015); serving as a delegate to the International Fire Safety Conference in Hong Kong (2015); serving as a delegate to a conference with the Chinese National Fire Service (2015); serving as a delegate to the Fire Safety Conference in Paris (2014); serving as a delegate to the Highrise Fire Safety Conference in Hong Kong (2014); serving as the American

Fire Service delegate to the Russian Fire Service Conference in Moscow (2013); and serving on the Fire Fighter Safety Week Committee (2009–13).

16.     DeCrane has received numerous awards and recognitions for his service including Automatic Fire Alarm Association Person of the Year Award (2015); Underwriters' Laboratories Council Member of the Year Award (2015); Fire Equipment Manufacturers Association Fire and Life Safety Advocate of the Year Award (2014); International Association of Fire Chiefs (IAFC) Fire Life Safety Award (2013); City of Cleveland Advanced Health & Awareness Award (2012); International Code Council (ICC)-IAFC Life Safety Advocate Award (2012); Cleveland Division of Fire Thomas E. Andrews Award (2011); ICC's Fire Service Award (2010); and the MetroHealth Hospital Chris Holt Award for Medical Response of the Year (Rescue Squad #1 1996).

17.     Since 2006, DeCrane has served as the representative of the International Association of Fire Fighters in the International Code Council development process. He served on the 2009, 2012, 2015, and 2018 Fire Code Developing Committee and as Chair for 2015 and 2018. He served on the IAFF's Technical Panel Community Risk Assessment Project in 2015. He served as a representative to establish a National Fire Fighter Education Curriculum in Fire Behavior (2014–present).

18.     DeCrane has been involved in the National Fire Protection Association since 2010 and has been involved in a variety of projects and research studies in that capacity. He has served on the Fire Code Technical Committee and serves on the NFPA 1 Technical Advisory Panel, NFPA Research Foundation on Tall Wood Buildings. He was recently appointed as the IAFF alternate to the NFPA Fire Behavior Research Technical Committee.

19.     DeCrane has been involved with the International Code Council since 2006 and has been a part of its Fire Service Membership Governing Council since 2011. He served on the ICC's Board of Directors Nominating Committee in 2014 and as chair of the International Fire Code Development Committee since May 2012.

20.     DeCrane has been very involved in the research at Underwriters' Laboratories and the National Institute of Standards and Technology. He serves on the UL Fire Council, is a member of the UL Fire Fighter Safety Research Institute's Advisory Board, and is currently on a number of technical panels for research and standards. His involvement with that organization began in 2009.

21.     DeCrane served as a technical reviewer for the following fire-education publications: Brannigan's Building Construction for the Fire Service (5th Ed. 2013); Fire Officers Principles and Practice (3d Ed. 2014); and Fire Fighter Essentials (Jones-Bartlett, 4th Ed.).

22.     He has been involved with the following national fire-fighting organizations and projects: National Fallen Fire Fighters Foundation; National Institute of Occupational Health and Safety; Vision 20/20 National Strategic Agenda for Fire Loss Prevention; Institution of Fire Engineers; International Fire Marshals Association United States Fire Administration Residential Fire Environmental Workshop Project, and has served as a panelist in other fire-industry events. He is a contributor to Fire Engineering Magazine and co-hosts a podcast called Taming the Fire Environment.

23.     DeCrane has given the following keynote presentations at national and international conferences: Fire Department Instructors Conference (2015); British Columbia Fire Chiefs Association (2015); New York State Office of Fire Prevention and Control's Fire Marshals and Inspections annual conference (2014); Wisconsin Fire

Inspectors annual conference (2013), and Michigan Fire Inspectors annual conference (2013). He also gave a presentation at the International Association of Fire Fighters Conference (2015).

**Fire-fighter certification and Academy record-keeping practices**

24.     Chapter 737 of the Ohio Revised Code authorizes the adoption of rules and regulations to govern a city's safety forces including the fire service.

25.     Per City of Cleveland Division of Fire General Order # 4-6, each member is required, as a condition of employment to maintain a valid and current Ohio driver's license, a valid and current Ohio Fire Fighter II certification, and a valid and current Ohio EMT-B certification. The EMT-B certification is required only for those employees who began service on or after January 1, 1981.

26.     Members who do not meet these requirements laid out in General Order # 4-6 are prohibited from working in the Division of Fire either as an active fire fighter or in more senior roles up to and including Chief of Division.

27.     Per General Order # 4-6, a Division of Fire employee determined to have an invalid State of Ohio EMT-B or Fire Fighter II certification shall be immediately placed on departmental charges and is subject to discipline up to and including termination.

28.     Maintaining the Fire Fighter II certification requires 54 hours of continuing education every three years.

29.     Maintaining the EMT-B certification requires 40 hours of continuing education every three years.

30.     Per Ohio state law, each fire fighter is required to maintain his or her own training records. As a courtesy, and for administrative convenience, the Division's Fire

Training Academy maintains hard copies of these certificates if the fire fighters provide them. The Division is not required by law to maintain these records.

**DeCrane becomes the Director of Training at the Academy in 2012.**

31.     In the late summer of 2012, DeCrane became the head of the Fire Training Academy.

32.     The immediate past chief of the Academy before DeCrane was Daryl McGinnis.

33.     While McGinnis had been the Director of Training at the Fire Training Academy, he told staff not to keep track of fire-fighter training hours.

34.     Under McGinnis's leadership, the Academy did not track fire-fighter training records in a comprehensive or reliable manner.

35.     At the time DeCrane became the head of the Academy, the Academy did not have a centralized database for tracking employee certifications or continuing education.

36.     When DeCrane became head of the Academy, EMT continuing-education records were maintained on a website hosted by University Hospitals (UH database), which the Academy's EMT Office would transfer to an Excel spreadsheet saved on the Division's Microsoft SharePoint Intranet.

37.     The Division's SharePoint Intranet is a local, web-based network that allows different users to access Division records.

38.     All members of the Division could and still can access this database through SharePoint.

39.     At that time, Academy staff members were entering classroom training and company drills into a "Miscellaneous" section of the Division's Firehouse software program.

40.     In addition to the electronic files in the UH database and Firehouse program, the Academy maintained a hard-copy file on each Division member that included, e.g., certificates earned both inside and outside the Academy.

41.     When DeCrane took over as Chief of the Academy, his priority was to merge all training records into a single system.

**A 2012 audit revealed the deficiencies in Academy record keeping under McGinnis and recommended a consolidated database for tracking.**

42.     On October 16, 2012, consultant Shelly L. Trochemenko of Resources Global Professionals completed an audit of the Academy's record keeping from January 1, 2011 through June 30, 2012 (while McGinnis was the head of the Academy).

43.     In her review, Trochemenko determined that "Fire uses a series of disjointed databases to track training hours."

44.     Trochemenko called these databases "incomplete" and noted various "input errors."

45.     Trochemenko concluded that "almost 7% of its recorded drills could not be matched with a payroll attendance record."

46.     She expressed concern about "data integrity" based on this approach to tracking records.

47.     Trochemenko's recommendation was "the creation of a single data base to capture all training hours for both Fire and EMS, including drills, in-house training, online courses and courses through third party vendors."

48.     Trochemenko identified as a challenge to achieving this centralized database the fact that the "designated Public Safety Reporting Management System (RMS) remains undetermined (i.e. Firehouse vs. New World) and the Division will require additional IT

training for personnel." She emphasized that the Department of Public Safety needed to determine which RMS system to implement to begin the process of moving to a centralized database.

49.    Despite Trochemenko's findings of errors and inaccuracies in the Academy's training records, no one was accused of wrongdoing or faced administrative charges.

50.    As he was taking over the Academy in the summer of 2012, DeCrane had identified the flaws summarized in Trochemenko's audit even before her report was released. In the Proposed Strategic Plan DeCrane submitted to Defendant Eckart on September 12, 2012, DeCrane requested civilian clerical support for data entry and requested technical assistance for training/testing support. DeCrane noted the need for a centralized filing system and called the current system "unacceptable."

**In January 2013, the City promotes Daryl McGinnis to Chief of Division; DeCrane tells Eckart privately that McGinnis lacks the training hours to maintain his fire certification.**

51.    In late 2012, while serving as the head of the Academy, DeCrane applied for promotion to Chief of Division.

52.    DeCrane interviewed with then-Safety Director Martin Flask, who was the appointing authority at the time, and Assistant Safety Director Eckart.

53.    On or about January 11, 2013, Defendant Eckart called DeCrane to tell him that McGinnis would be named chief and that DeCrane was the second-place candidate.

54.    Patrick Kelly was ranked third on the list, and he was significantly behind DeCrane in terms of the scoring.

55.    When Defendant Eckart conveyed this news to DeCrane, he expressed surprise because he believed that McGinnis lacked the required continuing-education hours to

maintain his fire certification, which made him ineligible for employment with the Division of Fire under General Order # 4-6.

56.　　DeCrane told Eckart about McGinnis's deficient training hours.

57.　　DeCrane explained to Eckart that this was information available on Sharepoint to all Division members.

58.　　Defendant Eckart had not done his homework on McGinnis and was unaware of his lack of basic qualifications to even be a Cleveland fire fighter, let alone the fire chief.

59.　　Defendant Eckart insisted that they would move forward despite what DeCrane had explained about McGinnis not even being a fire fighter given his failure to properly maintain his fire certification.

60.　　Despite DeCrane's concerns about the embarrassment McGinnis's lack of training might cause to the City, the Division, and the Mayor if it became known, DeCrane expressed to Defendant Eckart, Flask, McGinnis, and others that McGinnis had DeCrane's support.

61.　　McGinnis took over the Division of Fire in January 2013.

### The *Plain Dealer* reports about McGinnis's lack of continuing-education hours, which leads to his administrative leave and abrupt retirement.

62.　　In approximately June 2013, DeCrane, in his capacity as head of the Academy, received a phone call from Leila Atassi of the Northeast Ohio Media Group, also known as Cleveland.com, making a public-records request for McGinnis's training records.

63.　　DeCrane did not provide Atassi with any records.

64.　　Per City policy, DeCrane directed Atassi's call to Kim Roberson, the Public Records Administrator in the City's Law Department.

65.     After DeCrane received the call from Atassi, he notified McGinnis that the press was asking for his training records. McGinnis replied, "I was wondering how long that would take."

66.     At the time Atassi made her public-records request, McGinnis did not have the required continuing-education hours to maintain the EMT-B certification needed to be a member of the Division of Fire, which the Division's Sharepoint database reflected.

67.     DeCrane had been sincerely mistaken in his conversation with Eckart when DeCrane indicated that it was McGinnis's fire—as opposed to EMT-B—certification that was deficient due to lack of training hours.

68.     In a story published on Cleveland.com on August 1, 2013, Cleveland.com reported on McGinnis's lack of qualifications to be fire chief and indicated that it had received a tip about McGinnis's failure to complete the required training hours to maintain his EMT-B certification. The story was printed in Cleveland.com's sister publication, the *Plain Dealer*, as well.

69.     These media reported that McGinnis had only 22 of the 40 credit hours needed for his EMT-B certification in the preceding three-year period. This meant that he was not eligible to be a member of the Division of Fire.

70.     That same day, McGinnis was relieved of his duties pending an investigation into his deficient certifications. He retired two weeks later.

**Eckart blames DeCrane for the story that led to McGinnis's ouster and begins retaliating against DeCrane by passing him over for promotion to Acting Chief and seizing the Academy's training records.**

71.     Eckart believed that DeCrane was responsible for alerting the media about McGinnis's training deficiencies.

72.     Eckart's mistaken belief about DeCrane's involvement arose from the fact that DeCrane had raised McGinnis's lack of training with Eckart back in January 2013 (when there was still time to avoid the embarrassment this caused) but Eckart had refused to listen.

73.     Eckart had no proof that DeCrane was involved in leaking the story and simply assumed that he was to blame.

74.     Eckart's desire to hide McGinnis's lack of qualifications was motivated by Eckart's personal embarrassment about his failure to competently vet chief candidates.

75.     But DeCrane is a team player and, despite his concerns, did not tip off media about McGinnis's lack of continuing-education hours.

76.     The fire chief's certifications and qualifications touch on matters of public concern. Of course the public is concerned about the qualifications of those individuals entrusted with the responsibility of leading the City's safety forces. The fact that media took the tip and engaged in investigative journalism that led to McGinnis's immediate reassignment and then retirement evidences the fact that this issue touches on a matter of public concern.

77.     Thus, the statements Eckart attributed to DeCrane about McGinnis's lack of continuing education or certification are protected speech under the First and Fourteenth Amendments.

78.     Eckart was angry with DeCrane about the McGinnis leak. So Eckart began a campaign to discredit and harm DeCrane and his career because Eckart perceived DeCrane as having engaged in this protected conduct.

79.     DeCrane would not have been treated how he was treated had Eckart not attributed to DeCrane the tip about McGinnis's deficient training.

80. As DeCrane explained to Eckart, any person with access to the Division of Fire's Sharepoint database could have accessed this information. All fire fighters have access to this database though the Division's Intranet.

81. When McGinnis went on administrative leave pending investigation, Eckart's office named Assistant Chief Patrick Kelly Acting Chief of Division.

82. Kelly was ranked third on the promotion list just a few months earlier, and was significantly behind DeCrane in terms of scoring. DeCrane had internationally recognized accomplishments recited above that Kelly did not have. Yet DeCrane did not get the nod. Frank Chontos became the Acting Executive Officer. Based on seniority, DeCrane temporarily filled Chontos's position as Acting Chief of Operations.

83. After McGinnis stepped down, Public Safety announced that it was conducting an audit to examine every fire fighter's training records. Defendant Eckart came to the Academy with Division of Police members and seized files, computers, and the database of training records (including the Access database program that DeCrane had personally purchased for the Academy to help remedy the records issues given Eckart's failure to make a decision about a records-management system per Trochemenko's recommendation and DeCrane's repeated requests).

84. Before the City seized the Academy's training records, DeCrane had repeatedly requested a functional records-management system for training records to implement Trochemenko's recommendations for a comprehensive and consolidated database to track this information. Eckart indicated that Public Safety would be moving to a new record-keeping program from "Firehouse," the current program. Eckart specifically told DeCrane not to enter data in Firehouse because of the impending switch. Eckart

repeatedly indicated that he was working on getting a functional records-management program for the Division, but still has not done so.

85. Eckart had the seized records taken to Defendant James Votypka, head of the Office of Integrity Control, Compliance, and Employee Accountability (OIC), which is located inside EMS headquarters.

86. Eckart's seizure of the training records crippled DeCrane's efforts to remedy the record-keeping issues that remained from McGinnis's tenure at the Academy or to work toward completing the centralized database to track certifications and training.

87. DeCrane made numerous requests to Eckart's office (through the proper Division of Fire channels) for a central server to allow multiple data-entry capabilities, which would have accelerated the laborious process of manually entering each member's information.

88. On October 9, 2013, DeCrane met with Chumita, Votypka, Greg McKernan, and Captain Patrick Corrigan about the various databases that the Academy maintained. During the meeting, Chumita and Voytpka insisted that the Division's medics lacked certifications. They were incorrect, which Corrigan explained and demonstrated how to scroll over one column in the Excel spreadsheet in Sharepoint to see the certifications recorded.

### DeCrane must actively lobby to be included in the interview process for consideration as McGinnis's permanent replacement; DeCrane is passed over for Chief of Division and Assistant Chief of Operations.

89. In November 2013, DeCrane learned that Acting Chief Patrick Kelly had multiple interviews with the Mayor about the Chief position while DeCrane had not been contacted at all (despite having been second on the promotion list—well ahead of Kelly— earlier that year).

90.     Eckart had taken no steps to include the candidate who had ranked second on the previous promotion list for the chief position in these interviews.

91.     DeCrane sent an email through Kelly to Eckart asking to be placed in the interview process for the chief position.

92.     After DeCrane asked to be interviewed for the chief position, Safety Director Flask interviewed DeCrane in November 2013. Defendant Eckart was on the phone. During the interview, Flask told DeCrane that Kelly had a "leg up" in the process.

93.     Unbeknownst to DeCrane during his interview, Acting Chief Kelly had been informed in October 2013—before DeCrane had even been interviewed—that Kelly would become chief.

94.     Flask and Eckart's "interview" with DeCrane was merely a formality designed to make it appear that the process was fair and not rigged against DeCrane from the start.

95.     On or about December 9, 2013, the City promoted Acting Chief Kelly to serve as Chief of Division.

96.     Flask called DeCrane to inform him that he had been passed over and expressed that it was Kelly's "knowledge of the administrative process" that got him the position over DeCrane.

97.     Upon information and belief, DeCrane is the only first-ranked chief candidate to ever be passed over for appointment during his time with the Division.

98.     After receiving the news that Kelly would become chief, DeCrane spoke with Defendant Eckart about how to avoid being passed over again for promotion to chief. Eckart agreed to meet with DeCrane to discuss this but then repeatedly rescheduled and cancelled the meeting they set up to do so.

99. After rescheduling and cancelling several meetings, Eckart eventually stopped responding to DeCrane's emails on this and other topics because Eckart remained angry about the McGinnis leak.

100. In later December 2013, DeCrane, who had been serving temporarily as Acting Assistant Chief and Chief of Operations based on seniority, learned that Frank Chontos would be promoted to that position.

### DeCrane and his staff make repeated requests for Eckart and Votypka to return the Academy's training records; DeCrane is at the Academy briefly before being reassigned to headquarters.

101. When Chontos was promoted to Chief of Operations, DeCrane briefly returned to helm the Academy.

102. While the City reviewed the Academy's records at EMS headquarters, the seized records were strewn about in disarray and not maintained in an appropriate or secure manner.

103. One Division member submitted a Form-10 complaining about how the Academy's records were being stored during this time. A Form-10 is an internal complaint in the Division of Fire.

104. While DeCrane was Acting Chief of Operations, the Acting Academy Chief, Patrick Corrigan, was DeCrane's direct report. While he was temporarily serving as Operations Chief, DeCrane repeatedly requested that the seized training records be returned to the Academy.

105. When DeCrane returned to the Academy, he redoubled his efforts to seek the records' return so the centralized-database project, which the records seizure halted, could proceed. DeCrane needed the records to complete the database project that he had spearheaded when he took over the Academy in 2012.

106.    OIC had completed its own review of the Academy's seized records and reported on its findings in a report dated December 2013. This audit identified a handful of members with deficient continuing education and lapsed certifications. This audit report did not mention McGinnis's deficient EMT-B certification.

107.    On January 17, 2014, DeCrane sent a request to Chontos noting the partial database creation and the difficulties created by having no staffing and no files.

108.    On or about February 14, 2014, at Eckart's behest, Chief Kelly detailed DeCrane out of the Academy to headquarters for the incoming cadet class, which was scheduled to begin in a week.

109.    Chief Kelly explained that Battalion Chief Angelo Calvillo had volunteered to replace DeCrane as Director of Training for the cadet responsibilities only. There was no indication on who would handle DeCrane's other Academy duties while he was stationed at headquarters and performing the duties he was assigned there.

110.    There was no precedent for a Director of Training having responsibility only for a cadet class and not for the entire Academy operations.

111.    On February 24, 2014, DeCrane was transferred from the Academy to Special Services at headquarters. This transfer was initially for 63 days but then extended to July 7, 2014.

112.    On information and belief, Eckart pressured Kelly to transfer DeCrane out of the Academy as part of the retaliation for the McGinnis story.

113.    While DeCrane was detailed out, no one was asked to assume DeCrane's Academy duties in his absence. Meanwhile, Chief Kelly continued to rely on DeCrane to handle training issues.

114.    During this time, Calvillo was copied on email correspondence regarding such issues but was nonresponsive and rarely present at the Academy.

115.    While DeCrane was attempting to remedy the record-keeping issues Trochemenko had identified at the Academy under McGinnis's tenure, DeCrane was yanked in and out of the Academy (making it more challenging to complete the difficult task of remedying the issues left behind by his predecessor). In addition to bouncing him from one assignment to another, Eckart failed to allocate sufficient resources to the Academy in terms of software and personnel to timely complete the task of creating a consolidated, comprehensive database or the records-management system needed to make the records functional.

### OIC finally releases some—but not all—of the Academy's training records, but they are in disarray.

116.    In March 2014, despite having detailed DeCrane out of the Academy, Chief Kelly asked DeCrane to retrieve the records from OIC. When his staff arrived to collect the records at OIC, the records were piled in no particular order. Inexplicably, some members' files were missing.

117.    DeCrane (who at the time was detailed to Special Services) notified Assistant Chief Chontos of the missing files. Chontos indicated that he would follow up with Votypka. But Votypka never responded.

### DeCrane repeatedly requests help from Chief Kelly and Safety Director McGrath to deal with the retaliation DeCrane faced from Eckart.

118.    On February 11, 2014, DeCrane asked Chief Kelly for help in dealing with the retaliation DeCrane was facing from Eckart. DeCrane asked Kelly to help arrange a meeting with Eckart (who continued to set and then cancel meetings with DeCrane) so

they would clear the air about the McGinnis media leak. Kelly agreed to help, but did nothing.

119.    On March 17, 2014, DeCrane complained to new Safety Director Michael McGrath about false statements that Eckart was making about DeCrane and the retaliation DeCrane was experiencing. McGrath promised to follow up and work out the issues, but did nothing.

120.    On April 29, 2014, DeCrane again complained to Chief Kelly about Eckart's treatment of DeCrane. DeCrane compared Eckart's treatment of DeCrane to being "in timeout" and asked Kelly for help. Kelly continued to do nothing.

121.    DeCrane's complaints to the Chief of Division and the Safety Director put the City on notice that Eckart was retaliating on an ongoing basis against DeCrane.

122.    The City failed to take reasonable steps to remedy the retaliation or protect DeCrane from further retaliation. This failure created a custom, policy, or practice of retaliating against DeCrane based on the mistaken belief that he was responsible for the leak that resulted in McGinnis's ouster.

### DeCrane returns to the Academy and again focuses on trying to remedy the record-keeping issues and create the central database.

123.    In July 2014, DeCrane was detailed back to the Academy from headquarters. At that point, he immediately began trying to put the training records Eckart seized (at least the ones that Votypka had returned) back in order, despite a lack of staffing and still no decision on a records-management system from Eckart's office.

124.    DeCrane informed Chief Kelly that the Academy would be using the existing Firehouse program to achieve this.

125.    To this end, DeCrane had discussions with IT personnel about how to ensure this centralized database would roll over when a new database was finally selected and implemented.

126.    Fire Fighter Barry Kifus, who had worked on creating the centralized database initially, was no longer detailed to the Academy. So no one familiar with the record-keeping process was available to assist in putting the mess back in order or continue the efforts to centralize EMT and fire-fighter training records. DeCrane requested assistance with this task from Chief Kelly.

127.    On June 30, 2014, Lt. Dave Telban notified Chontos and Calvillo that certain fire-fighter files were still missing from what Eckart had seized and delivered to Votypka. DeCrane followed up with Chontos on October 10 and October 31 about these files but received no response.

128.    On July 28, 2014, DeCrane sent an email to Chontos and O'Toole about the lack of a records-tracking system.

129.    Despite DeCrane's best efforts, Eckart and Votypka's failure to return all of the seized records prevented the Academy from creating a complete and accurate database or to remedy the litany of problems from the McGinnis era that Trochmenko's audit elucidated.

130.    The City's failure to provide the necessary staffing or resources to complete the task of creating a comprehensive, consolidated database of training records at the Academy hindered DeCrane's progress in implementing Trochemenko's audit recommendations.

131.    DeCrane competently and professionally handled his responsibilities despite the retaliation he endured.

**Eckart's retaliation continues after DeCrane returns to the Academy and through the end of 2014.**

132.     DeCrane coordinated and managed the training of all Division members in the use of Narcan, a life-saving antidote for opioid overdoses. In July 2014, DeCrane submitted a briefing regarding how Cleveland Fire had saved 11 lives in a matter of weeks using Narcan. DeCrane quickly received notice that Eckart had Votypka investigating the Academy on the Narcan training it had reported conducting.

133.     Rather than commending the outstanding results of the prompt and effective training that DeCrane led, Eckart lashed out at DeCrane to try to further undermine his credibility and success by having Votypka again use an investigation as a tool of retaliation.

134.     Also in 2014, DeCrane had been working for months to develop and implement an Inspector program for Division members that would train them to conduct fire inspections for code violations. As part of his retaliation against DeCrane, Eckart worked to prevent the Inspector class from taking place. DeCrane developed this continuing education personally using the state fire code, so it was available at no cost to the Division. Eckart's motive for resisting it was purely personal animus against DeCrane based on Eckart's behalf that DeCrane had leaked the McGinnis story to the press.

135.     Eckart raised his concerns about the Inspector program not with DeCrane but with Chief Kelly. When Chief Kelly forwarded Eckart's email to DeCrane for a response, DeCrane explained that the Division's responsibility for not only fire suppression but also prevention, and inspections to prevent fires. When DeCrane responded to Eckart directly—which Kelly had asked DeCrane to do—Eckart responded only to Kelly

chastising him never to allow DeCrane to contact Eckart directly again. Eckart's animus against DeCrane stemmed from Eckart's belief that DeCrane had tipped off the media about McGinnis's deficient training history. There was no reason other than personal animus against DeCrane for Eckart to act in such a counterproductive manner in a professional setting.

136.    On December 10, 2014, DeCrane sent a memo to Chontos updating him on the efforts to work within the existing Firehouse program to record trainings, issues caused by waiting for an upgrade to the system, and noting the lack of support from Public Safety: "It would have been nice to have the support of Public Safety when we made numerous requests to AD Eckart for the last two years but we will get it done." DeCrane asked that Kifus be returned to assist with data entry.

**Larry Moore is detailed to the Academy; Chumita gets Moore to file a false report against DeCrane and Captain Patrick Corrigan, which Eckart and Votypka use to drum up false administrative charges against DeCrane.**

137.    In late 2014, Fire Fighter Larry Moore was on light duty and detailed to the Academy.

138.    Moore has a history of making wild accusations within the Division dating back years. It is common knowledge in the Division that Moore makes unfounded complaints. Based on his reputation, anything he "reported" should have been viewed skeptically.

139.    DeCrane assigned Moore to sit at the front desk where he answered phones and did paperwork.

140.    While he was detailed to the Academy, Moore never had any responsibility or authority to enter official records into any database.

141.    There were no official data records on the computer to which Moore had access.

142.    For DeCrane's convenience, he instructed Moore to keep an informal Excel spreadsheet of the trainings, instructors, and estimated number of attendees at the various trainings taking place at the Academy. This was necessary to attempt to deal with the ongoing and problematic lack of a comprehensive, functional records-management system for the Academy, which Eckart continued to fail to provide.

143.    This Excel spreadsheet was to provide a quick reference for DeCrane so he would not have to check multiple databases to determine what activities the Academy had going on during a particular week. This was a stop-gap measure while Eckart continued to delay giving the Academy guidance or direction regarding a functional records-management system that would allow for the assembly of all training information in one location.

144.    No one was ever awarded any kind of training credits from this Excel spreadsheet that Moore was keeping, nor was it used to fulfill any reporting obligations or certification requirements.

145.    This was busy work for Moore strictly for DeCrane's convenience and not part of the Academy's official documentation program.

146.    DeCrane saw no need to inform Moore that his efforts were busy work and not part of the Academy's official documentation procedures.

147.    Before the events of January 2015, DeCrane had a pleasant working relationship with Moore, who seemed to be performing the limited tasks assigned to him.

148.    In early January 2015, Defendant Chumita called Moore and asked him to come down to OIC.

149.    Shortly after being summoned to OIC, Moore filed a series of complaints (Form-10s) on January 12, 2015:

a.    Moore claimed that on January 12, 2015, Captain Charles Kelley engaged in race discrimination by not responding to a knock on the Academy door by a black male.

b.    Moore claimed that Chief Patrick Kelly had been discriminating against black fire fighters by having them sit atrium watch at headquarters.

c.    Moore claimed that Chief Glauner tried to physically harm Moore by offering to let him borrow Glauner's reading glasses: according to Moore, "Even a child knows that wearing glasses not PRESCRIBED to you WILL damage your eyes."

d.    Moore claimed that on December 4, 2014 Captain Patrick Corrigan informed Moore that DeCrane said Moore should log in a live-burn cadet-training drill consisting of one cadet on light duty. Moore claimed that DeCrane later said not to log the cadet.

e.    Moore claimed that on December 3, 2014, Captain Corrigan informed Moore that DeCrane said Moore should go to Station 5 and get the CPD Pepper Spray class instructor's name and a head count of the class and log it into the Academy's Master Class File.

150.    Moore's Form-10s were false writings intended to influence one or more public officials in carrying out their duties.

151.    Regarding the Form-10 about December 3, "Station 5" is a former active fire station located directly beside the Academy that now contains classrooms and a conference room as well as Academy offices. The "Master Class File" was the name of the unofficial Excel spreadsheet that DeCrane asked Moore to keep of activities at the Academy. It was not any kind of official record and was never used to award continuing-education credits.

152.    Regarding the Form-10 about December 4, on information and belief, Moore was referring to training conducted for a cadet who was injured and unable to graduate with his Academy class. Academy staff meticulously tracked that cadet's subsequent completion of his state training requirements in the official database. DeCrane may have

said that Moore did not need to log this cadet's individual training exercises in the unofficial list that DeCrane had Moore keeping for DeCrane's convenience.

153.     Despite expressing that he was concerned about being asked to do something illegal, Moore waited over a month—and until after Chumita summoned Moore to OIC—to file this series of Form 10s that included these particular assertions as well as complaints about race discrimination and attempts to physically harm him using prescription eyeglasses.

154.     Within days, OIC was pursuing an investigation into Moore's complaints in retaliation for the protected activity that Eckart attributed to DeCrane.

155.     After learning that Moore had complained about logging activities in the informal spreadsheet, DeCrane was stunned.

156.     Shortly after Moore's complaint, he insisted on addressing the entire staff in the Academy's kitchen. The gripes Moore addressed to the assembled Academy staff largely centered on his belief that he should be "comfortable" at work. He designated the watch area of the Academy as his personal space and insisted that members knock and be invited in before entering this common area (where the copier, printer, and fax machine are located). He also complained that he had been cheated during a weight-loss contest among the staff.

157.     When DeCrane approached Moore after Moore's outburst in the kitchen, Moore accused DeCrane of keeping Moore out of the Inspector class (the one that Eckart had fought to stop). DeCrane assured Moore that DeCrane was not keeping anyone out of any class, but that it had been postponed due to the ongoing inability to obtain the correct textbooks for the course. DeCrane further explained that he was in favor of Moore participating in the class.

158.    The Inspector class had to be provided to the four members who were moving into the Fire Prevention Bureau. DeCrane proposed to Chief Kelly that the class be held at the Academy and opened to some additional members. Kelly approved this idea but indicated that, to avoid overtime charges, only staff officers and those assigned to the Fire Prevention Bureau would be permitted to participate. Kelly established the selection criteria, which precluded Moore from participating because he was not a staff officer or assigned to the Fire Prevention Bureau. The books finally became available and the class was administered while DeCrane was detailed out of the Academy in early 2015.

159.    On information and belief, Chumita encouraged or convinced Moore to lodge these false accusations against DeCrane—which Chumita knew or should have known to be false—possibly by telling Moore that DeCrane was preventing Moore from taking the Inspector's course even though that was not true.

160.    On January 20, 2015, DeCrane responded appropriately per Division and City policy to Moore's nonsense accusations through a letter to Assistant Chiefs Edward Whatley and Frank Chontos.

**Eckart continues to retaliate against DeCrane by falsely accusing him of misrepresenting training data and placing him as 11th out of 11 candidates for the open Assistant Chief positions.**

161.    In February 2015, three Assistant Chief positions opened. The City conducted in-person interviews on February 25 and 26 with Eckart and others, including Assistant Chief Edward Whatley.

162.    Eckart was the only participant who asked questions of DeCrane during his interview for the open Assistant Chief positions.

163.    That same month, before the City released the rankings, DeCrane was appointed by seniority to serve as Acting Chief of Operations again. Assistant Chief Tim O'Toole had moved from Chief of Staff to Chief of Suppression in advance of retiring in March. Mike Odum became Chief of Staff and Chontos moved to the Executive Officer position.

164.    In approximately March 2015, Fire Fighter Kifus returned to the Academy and reapplied his expertise to the reorganization of the seized files, slowly working toward returning them to functional organization.

165.    In March 2015, DeCrane received a records request through Public Safety from City Council for all training provided in 2014 and 2015 and projected training and costs.

166.    DeCrane was given two days to comply with this massive request despite Public Safety's knowledge that its mishandling of the training records had stymied the Academy's ability to quickly respond to such a request.

167.    DeCrane responded within the allocated timeframe to the best of his ability under the circumstances by creating a summary and narrative of the training provided and submitting training rosters and a detailed calendar of events.

168.    In response, Eckart accused DeCrane of providing false documents, instigating another review of Academy records by Chumita and Votypka.

169.    When reviewing the summary DeCrane had provided, Eckart's comment was, "There is no fucking way they did all this training."

170.    DeCrane provided no false documents to anyone.

171.    The Academy had delivered all of the training detailed in the summary DeCrane provided in response to Council's request.

172.    Eckart's accusation is part of his vendetta against DeCrane stemming from Eckart's belief that DeCrane tipped off media about McGinnis's lack of training, which made Eckart look incompetent in performing his job duties.

173.    To attempt to justify the OIC investigation that Votypka would lead, Eckart used one of the myriad hearsay accusations lodged by Moore (who was known for making unfounded accusation and whom Chumita had pressured by to complain in the first place) to leverage the review. Moore asserted that DeCrane had told Captain Corrigan to tell Moore to enter false information in "FTA Master Class File," which was a lie. Eckart, Votypka, and Chumita would leverage this coerced hearsay into a vicious and public attack on DeCrane's character and performance.

174.    DeCrane explained why Moore's complaints were ridiculous not only in his January 20 report of the situation but also during a *Garrity* hearing in March 2015 during which Votypka questioned DeCrane about Moore's complaints. DeCrane explained Moore's lack of understanding of the database-creation process (in which Moore was not involved) as well as the files that were still missing from the 2013 post-McGinnis seizure.

175.    In March 2015, the City announced that it would not be posting the rankings from the last round of Assistant Chief interviews.

176.    On information and belief, this is the first time the City decided not to post the promotional rankings.

177.    DeCrane enjoys a good reputation among the Division members in terms of his substantive knowledge and professional demeanor.

178.    The purpose behind the decision not to post the rankings was Eckart's desire to hide the fact that DeCrane was ranked 11th out of 11 candidates, which everyone in the Division would immediately know was ridiculous and unfair.

179.    In late March 2015, Local 93 submitted a public-records request for the rankings from the Assistant Chief interviews.

180.    Shortly after the Local submitted the public-records request, Assistant Chief Edward Whatley asked DeCrane if Whatley could disregard and remove from the official file DeCrane's summary of the Moore incident due to "nothing coming of it."

181.    Whatley was asking for DeCrane's permission to destroy a public record, which DeCrane was neither empowered nor inclined to do.

182.    Whatley indicated that the City HR department was not going to follow up on the complaints given their knowledge of Moore's history of making nonsense accusations.

183.    Whatley said of HR and Moore: "They know he's nuts."

184.    Whatley's efforts to obtain DeCrane's agreement to remove his narrative on the Moore situation from the file were at Eckart's behest and intended to erase the truth from the public record. This would make it easier for Eckart and his minions to concoct a false narrative about DeCrane's administration of the Academy.

185.    DeCrane responded that he was not comfortable discarding the summary and would prefer it remain in the file.

186.    Days later, on April 5, 2015, Whatley abruptly retired, cleaning out his office over the weekend.

187.    On April 8, 2015, the City finally released the Assistant Chief rankings. Despite having been the second-ranked candidate for the Chief position two years earlier, DeCrane was listed as 11th out of 11 for Assistant Chief.

188.     On information and belief, Eckart pressured Whatley, who served as subject-matter expert during the interviews, to give DeCrane very low scores without any grounds to do so for the purpose of creating a false justification to deny DeCrane a promotion.

189.     DeCrane—who in the past several years has given numerous keynote addresses at large fire-industry gatherings and is an accomplished and direct public speaker and communicator—was scored poorly on his "communication skills."

190.     This ranking DeCrane 11th out of 11 candidates was part of Eckart's ongoing campaign of retaliation against DeCrane, which at this point the City had blessed and endorsed through inaction despite the Fire Chief and Safety Director being on notice of the retaliation.

**As part of his ongoing retaliation against DeCrane, Eckart attempts to destroy the Academy by outsourcing all training.**

191.     In the fall of 2014, DeCrane learned that the City was going to hire a new class of cadets. Eckart notified the Division that—for the first time ever—the training would not take place at the Academy but be outsourced to Cuyahoga Community College's (Tri-C's) facility in Parma Heights.

192.     This outsourcing would have ended more than a century of Cleveland Division of Fire providing training in-house. The Division began training its own cadets in 1863 and began its official Academy in 1965.

193.     Eckart was working to undermine DeCrane as the Director of Training and head of the Academy by trying to outsource the training of the new incoming cadet class.

194.     Safety Director McGrath agreed to a $732,000 no-bid contract with Tri-C to conduct the new-cadet training.

195.   The Local filed a grievance because the City is supposed to approach the Local if the City intends to civilianize an area of member responsibility such as cadet training.

196.   City Council raised concerns about the serious resources that Eckart was proposing to allocate to this outside vendor, particularly given Mayor Frank Jackson's brother's personal interest in the contract as a Tri-C official.

197.   The City has given conflicting reasons for the impetus to outsource the training. But the true motivation is to punish DeCrane based on Eckart's belief that DeCrane leaked the McGinnis story to media.

198.   The City's efforts to privatize the training have thus far been unsuccessful.

199.   It was costing the City significant overtime that the cadet class was not taking place while Eckart schemed to wrest the training from the Academy and DeCrane's area of responsibility.

200.   Chief Kelly asked DeCrane to provide a cost projection for continuing to provide the new-cadet training at the Academy. DeCrane, working with Assistant Chief O'Toole, provided a detailed analysis showing the better training and better value that the Academy offered as compared with Tri-C. It was significantly cheaper to provide the training at the Academy.

201.   On information and belief, Eckart was sharing the Academy's projections with Tri-C, because Tri-C's proposal changed in terms of hours provided in SCBA training, search-and-rescue or self-rescue training, and rapid-intervention team training. Tri-C's initial bid was offering only the bare-minimum state requirements. Once DeCrane provided a cost projection to do the work at the Academy, which detailed extensive work over and above the bare minimums—that the Division knows it needs to provide its cadets—the Tri-C plans changed to include this additional work.

202.    By this time, the uproar from the Local and Council about awarding this no-bid

contract was overwhelming. On or about October 28, 2014, Cleveland.com and the *Plain*

*Dealer* ran a story questioning why the City was about to award the no-bid contract to

an agency run by the Mayor's brother.

203.    On information and belief, Eckart temporarily abandoned his plan to outsource

the entirety of the training because it cost the City so much in overtime every month that

the new cadet class was not operational.

**After the unsuccessful attempt to outsource the entire training program to
Tri-C, Eckart tries to pay Tri-C for work it has already been doing
administering the program instead of following DeCrane's
recommendation to seek self-accreditation to administer the program for
free through the Academy.**

204.    After Eckart's attempt to get the no-bid contract through failed, Tri-C suddenly

wanted to get paid for "administering" the training, which it had done without charge

for years.

205.    Although Cleveland fire fighters instruct their own cadets at the Academy, Tri-C

has been administering the city's academy as an "off-site" training program with the

state's blessing for nearly a decade.

206.    In exchange for administering the program, Tri-C received access to the City's

"burn building" to conduct training exercises for other fire departments and the ability

to count cadets toward its enrollment when applying for grants. Tri-C also received

approximately $1,100 for each student who successfully completed the Fire Fighter 1

and 2 certification through the Academy. But after the unsuccessful no-bid contract, Tri-

C decided that it wanted to be paid to administer the program.

207.    The only reason the City needs an outside entity to administer its new-cadet

training program is because Cleveland is one of the only major cities in Ohio that does

not have a charter from the Ohio Department of Public Safety to administer its own fire-training program.

208. The initial estimate from Tri-C to conduct this cadet class was $97,000. This was in early 2015.

209. The City issued a Request for Proposal (RFP) for a provider or use of the certification for the accreditation of the class.

210. When the City issues an RFP, it is required to hold an information session where potential submitters can ask questions.

211. On or about May 28, 2015, the information session on the RFP was held. Tri-C was the only attendee.

212. At the information session's conclusion, DeCrane and Eckart were the only two people left in the room.

213. DeCrane asked if they could meet to clear the air about the McGinnis leak and how Eckart had treated DeCrane ever since the story broke.

214. Eckart suggested they meet at some point in the future. Believing that Eckart's intention was to continue to avoid DeCrane, he addressed the issue directly.

215. DeCrane told Eckart that, despite what Eckart might believe, that DeCrane had not contacted the media about McGinnis's lack of training.

216. In response, Eckart slammed his hand down on the table and shouted: "You have to admit it is quite a coincidence!"

217. DeCrane replied that Eckart had destroyed DeCrane's career because of a coincidence.

218.    Eckart's vitriolic anger over the McGinnis situation nearly two years after media

had sought his training records further convinced DeCrane that Eckart's vendetta

against DeCrane would not stop as long as he worked for the Division of Fire.

219.    Eckart suggested that they have lunch to discuss the issue further and asked

DeCrane to email Eckart to set it up.

220.    DeCrane complied with Eckart's request, but Eckart—consistent with his

previous pattern of conduct—never responded to DeCrane's email or made any other

arrangements to meet with him.

221.    Final proposals on the RFP were due on a Friday, and Tri-C's final bid was

$52,400.

222.    When the bid came in, DeCrane was standing at Eckart's desk with Chief Kelly

and Assistant Chief Chontos.

223.    When the City is outsourcing a class, if the bid comes in over $50,000 it requires

City Council approval. Eckart indicated that he had explained to Tri-C that Council

approval would be needed for any bid over $50,000. Eckart expressed his displeasure at

Tri-C's failure to come in under $50,000 despite his indication that it should do so.

224.    The need to obtain Council approval would delay administration of the class by

several months. The delay would mean that the cadet class would not graduate on time,

which would have cost the City additional overtime for current members to work the

shifts the new fire fighters would have filled in the schedule.

225.    In response to this problem, DeCrane (using Akron as an example) explained that

the Academy could obtain the necessary accreditation through the state within six

weeks, which would keep the class on schedule and avoid both the additional overtime

costs and the cost of outsourcing the class to Tri-C. This would be the most cost-effective way to administer this and all subsequent new-cadet training programs.

226.    But as usual, Eckart resisted DeCrane's recommendation and insisted that DeCrane do nothing, i.e., not obtain the accreditation that would save the City money. Eckart instead indicated that he would contact Tri-C to lower its bid to try to bypass Council.

227.    Eckart contacted Tri-C and asked it to lower its bid so he could bypass Council approval and move forward with the outsourcing.

228.    In response to Eckart's request, Tri-C lowered its bid by $3,150 so it fell below the $50,000 threshold.

229.    On July 30, 2015, Leila Atassi of Cleveland.com wrote a story about Eckart's efforts to bypass Council approval. Tri-C withdrew its bid.

230.    When Atassi interviewed Eckart about his efforts to finagle Tri-C's bid to bypass Council, he insisted that his efforts were "about getting it done quickly and at the least expense to the city." Eckart's statement was false.

231.    The class would have been done the quickest and with the least expense to the city by having the Academy administer it with accreditation through the state (as DeCrane was recommending). But Eckart was more interested in punishing DeCrane than saving the City money.

232.    Eckart's efforts to pay Tri-C to administer the new-cadet class were an effort to undermine and diminish DeCrane and the Academy he ran.

**DeCrane renews his complaints to supervisors and administrators, but the City still does nothing to remedy or prevent Eckart's retaliation.**

233. After the Tri-C issues, DeCrane again asked Chief Kelly for help in stopping Eckart's retaliation. On June 16, 2015, DeCrane complained to Chief Kelly that the ongoing OIC investigation was a concerted effort to discredit DeCrane and that Eckart was trying to damage his career. Kelly continued to do nothing.

234. On July 4, 2015, DeCrane again complained to Safety Director McGrath that Eckart's retaliation was taking a toll on DeCrane's career. DeCrane said Eckart's lies were impacting his life and his family. McGrath assured DeCrane that McGrath "didn't believe any of the bullshit" about DeCrane. But McGrath did nothing to remedy the retaliation or protect DeCrane from future retaliation.

235. DeCrane also complained to Assistant Safety Director Tim Hennessey about Eckart's retaliation against DeCrane and requested assistance. As far as DeCrane is aware, Hennessey took no steps to remedy the retaliation or protect DeCrane.

236. The City's failure to conduct an investigation or take appropriate steps to remedy or prevent retaliation against DeCrane confirmed that the City had adopted and maintained a custom, policy, or practice of tolerating retaliation against DeCrane.

**Eckart and Votypka use Moore's complaints (that Chumita had prompted) to charge DeCrane with official misconduct to malign his reputation within the Division and in the public eye.**

237. Preventing DeCrane from being promoted was not enough for Eckart.

238. Unbeknownst to DeCrane, on April 30, 2015, Votypka sent a memorandum to Eckart recommending administrative charges against four officers: Assistant Chief Frank Chontos, DeCrane, Captain Patrick Corrigan, and Chief Patrick Kelly. These charges were based on Moore's false allegations and the record-keeping issues at the

Academy including stemming back to when McGinnis was Director of Training. This was a false writing intended to influence one or more public officials in carrying out their duties.

239. The OIC's investigation and Votypka's memorandum attempted to impose documentation standards on the Academy's 2014 activities that the Academy will not have to meet until its audit in 2018.

240. Eckart, Votypka, and Chumita encouraged the City prosecutor's office to file criminal charges against DeCrane based on their investigation of the Academy's training records.

241. When Assistant Prosecutor Kim Barnett informed Eckart, Votypka, and Chumita on June 2, 2015 that no criminal conduct had occurred, Eckart, Votypka, and Chumita had to settle for administrative charges against DeCrane.

242. Before the formal charges were issued, DeCrane requested meetings with Eckart through both Chief Kelly and Assistant Director Hennessey to try to stop the retaliation and address Eckart's attitude toward DeCrane, specifically Eckart's mistaken belief that DeCrane had leaked the McGinnis story.

243. On June 20, 2015, DeCrane sent a memo to Chief Kelly noting gaps in the Academy's data because Eckart had insisted they not use Firehouse or begin uploading documents. The memo identified hindrances to the Academy's progress in solving the database issues (e.g., no dedicated hard drive, no records-management decision from Eckart, Kifus being removed, needing to separate reporting to break it down). DeCrane noted that despite these issues, the Academy was "ahead of State requirements on our datakeeping" per the applicable standards at the time.

244. Despite DeCrane's explanation of why the supposed charges were meritless, on July 14, 2015, Eckart's plan to attack and undermine DeCrane culminated in issuance of administrative charges against DeCrane, Chief Kelly, and Captain Corrigan regarding alleged record-keeping discrepancies at the Academy.

245. The administrative charges accused DeCrane of incompetence, dereliction of duty, falsifying records, submitting fraudulent documents to council, and failing to comply with state law. This was a false writing intended to influence one or more public officials in carrying out their duties.

246. Everyone involved in the process of issuing these charges was acting under the specific direction of Eckart for the purpose of retaliating against DeCrane based solely on Eckart's personal animus.

247. Part of the basis for the charges was the incomplete training records at the Academy (which Eckart had seized and Votypka had only partially returned) that had been a problem from the McGinnis era (as detailed in the Trochomenko audit) and that DeCrane had been working diligently to resolve since assuming charge of the Academy (despite being detailed in and out to different positions in the meantime).

248. Part of the charges came following the OIC investigation that Eckart, Votypka, and Chumita conducted following Moore's nonsensical complaints about his busywork spreadsheet.

249. Knowing the deficiencies from the previous era of Academy leadership, and while refusing to provide the needed personnel or resources to efficiently address the concerns, and while yanking DeCrane in and out of the Academy, Eckart and his cohorts repackaged old issues that DeCrane had been trying to address into a new problem that he had supposedly created.

250.    DeCrane's pre-disciplinary hearing on the bogus charges was originally scheduled for August 27, 2015 and then for September 1, 2015 with Chief Kelly as hearing officer.

251.    On August 31, 2015, Defendant Eckart rescheduled DeCrane's hearing to September 9 with Eckart to preside over the hearing.

252.    The union notified Director McGrath of its objection to Eckart presiding as hearing officer noting his "conflict of interest."

253.    Notwithstanding the Local's objection, Eckart and company were determined to proceed with the disciplinary hearing against DeCrane.

254.    On September 4, 2015, Chief Kelly sent Eckart a memo indicating that from February 24, 2014 through July 7, 2014, DeCrane was detailed out of the Academy and Angelo Calvillo was in charge of the Academy during that time.

255.    Eckart and the City took no action against Calvillo regarding any allegedly missing or incomplete information in the Academy's training records during his period of leadership even though he presided over the Academy for nearly five months during that year.

256.    Eckart and the City took no action against McGinnis regarding any allegedly missing or incomplete information in the Academy's training records during his period of leadership. Instead, the City promoted him to Chief of Division.

257.    On September 8, 2015, DeCrane submitted a public-records request to the City for records regarding the charges.

258.    Having received no response to his year-old public-records request, on September 16, 2016, DeCrane filed a petition for writ of mandamus with the Ohio Supreme Court to compel the City to respond.

259.    On September 21, 2016, the City finally provided a partial response to DeCrane's year-old public-records request.

260.    The City provided another partial response on October 6, 2016.

261.    On October 12, 2016, the City notified DeCrane's counsel that it had inadvertently provided certain of the response documents without applying proper redactions for things like employee social-security numbers and other personal information.

262.    The City provided a further partial response on October 13, 2016.

263.    To date, the City has not complied fully with its obligations under the Public Records Act regarding DeCrane's September 8, 2015 request.

264.    The City's failure to provide fully responsive public records in a timely manner was and is further retaliation.

### DeCrane transfers out of the Academy to try to prevent Eckart's animus against DeCrane from further damaging the institution.

265.    Concerned about what Eckart's never-ending vendetta against DeCrane would do to the Academy, DeCrane transferred out of the Academy in August 2015. DeCrane's goal was to try to reduce the focus on the Academy and take it out of Eckart's sights before Eckart inflicted permanent and irrevocable damage on the institution.

266.    Following the bogus charges, Chief Kelly left the Division to become the Olmsted Falls fire chief in September 2015.

267.    After his transfer, DeCrane remained as Acting Chief of Operations until his transfer to Battalion 3.

### The City indefinitely postpones DeCrane's disciplinary hearing; Eckart delays state audit that would eventually exonerate DeCrane.

268.    The Temporary Chief applications to replace Kelly on an interim basis were due on September 9, 2015. Eckart's office scheduled DeCrane's disciplinary hearing on the

administrative charges for the same day. He dropped off his interim-chief application on the way to this hearing.

269.     Eckart, Votypka, and Chumita met before the hearing to coordinate and prepare for the disciplinary hearing against DeCrane.

270.     On September 9, 2015, DeCrane appeared for his first disciplinary hearing on the bogus administrative charges.

271.     At the hearing, DeCrane was represented by the Local's counsel, Tom Hanculek. When the Local's counsel told the City attorney (Ami Patel) that DeCrane and Corrigan had not been questioned or interviewed before the charges were issued, the City attorney became concerned and expressed that to Haculek.

272.     Had anyone bothered to interview DeCrane about the "records" Moore was tasked with updating, DeCrane would have explained that Moore was not editing official records. Other Division employees also could have provided this information had Eckart, Votypoka, or Chumita bothered to inquire before publicly accusing DeCrane of wrongdoing.

273.     Hanculek pointed out that the Academy's Continuing Education Certification Renewal with the state EMS Board was approaching and that the state would conduct a review of the education and records to determine if things were in order. Hanculek suggested that the disciplinary hearing be continued until after that review was complete.

274.     Patel told Hanculek that she had advised Director McGrath that he should continue the hearing until after the EMS board review and that McGrath granted that continuance at Patel's recommendation.

275. The initial date for the state review was September 15, 2015, but Eckart cancelled the appointment without consulting DeCrane or other Academy personnel.

276. Despite the roadblocks Eckart had erected and his lack of cooperation with the Academy, DeCrane and his staff had made great progress in solving the McGinnis era's record-keeping problems.

277. Eckart cancelled the state audit because he knew that DeCrane would be exonerated by a neutral observer's review of the Academy's training records applying the applicable standards and protocols put in place by the state.

278. DeCrane's interview for Temporary Chief was scheduled for September 14, 2015. That took place with Eckart and others. DeCrane performed well, discussing a number of issues facing the City and his ability to use his broad swath of international experience to address those issues.

279. Ken Ledford, the Bedford Fire Chief, served as the subject-matter expert for the interviews and, on information and belief, also served as a reference for candidate Angelo Calvillo, who was selected to serve as the Temporary Chief.

280. Eckart was aware that the subject-matter expert for these interviews was a personal reference for Calvillo and took no steps to find an alternative participant to make the process fair and impartial.

281. Anyone who served as a personal or professional reference for one of the candidates in the interview process should not have participated in that process due to a conflict of interest.

**To undermine DeCrane's chances in the promotion process, Eckart circulates a press release and a report from Votypka purporting to conclude that the false administrative charges against DeCrane are true.**

282.    The evening of DeCrane's interview, Eckart released a press release and report from Votypka based on Moore's false allegations claiming there was substantial evidence to support the allegations of wrongdoing by DeCrane and his staff. These were false writings intended to influence one or more public officials in performing their duties.

283.    Eckart released this information to the media despite knowing that it was false.

284.    Cleveland.com and the *Plain Dealer* covered this story. A Google search for DeCrane's name returns that story as the first hit.

285.    In releasing the false charges to the media, Eckart intended to and did portray DeCrane in a false light before the public. Eckart's release of the report was timed to undermine DeCrane's chances at earning the Temporary Chief position and was in retaliation for the McGinnis story, for which Eckart still mistakenly believed DeCrane was responsible.

286.    Eckart's release of records regarding the charges against DeCrane to the media without notifying DeCrane violated the collective-bargaining agreement. The Local filed a grievance regarding this violation.

287.    In response to the grievance, Eckart apologized but said the "coincidence is amazing."

288.    Eckart used the word "coincidence" in reference to his earlier conversation with DeCrane where Eckart had emphasized the "coincidence" of DeCrane mentioning McGinnis's lack of training to Eckart six months before media started digging on that story. But unlike DeCrane, Eckart was actually responsible for this leak, which led to

DeCrane's public humiliation in an article that remains accessible online and basically accepts that DeCrane was guilty of the charges, which is not true.

289. For more than a year, DeCrane has been living under a cloud of suspicion. The City has taken no steps to move forward with an investigation on these false charges against DeCrane because Eckart knows DeCrane would be formally exonerated.

290. News of these false charges has reached DeCrane's colleagues in the international fire community who have commented about seeing the report Eckart released.

**DeCrane is again passed over for the interim and then permanent chief position.**

291. Eckart's animus against DeCrane was obvious to everyone in the Division and impacted how he was treated in the chain of command up to and including the Chief of Division.

292. On October 9, 2015, Angelo Calvillo was sworn in as the Acting Chief.

293. Before becoming Acting Chief, Calvillo had no administrative experience in the Division.

294. On October 12, 2015, Chief Calvillo held a Command Staff meeting and dismissed DeCrane as Acting Chief of Operations, saying Calvillo needed his senior chiefs on the street.

295. Mike Odum remained as Executive Officer even though he is senior to DeCrane, so Calvillo's explanation for DeCrane's demotion is pretextual.

296. As of October 19, 2015, DeCrane was supposed to move to Battalion 3, but remained as Acting Chief of Operations stationed at headquarters. Calvillo called DeCrane at home that evening and asked him to stay at headquarters but agree to waive his right to a 28% acting differential pay (to which DeCrane was entitled based on his

assignment at headquarters as an Acting Chief). DeCrane declined Calvillo's request that DeCrane take a pay cut yet remain at headquarters.

297.    Chief Calvillo was either part of the effort to retaliate against DeCrane, or the understanding that DeCrane was *persona non grata* (based on Eckart's ongoing efforts to undermine and retaliate against DeCrane) had become so widespread that others knew they could gain points with Eckart by attacking DeCrane and did so with aplomb. The City has done nothing to remedy or prevent this custom, policy, and practice.

**DeCrane is appointed RNC Coordinator for the Division, but steps down after Eckart's ongoing refusal to work with DeCrane undermines DeCrane's ability to perform the duties of that important position effectively.**

298.    Before he left for Olmsted Falls, Chief Kelly appointed DeCrane to serve as he Republican National Convention Coordinator for the Division of Fire.

299.    DeCrane continued in this position under Chief Calvillo.

300.    During the fall and winter of 2015 and into 2016, DeCrane repeatedly requested a meeting with Eckart to discuss Public Safety preparations for the RNC including specific expectations for the Division of Fire, whose effort DeCrane was responsible for coordinating.

301.    Eckart did not reply to DeCrane's requests to meet to discuss the RNC preparations.

302.    Defendant Eckart refused to work cooperatively with DeCrane toward the goal of a safe and successful convention.

303.    As part of his duties as the RNC Coordinator, DeCrane requested of Chief Calvillo and Eckart that certain members be assigned to various sub-committees. DeCrane received no response and eventually had to go directly to the Secret Service committee chairs to address these issues.

304.     The Chief wanted DeCrane to attend the meetings of training for the RNC that Eckart was hosting. The Division had been sending Lt. Robert Kollar. Eckart continued to exclude DeCrane from communications about discussions and plans for training. When former-Chief Kelly directly informed Eckart that DeCrane would be attending, Eckart cancelled all subsequent meetings.

305.     In February 2016, DeCrane, in his capacity as RNC Coordinator for the Division, spoke with Cleveland Division of Police Deputy Chief Ed Tomba regarding Hard Zone vehicle placements for the RNC. Tomba recommended that DeCrane contact Special Agent Rob Rowe with United States Secret Service. When DeCrane followed Tomba's recommendation, Acting Assistant Chief Wayne Naida delivered a message from Calvillo that if DeCrane spoke "out of line" again he would be subjected to formal discipline.

306.     Eckart's refusal to work with DeCrane and the ramifications of the City's custom, policy, and practice of accepting that retaliation hampered DeCrane's ability to perform this important role in a way that would reflect well on the City and the Division as Cleveland took the national spotlight.

307.     Unable to effectively perform the duties of RNC Coordinator given the retaliation he faced, and concerned about how the petty grievances of those in power might impact the safety of this important event in Cleveland if he continued to receive no cooperation within the Division or Public Safety, on February 29, 2016, DeCrane resigned as the RNC Coordinator for the Division of Fire.

### Eckart personally handles DeCrane's latest *Garrity* hearing

308.     On November 23, 2015, DeCrane was required to attend a *Garrity* hearing.

309.     Before the *Garrity* hearing, the union president told DeCrane that Eckart would personally handle this hearing, which Eckart does not typically do.

310. During the hearing, Eckart asked DeCrane general questions about the Academy's record keeping.

311. Also during the *Garrity* hearing, Eckart specifically asked DeCrane a series of pointed questions about Daryl McGinnis's training hours, even though the former chief's hours were not the subject matter of the hearing.

312. McGinnis was the only specific fire fighter about whom Eckart asked DeCrane questions during the *Garrity* hearing on November 23, 2015.

313. Over two years after McGinnis stepped down as fire chief, Eckart remained preoccupied with what DeCrane knew about McGinnis's training and certification deficiencies.

**The state auditors conduct their review of Academy records—finding "excellence" and calling the Academy a "role model"—but the City fails to resolve the outstanding administrative charges against DeCrane.**

314. The audit by the Ohio Department of Public Safety—Division of EMS had to be scheduled by the end of the year to maintain certification (such reviews take place every three years and are required for the Academy to maintain its certification to provide continuing education to its personnel). It was rescheduled for December 11, 2015.

315. The state auditors did a thorough review of all records and training materials at the Academy.

316. During a meeting with the auditors following the review, the auditors indicated that they had received numerous complaints, which, on information and belief, came from Eckart, Votypka, and/or Chumita or others acting at their direction.

317. According to the lead state investigator who audited the Academy's records, DeCrane's tireless work to improve Academy record-keeping practices had been successful. The auditors indicated that they expected to find numerous issues given the

number of complaints they had received. But the auditors said they found only excellence and that the Academy was a role model for others to follow. The auditors strongly recommended the Division submit for accreditation.

318.    Votypka was also present for this meeting with the auditors. He let slip that he was very familiar with the state office and spoke to them often.

319.    The state auditors' issued their official report on December 17, 2015.

320.    In the official report, the Division of EMS determined that the Academy properly maintains records under Ohio Administrative Code 4765-7-09(D).

321.    In the official report, the Division of EMS determined that the Academy met each of the state requirements for documenting courses.

322.    In the official report, the Division of EMS determined that the Academy had not furnished any false, misleading, or incomplete information.

323.    In the official report, the Division of EMS stated that the Academy's "[r]ecords are exceptionally well kept and complete."

324.    This glowing review of the Academy's record-keeping methods by neutral observers familiar with how these types of files should be maintained was an unequivocal endorsement of DeCrane's progress in solving the Academy's record-keeping issues from the McGinnis era.

325.    This official report should have put to rest permanently any question about whether DeCrane had competently performed his duties as head of the Academy in terms of record keeping.

326.    This official report should have led to DeCrane being exonerated of the bogus administrative charges Eckart, Votypka, and Chumita had concocted against DeCrane

based on Moore's false report and problems with record keeping that existed in past Academy administrations.

327.    Despite the state audit report lauding the Academy's record keeping under DeCrane, the charges against him have remained unaddressed and unresolved months after the report's release.

328.    The outstanding charges and negative publicity have continued to be a source of embarrassment for DeCrane as he travels nationally and internationally to present fire-training courses and at various industry conferences and events.

329.    Because the administrative charges remain unresolved, DeCrane is not eligible for rehire within the Division.

**The City again fails to promote DeCrane to Chief of Division.**

330.    In March 2016, DeCrane again interviewed for the chief position. Again, Eckart was in charge of the process and led the interviews.

331.    After a short interview, Eckart placed DeCrane third out of three.

332.    Unlike the other two candidates, DeCrane was not given the opportunity to meet with Mayor Jackson as part of the promotion process.

333.    As had been the case in the previous rounds of promotional interviews, Eckart predetermined DeCrane's failure.

334.    On April 6, 2016, Acting Chief Calvillo was appointed Chief of Division.

**DeCrane reached his limit and retired.**

335.    Unable to bear the retaliation any longer, DeCrane was left with no choice but to leave his employment.

336.    No one could endure the widespread and systemic retaliation that DeCrane endured without sustaining significant emotional turmoil.

337.    DeCrane experienced serious physical and mental distress as a result of the retaliation Eckart engaged in and prompted and encouraged in others as well as the City's failure to correct or remedy the retaliation despite DeCrane's repeated complaints about Eckart's vendetta.

338.    No one could be expected to endure the treatment that DeCrane endured and continue in his employment.

339.    DeCrane retired as of September 11, 2016.

340.    DeCrane had not planned to retire from his employment for many years and had hoped and expected to become Chief of Division.

341.    Because of the early retirement into which DeCrane was pressured by the retaliation, he will not receive the fixed-annuity benefit (known colloquially as the "drop") available for Division of Fire employees who work past their earliest retirement eligibility, which DeCrane had every intention of doing.

### Even DeCrane's retirement did not stop the retaliation: as a parting shot, Chief Calvillo shuts down DeCrane's "last-day" party.

342.    Traditionally, when members retire the Division, their station hosts an informal get-together where members and their families can come say goodbye and pay their respects to their departing colleagues. These events typically involve food and non-alcoholic refreshments and are referred to as a "last day."

343.    In honor of DeCrane's retirement on Sunday, September 11, 2016, his staff at the fire station sent an email and a message over the Vocal Alarm that they would be gathering for his last day from 1:00–5:00 p.m. Some members bought food, set up tables and chairs, and some families came in to honor DeCrane's service.

344.   At about 1:10, Chief Calvillo came to the station and demanded to know who approved the gathering, who organized it, who ordered the food, etc.

345.   Calvillo made no effort to socialize with any of the assembled members or their families.

346.   Calvillo had no words of congratulations or farewell for DeCrane on his retirement.

347.   After his brief appearance at DeCrane's last day, Calvillo placed a phone call to the acting Assistant Chief on duty—Bob Smith—and ordered him to shut down DeCrane's last day event. Calvillo made two calls to Smith screaming at him to shut down DeCrane's last day.

348.   Smith followed Calvillo's order to shut down DeCrane's last day.

349.   Calvillo's actions were unprecedented and intended to retaliate against DeCrane.

350.   No Cleveland fire fighter has ever been denied a "last day."

351.   The previous day, Battalion Chief John McKenna had a last-day gathering that was not pre-approved by Calvillo and it took place without incident.

352.   But DeCrane's last day was abruptly curtailed as a final departing act of retaliation.

353.   Calvillo's actions were intended to humiliate and punish DeCrane on his way out the door and to send a message to all members of the Division.

### The City finally dismisses the bogus administrative charges after DeCrane files this federal lawsuit

354.   DeCrane filed this suit on October 31, 2016.

355.   In early December, DeCrane offered to volunteer to teach fire behavior, ventilation, and building construction for the incoming cadet class scheduled to begin at

the Fire Training Academy in January. DeCrane is a subject-matter expert on each of these topics.

356.    On December 7, 2016, the City dismissed the pending administrative charges from 2015 against DeCrane and Corrigan.

357.    The City did not bother to notify DeCrane personally that the administrative charges against him were dismissed. No one at the City communicated this dismissal to him.

358.    DeCrane learned that the administrative charges were finally dismissed after Eckart sent a letter to Local 93 President Tim Corcoran on December 7, 2016.

359.    In Eckart's letter to Corcoran on December 7, 2016, Eckart acknowledged that "the files and documents were well maintained" at the Fire Training Academy.

360.    With his letter to Corcoran on December 7, 2016, Eckart provided records that demonstrate that the OIC's investigation was completed *more than a year ago* with the recommendation that the Safety Director dispose of the charges.

361.    The City failed to dispose of the administrative charges against DeCrane until after DeCrane filed his federal lawsuit claiming the charges were baseless and retaliatory.

362.    The records Eckart provided with his letter to Corcoran on December 7, 2016 include a December 17, 2015 memorandum to Eckart from Votypka where Votypka acknowledged that "[t]he two specific complaints of wrongdoing involving intentional acts or omissions by BC DeCrane and Cpt. Corrigan could not be substantiated."

363.    The City dismissed the charges because it was unable to justify continuing to maintain them without a scintilla of evidence that DeCrane had engaged in any

wrongdoing, which Votypka had concluded nearly a year earlier in his December 17, 2015 memo to Eckart.

364.    The December 17, 2015 memorandum from Votypka to Eckart specifically reports that the EMS Board auditors stated the following regarding that Fire Training Academy: "the files and documents were very good, well maintained, and above and beyond what was expected" and "FTA would be an excellent site for a charter and accreditation."

365.    The December 17, 2015 memorandum from Votypka to Eckart indicates that "[a]ll the problems and deficiencies of the FTA seems to be corrected." Votypka recommended that "the charges be disposed of as the Safety Director determines."

366.    Despite Votypka's December 17, 2015 memo recommending that the pending administrative charges be disposed of, Eckart and the City failed to take steps to conclude the investigation or make a final disposition of those charges for nearly a year.

367.    The City had no valid reason to delay concluding the investigation or final disposition of the administrative charges against DeCrane or Corrigan from December 17, 2015 until December 7, 2016.

368.    In total, the now-dismissed administrative charges were pending against DeCrane from July 14, 2015 until December 7, 2016.

369.    The City did not make any effort to publicize the dismissal of the administrative charges against DeCrane described above.

370.    The delay in concluding the investigation and disposing of the administrative charges against DeCrane and Corrigan was retaliatory.

371.    Had DeCrane not filed this federal lawsuit, the false administrative charges would still be pending against him.

372.    In a certified letter dated December 13, 2016, Safety Director McGrath rejected DeCrane's offer to volunteer to teach fire behavior, ventilation, and building construction to the incoming cadet class.

### FIRST CLAIM
### FIRST AND FOURTEENTH AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS

373.    DeCrane incorporates all previous allegations.

374.    Eckart, Votypka, and Chumita and others acting on the City's behalf regarded DeCrane as having engaged in protected conduct as described above.

375.    Eckart, Votypka, and Chumita and others acting on the City's behalf took adverse actions against DeCrane that would deter a person of ordinary firmness from engaging in the protected conduct.

376.    The retaliation included, but is not limited to, the following acts:

a.    failing to promote DeCrane when he was the most-qualified candidate in various rounds of chief and assistant-chief interviews (both acting and permanent);

b.    trying to outsource the Academy's activities;

c.    failing to provide the necessary resources for DeCrane to efficiently solve the Academy's record-keeping issues from McGinnis's era;

d.    concocting false administrative charges against DeCrane about Academy record keeping;

e.    scheming to bring false criminal charges against him about Academy record keeping;

f.    delaying the state EMS board audit that would determine that the Academy's records were "exceptionally well kept and complete;"

g.    failing to formally clear DeCrane on the administrative charges once the state audit found the Academy's records in good order;

h.    failing to formally clear DeCrane on the administrative charges after the OIC's December 17, 2015 memo found that Moore's specific complaints of

intentional wrongdoing against DeCrane and Corrigan could not be substantiated;

i.    failing to formally clear DeCrane on the administrative charges until after he filed this federal lawsuit;

j.    releasing false information about him to the media purporting to find him guilty of the false charges;

k.    refusing to respond to DeCrane's emails or removing him from group emails regarding City business;

l.    refusing to meet with DeCrane about City business;

m.    seizing the Academy's training records;

n.    failing to fully or timely respond to a public-records request for records that tend to support DeCrane's assertions throughout this complaint;

o.    failing to preserve evidence that DeCrane could use to prove his claims; and

p.    otherwise trying to damage his reputation and career.

377.    These adverse actions were motivated by the belief that DeCrane engaged in protected conduct.

378.    As of at least 2012, it was clearly established that a public official violated an employee's constitutional right to free speech by retaliating against the employee for engaging in protected speech. Any reasonable public official would have known during the time of the events detailed in this complaint.

379.    Eckart is a sufficiently empowered City official that his acts constitute the customs, policies, and practices of the City.

380.    DeCrane complained about the retaliation to Eckart's supervisor, Safety Director McGrath, but he took no steps to end Eckart's vendetta or even investigate DeCrane's complaints. Neither did Chief Kelly when DeCrane complained to him. Assistant Director Hennessey likewise failed to intervene. As such, these City officials approved,

endorsed, and adopted the custom, policy, and practice of retaliating against DeCrane and Eckart's policy became the City's policy (both because Eckart implemented it and because no one took steps to change or remedy it once they were put on notice of Eckart's unconstitutional conduct).

381.    As a direct and proximate result of this unlawful campaign of retaliation that the City endorsed and adopted as its own unwritten municipal policy, DeCrane has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable including, but not limited to, pain and suffering, loss of salary, wages, and benefits, and other privileges and conditions of employment.

382.    The individual Defendants intentionally, maliciously, wantonly, recklessly, and maliciously violated the First and Fourteenth Amendments of the United States Constitution.

383.    Defendants are liable to DeCrane for economic and non-economic compensatory damages, back pay, front pay, fringe benefits, attorneys' fees and costs, witness fees, expert fees, and any additional legal or equitable relief that this Court deems appropriate.

384.    Defendants Eckart, Votypka, and Chumita are liable for punitive damages based on their intentional, wanton, or reckless behavior.

### SECOND CLAIM
### FALSE LIGHT INVASION OF PRIVACY AGAINST DEFENDANT ECKART

385.    DeCrane incorporates all previous allegations.

386.    As a result of Defendant Eckart's vendetta against DeCrane, which included bogus administrative charges that Eckart knew to be false (and that Eckart took steps to publicly circulate in the media) DeCrane was placed in a false light before the public.

387. As a result of Defendant Eckart's lollygagging about bringing the false charges to a prompt resolution, Defendant Eckart has forced DeCrane to remain in this false light for more than a year.

388. Being accused of criminal mishandling of one's work responsibilities or falsifying public records would be highly offensive to a reasonable person.

389. Defendant Eckart had knowledge of or acted with reckless disregard of the falsity of the charges against DeCrane and the false light in which public disclosure of those charges would place him.

390. As a direct and proximate result of Defendant Eckart's unlawful conduct, DeCrane has suffered and will continue to suffer economic and non-economic damages for which Defendant Eckart is liable including, but not limited to, pain and suffering, loss of salary, wages, and benefits, and other privileges and conditions of employment.

391. Defendant Eckart intentionally, maliciously, wantonly, recklessly, and maliciously invaded DeCrane's privacy by portraying him in a false light.

392. Defendant Eckart, in both his personal and official capacities, is liable to DeCrane for economic and non-economic compensatory damages, punitive damages, back pay, front pay, fringe benefits, attorneys' fees and costs, witness fees, expert fees, and any additional legal or equitable relief that this Court deems appropriate.

### THIRD CLAIM
### INTIMIDATION (USING MATERIALLY FALSE OR FRAUDULENT WRITINGS TO ATTEMPT TO HINDER PUBLIC SERVANTS) UNDER OHIO REV. CODE § 2921.03(A) AND (C) AGAINST DEFENDANTS ECKART, VOTYPKA, AND CHUMITA

393. DeCrane incorporates all previous allegations.

394. Defendants Eckart, Votypka, and Chumita created and/or used one or more materially false or fraudulent writings with malicious purpose in bad faith to attempt to hinder a public servant in the discharge of his duty.

395. The materially false or fraudulent writings that these defendants used include Larry Moore's Form-10s from January 12, 2015 asserting that DeCrane had asked Captain Corrigan to ask Moore to enter certain information in a database, the April 2015 memo from Votypka to Eckart recommending administrative charges, the administrative charges themselves, Votypka's report regarding the charges that Eckart released to the media on the day of DeCrane's interview for Temporary Chief, and the press release that accompanied it.

396. These records were intended to destroy DeCrane's career, prevent him from being promoted any further up the chain of command, and subject him to unwarranted discipline as a public employee.

397. Defendants Eckart, Votypka, and Chumita are liable to DeCrane for the injury and loss he suffered as a result of bad-faith use of materially false or fraudulent writings.

398. Defendants Eckart, Votypka, and Chumita intentionally, maliciously, wantonly, recklessly, and maliciously violated Ohio Rev. Code § 2921.03(A) and (C) and are accordingly liable to DeCrane for punitive damages.

399. Defendants Eckart, Votypka, and Chumita are also liable to DeCrane for reasonable attorneys' fees, court costs, and other expenses incurred as a result of prosecuting this civil action.

### FOURTH CLAIM
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO REV. CODE § 2307.60(A)(1) AGAINST DEFENDANTS ECKART, VOTYPKA, AND CHUMITA

400. DeCrane incorporates all previous allegations.

401. As described above, Defendants Eckart, Votypka, and Chumita committed criminal acts, including but not limited to intimidation in violation of Ohio Rev. Code § 2921.03(A), which constitutes a third-degree felony under Ohio Rev. Code § 2921.03(B).

402. As a result of Defendants' criminal acts, DeCrane suffered injuries and losses to his person and property.

403. Defendants Eckart, Votypka, and Chumita are liable to DeCrane for reasonable attorneys' fees, court costs, and other expenses incurred in maintaining this civil action.

404. Defendants Eckart, Votypka, and Chumita intentionally, maliciously, wantonly, recklessly, and maliciously engaged in criminal acts are accordingly liable for punitive damages.

### PRAYER FOR RELIEF

For the reasons stated above, DeCrane respectfully requests the following relief from the Court:

A. Declare that Defendants' acts and conduct constitute violations of the First and Fourteenth Amendments;

B. Declare that the City is vicariously liable for its employees' acts described above based on the City's custom, policy, and practice of retaliating, permitting retaliation, endorsing retaliation, and/or failing to remedy retaliation against DeCrane;

C. Enter judgment in DeCrane's favor on all claims for relief;

D. Enjoin Defendants from continuing to retaliate against DeCrane by failing to take steps to remedy the damage to DeCrane's reputation caused by broad distribution of the false allegations against him;

E. Award full compensatory economic and non-economic damages including, but not limited to, damages for pain and suffering, mental anguish, emotional distress, humiliation, and inconvenience that DeCrane has suffered and is reasonably certain to suffer in the future;

F. Award punitive and exemplary damages for the individual Defendants' egregious, willful, and malicious conduct;

G.   Award pre- and post-judgment interest at the highest lawful rate;

H.   Award DeCrane his reasonable attorneys' fees (including expert fees) and all other costs of suit;

I.   All other relief in law or equity, including injunctive relief, to which DeCrane is entitled and that the Court deems equitable, just, or proper.

## JURY DEMAND

DeCrane demands a trial by jury on all issues within this complaint.

Respectfully submitted,

THE CHANDRA LAW FIRM LLC

*/s/ Subodh Chandra*
Subodh Chandra (Ohio Bar No. 0069233)
Ashlie Case Sletvold (Ohio Bar No. 0079477)
Patrick Kabat (NY Bar No. 5280730)
Patrick Haney (Ohio Bar No. 0092333)
The Chandra Law Building
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Ashlie.Sletvold@ChandraLaw.com
Patrick.Kabat@ChandraLaw.com
Patrick.Haney@ChandraLaw.com

*Attorneys for Plaintiff Sean DeCrane*

**CERTIFICATE OF SERVICE**

I certify that the above document was filed on February 16, 2018 using the ECF system, which will send notification to all counsel of record.

_/s/ Patrick Kabat_
_One of the attorneys for Plaintiff Sean DeCrane_