**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **SEAN DECRANE,** | : | **Case No. 1:16-cv-02647-CAB** |
|  | : |  |
| **Plaintiff,** | : | **Judge Christopher A. Boyko** |
|  | : |  |
| **v.** | : | **Magistrate Judge** |
|  | : | **William H. Baughman, Jr.** |
| **EDWARD J. ECKART, et al.,** | : |  |
|  | : |  |
| **Defendants.** | : |  |
|  | : |  |

---

*Defendants' Memorandum of Law
in Support of their Motion for Summary Judgment*

---

**Zashin & Rich Co., L.P.A.**
**Jon M. Dileno (#0040836)**
 jmd@zrlaw.com
**David R. Vance (#0083842)**
 drv@zrlaw.com
950 Main Avenue, 4th Floor
Cleveland, OH  44113
T:  (216) 696-4441
F:  (216) 696-1618

**City of Cleveland Department of Law**
**Stacey M. Pellom (#0095292)**
 spellom2@city.cleveland.oh.us
601 Lakeside Avenue, Room 106
Cleveland, OH  44114
T:  (216) 664-2800
F:  (216) 664-2663

*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................ii

TABLE OF AUTHORITIES ............................................................................................iv

BRIEF STATEMENT OF THE ISSUES TO BE DECIDED.................................... vi

SUMMARY OF THE ARGUMENT ................................................................................ 1

RELEVANT FACTS ......................................................................................................... 2

    I.       THE PARTIES.................................................................................................... 2

    II.      PLAINTIFF IS PASSED OVER FOR PROMOTIONS DATING BACK TO 2011 –BEFORE THE ALLEGED "TIP" TO THE MEDIA ....................................... 2

    III.    A MEDIA INQUIRY LEADS TO THE UNCOVERING OF THE CHIEF'S AND 45 OTHER FIREFIGHTERS' DEFICIENT TRAINING ................................. 3

    IV.    "URINE-GATE" – PLAINTIFF'S FTA STAFF COMMITS VILE ACTS................ 4

    V.     THE OIC CONDUCTS AN AUDIT OF THE FTA'S TRAINING............................. 5

    VI.    THE CITY PROMOTES ANGELO CALVILLO TO FIRE CHIEF ......................... 8

    VII.   PLAINTIFF ACCEPTS A SIX-FIGURE JOB AND RETIRES FROM THE CITY ..................................................................................................................... 9

STANDARD OF REVIEW ............................................................................................... 9

LAW AND ARGUMENT................................................................................................. 10

    I.       PLAINTIFF'S RETALIATION CLAIMS LACK MERIT ....................................... 11

        A. Plaintiff Did Not Engage in Protected Speech............................................. 11

        B. There was No Adverse Action that Would Deter Plaintiff from Engaging in Free Speech ........................................................................... 13

            1.   Some of Plaintiff's Claimed Adverse Actions are Time-Barred ........................ 13

            2.   Most of the City's Alleged Actions Do Not Constitute Adverse Actions ................................................................................................ 13

        C. If Any Adverse Actions Occurred, There is No Causal Connection between Plaintiff's "Speech" and the Claimed Adverse Actions ............................... 15

1.   Defendants Did Not Know Who the Tipster Was ................................................... 15

2.   Plaintiff Cannot Establish that the Alleged Mistaken Belief Was a Motivating Factor for an Adverse Employment Action. ...................................... 16

3.   Temporal Remoteness Between the Tip in mid-2013 and the Claimed Adverse Actions Undermines the Connection ...................................... 17

4.   The City Treated Others the Same as Plaintiff ..................................................... 18

D.   Even if Plaintiff Could Establish a *Prima Facie* Case of Retaliation, the City Would Have Taken the Same Action Absent the Protected Conduct .................................................................................................................... 19

II.   PLAINTIFF'S INVASION OF PRIVACY CLAIM IS BASELESS ......................... 22

III.   PLAINTIFF'S INTIMIDATION CLAIM AND CLAIM FOR CIVIL RECOVERY UNDER OHIO REV. CODE § 2307.60(A)(1) ARE BASELESS ............................................................................................................... 23

**CONCLUSION** ................................................................................................................. **25**

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1** ......................................... **27**

**CERTIFICATE OF SERVICE** ........................................................................................... **27**

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Pirozzoli*, No. 103632, 2016 Ohio App. LEXIS 1688, 2016-Ohio-2645 (8th Dist. April 21, 2016)............................................................................................................ 25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .............................................. 10

*Bailey v. Floyd Cty. Bd. of Educ.*, 106 F.3d 135 (6th Cir. 1997)............................ 17, 18

*Browning v. Pendleton*, 869 F.2d 989 (6th Cir. 1989).................................................. 13

*Carter v. City of Miami*, 870 F.2d 578 (11th Cir. 1989)............................................... 17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................... 9, 10

*Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159 (3rd Cir. 1993)............................... 14

*Connick v. Myers*, 461 U.S. 138 (1983)....................................................................... 11

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286 (6th Cir. 2012)................... 11, 17, 20

*Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202 (6th Cir. 2010) ......................... 11, 20

*Ehrlich v. Kovack*, No. 16-4751, 2017 U.S. App. LEXIS 17958 (6th Cir. Sept. 14, 2017) ........ 17

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ............................................................ 12, 13

*Gillis v. Miller*, 845 F.3d 677 (6th Cir. 2017).............................................................. 11

*Gutierrez v. Lynch*, 826 F.2d 1534 (6th Cir. 1987)....................................................... 19

*Hollowell v. Society Bank & Trust*, 78 Ohio App.3d 574, 605 N.E.2d 954 (6th Dist. 1992)....... 19

*Jane v. Patterson*, No. 1:16 CV 2195, 2017 U.S. Dist. LEXIS 55952 (N.D. Ohio Apr. 12, 2017) ....................................................................................................... 25

*Kuivila v. City of Newton Falls*, No. 4:14-cv-01593, 2016 U.S. Dist. LEXIS 17041 (N.D. Ohio Feb. 11, 2016) ................................................................................. 13, 17

*Magley v. Wright*, No. 5:98-CV-012, 2001 U.S. Dist. LEXIS 4612 (W.D. Mich. Mar. 30, 2001) ....................................................................................................... 13

*Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 664 N.E.2d 1272 (Ohio 1996).......................... 14

*Miller v. Davis*, 653 Fed. Appx. 448 (6th Cir. 2016).................................................... 24

*Moore v. Kuka Welding Sys.*, 171 F.3d 1073 (6th Cir. 1999)....................................... 14

*Neiman v. Reid*, No. 1:12-CV-1645, 2015 U.S. Dist. LEXIS 42725 (N.D. Ohio Mar. 31, 2015) ........................................................................................................ 12, 18

*Ortiz v. Kazimer*, No. 1:11 CV 01521, 2015 U.S. Dist. LEXIS 38496 (N.D. Ohio Mar. 26, 2015) ............................................................................................................ 25

*Peters v. Lincoln Elec. Co.*, 285 F.3d 456 (6th Cir. 2002) ........................................... 15

*Ratliff v. DeKalb Cty.*, 62 F.3d 338 (11th Cir. 1995)................................................... 11

*Replogle v. Montgomery County*, No. 3:09-cv-102, 2009 U.S. Dist. LEXIS 130719 (S.D. Ohio May 1, 2009)................................................................................................ 25

*Rodgers v. Banks*, 344 F.3d 587 (6th Cir. 2003)......................................................... 17

*Rowser v. Alliant Foodservice, Inc.*, 126 Fed. Appx. 310 (7th Cir. Mar. 8, 2005)...................... 14

*Savage v. Gee*, 665 F.3d 732 (6th Cir. 2012)............................................................... 15

*Slorp v. Lerner, Sampson & Rothfuss*, 587 Fed. Appx. 249 (6th Cir. 2014) .............................. 25

*Somogy v. Southeast Local Sch. Dist. Bd. of Educ.*, No. 5:06CV3047, 2007 U.S. Dist. LEXIS 64745 (N.D. Ohio Aug. 31, 2007) .......................................................... 17

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) .................................................. 15

*Weisbarth v. Geauga Park Dist.*, 499 F.3d 538 (6th Cir. 2007) .................................... 12

*Welling v. Weinfeld*, 113 Ohio St.3d 464, 866 N.E.2d 1051 (Ohio 2007).................................... 23

**Statutes**

42 U.S.C. § 1983 ........................................................................................................... 11

Ohio Rev. Code § 2307.60............................................................................................. 25

Ohio Rev. Code § 2921.03............................................................................................. 24

Ohio Rev. Code § 2921.13............................................................................................. 24

Ohio Rev. Code § 2921.52............................................................................................. 24

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................... 10

## <u>BRIEF STATEMENT OF THE ISSUES TO BE DECIDED</u>

I.      Did Defendants retaliate against Plaintiff based on a false belief that Plaintiff notified the media that the then current Chief of the City of Cleveland's Division of Fire lacked required training?

II.     Did Defendant Edward Eckart, Jr., who did not make false statements about Plaintiff and did not publish said allegedly false statements, invade Plaintiff's privacy by placing him in a false light?

III.    Absent a criminal conviction, can Plaintiff recover civilly against Defendants Edward Eckart, James Votypka, or Christopher Chumita under Ohio's criminal intimidation statute (Ohio Rev. Code § 2921.03) or under Ohio Rev. Code § 2307.60, which allows crime victims to recover damages for the criminal act?

## SUMMARY OF THE ARGUMENT

Plaintiff Sean DeCrane voluntarily retired from Defendant City of Cleveland ("City") on September 11, 2016 and filed the instant case shortly thereafter.  More than three years prior to his retirement, the City's Division of Fire Chief Daryl McGinnis abruptly retired after the media reported he lacked required training.  As the backbone of his case, Plaintiff alleges Defendant Edward Eckart, Jr. mistakenly thought Plaintiff tipped the media to Chief McGinnis' deficient training.  Plaintiff argues that virtually every workplace event that "negatively" impacted him, from that point forward, was due to Eckart's false belief Plaintiff was the tipster.

The uncontroverted facts demonstrate that the City denied Plaintiff promotions to Chief and Assistant Chief before and after the tip and that the City scrutinized and audited the Fire Training Academy ("FTA"), which Plaintiff led, before and after the tip.  Indeed, it was Plaintiff's uncontroverted actions in actively trying to subvert the City Administration in its policy decisions as well as his poor supervision of the Fire Training Academy – rocked by scandal under his leadership – which contributed to the City's decisions not to promote him. Moreover, although Plaintiff was neither disciplined or demoted, nor had any of his salary or benefits reduced, he alleges a panoply of sensational "adverse" employment actions ranging from justified investigations and audits into abhorrent behavior and negligent job performance to decisions rendered by the Mayor of Cleveland to outsource training and to place a charter amendment on the ballot.  There simply is no evidence to support his outlandish allegations.

Likewise, Plaintiff cannot satisfy the elements necessary to sustain his claim of invasion of privacy, and Plaintiff's intimidation claim and related claim seeking civil recovery under Ohio Rev. Code § 2307.60 is not actionable, as it requires a criminal conviction.

## RELEVANT FACTS

### I.     THE PARTIES

Plaintiff is a retired City Division of Fire Battalion Chief.  ECF #46 at ¶ 1.  Defendant Eckart is an Assistant Director in the City's Department of Public Safety.  Eckart Dep. 5:17-23, Nov. 21, 2017.[1]  Eckart reports to the City's Director of Public Safety.  Eckart I 31:24-25.

The Office of Integrity Control, Compliance, and Employee Accountability ("OIC") investigates internal and external complaints about the Division of Fire.  Eckart I 68:7-25. Defendant James Votypka, a former Cleveland police officer, was the Manager of the OIC from 2013 until he retired in January 2017.  Ex. 2 (Declaration of J. Votypka) at ¶ 2; Votypka Dep. 16:13-21, 33:19-21, Nov. 27, 2017.[2]  Defendant Christopher Chumita is a former paramedic who works as an investigator in the OIC.  Chumita Dep. 13:23-14:2, 17:24-18:13, Nov. 20, 2017.[3]

### II.    PLAINTIFF IS PASSED OVER FOR PROMOTIONS DATING BACK TO 2011 – BEFORE THE ALLEGED "TIP" TO THE MEDIA

In approximately 2011, Plaintiff was denied a promotion to Assistant Chief.  Plaintiff Dep. 44:21-46:24, Nov. 17, 2017.[4]  In 2012, Plaintiff sought a promotion to Chief.  Plaintiff 48:23-49:3.  After interviewing Plaintiff and two other candidates, Mayor Jackson concluded that Daryl McGinnis was the candidate most willing and able to make the significant changes the Mayor wanted within the Division, and the City promoted McGinnis to Chief.  Jackson Dep. 29:10-32:25, Dec. 5, 2017.[5]  Mayor Jackson considered Patrick Kelly the next most capable candidate to make the changes he envisioned.  Jackson 42:1-44:13.  Mayor Jackson felt Plaintiff was the most rigid, and the least likely to break from the Division's old way of doing things,

---

[1] Excerpts from day one of Eckart's deposition transcript are attached as Exhibit 1 and cited as "Eckart I _:_."
[2] Excerpts from Votypka's deposition transcript are attached as Exhibit 3 and cited as "Votypka _:_."
[3] Excerpts from Chumita's deposition transcript are attached as Exhibit 4 and cited as "Chumita _:_."
[4] Excerpts from both day one and two of Plaintiff's deposition transcript are attached as Exhibit 5 and cited as "Plaintiff _:_."  The transcript page numbering for day two of the deposition begins where day one ended.
[5] Excerpts from Mayor Jackson's deposition transcript are attached as Exhibit 6 and cited as "Jackson _:_."

which were largely perpetuated by Firefighters Union Local 93.  Jackson 44:2-17, 94:5-25; Plaintiff 26:17-27:2.  Indeed, Plaintiff had been a longstanding member of Local 93's Executive Board, and held high level offices in the union for a number of years.  Plaintiff 25:10-26:16.

As a courtesy, following the Mayor's decision to promote McGinnis, Eckart called and notified Plaintiff of the decision on or about January 11, 2013.  ECF #46 at ¶ 53.  In response, Plaintiff, who was the then head of the FTA, told Eckart that McGinnis' state-mandated recertification hours were deficient.  ECF #46 at ¶ 56; Plaintiff 205:3-206:10.[6]  Eckart contacted McGinnis who assured Eckart he had the required training.  Eckart I at 135:7-24.  McGinnis gave the same assurance to Mayor Jackson.  Jackson 44:18-45:25.  Satisfied McGinnis was telling the truth, the City swore McGinnis in as Chief in January 2013.  ECF #46 at ¶ 61.

## III.    A MEDIA INQUIRY LEADS TO THE UNCOVERING OF THE CHIEF'S AND 45 OTHER FIREFIGHTERS' DEFICIENT TRAINING

McGinnis served as the Chief of Fire for approximately six months, when, on July 16, 2013, a reporter for cleveland.com, made a public records request for "all of Fire Chief Daryl McGinnis' fire and EMT training records since 2000…"  *See* Ex. 7 (Declaration of E. Eckart) at ¶ 3.  Eckart received this public records request two-days later.  Ex. 7 at ¶ 3.  Assuming from the request that there was a problem with McGinnis' records, Eckart questioned McGinnis, who admitted to the deficiency. Eckart I 138:1-10.  The City then removed McGinnis as Chief and a day or two later McGinnis resigned.  Eckart I 152:13-153:17; Ex. 8 (8/1/13 press release).[7]

Upon learning of Chief McGinnis' training deficiency, Mayor Jackson ordered that the records at the FTA be confiscated and an audit be conducted of all firefighters' training records.  Jackson 76:20-77:6; Eckart I 201:14-18; Ex. 8.  The OIC conducted the audit and found that

---

[6] Plaintiff would later admit that at the time he told Eckart that McGinnis' training was deficient he was unsure whether his statement to Eckart was accurate.  Plaintiff 227:16-228:16.
[7] Authenticated at Eckart 160:11-22.

approximately 45 firefighters failed to meet State-mandated training or records requirements. Ex. 7 at ¶ 4.  The City reported these individuals to the State of Ohio, and the State found many of these individuals' records indeed were deficient.  Ex. 7 at ¶ 4.  Ultimately, the City disciplined 18 members of the Division for their deficiencies.  Ex. 7 at ¶ 4.  Although Plaintiff was the head of the FTA, he was not disciplined or removed from his position.  Ex 7 at ¶ 4.

## IV.      "URINE-GATE" – PLAINTIFF'S FTA STAFF COMMITS VILE ACTS

On the day Chief McGinnis retired, the FTA graduated a class of cadets.  That night there was a graduation party for the cadets at a local bar, which many FTA supervisors attended, including Plaintiff.  Plaintiff 309:23-310:18.  Prior to the party, someone had confiscated the picture of Chief McGinnis from the FTA, brought it to the party, and placed it in a urinal.  Ex. 9 (Declaration of Patrick J. Kelly) at ¶ 7.  Members of the Division of Fire urinated on the picture throughout the evening.  Someone then took a photograph of Chief McGinnis' picture in the urinal, which "was distributed via text message to a number of individuals, including former Chief McGinnis."  Ex. 9 at ¶ 7.  In Chief Kelly's 30-plus year career, this event, which is commonly referred to as "Urine-gate," "was one of the most heinous, if not the most heinous, events" that had ever occurred in the Division.  Ex. 9 at ¶ 7.

The City disciplined multiple employees for their misconduct related to Urine-gate.  Ex. 9 at ¶ 7.  In fact, the City administered a double-demotion to the second-in-command at the FTA – the person immediately below Plaintiff.  Eckart I 182:4-14.  While Plaintiff offered to take "responsibility for the actions of members under [his] command on that day", the City did not formally discipline him for Urine-gate.  Plaintiff 335:11-336:9; Eckart I 182:15-21.  Remarkably, Plaintiff considered the incident "juvenile" and thought the City overreacted with its investigation and the resulting discipline.  Plaintiff 312:4-313:4, 319:9-321:21.

-4-

In the aftermath of Urine-gate, effective February 24, 2014, Chief Kelly detailed Plaintiff out of the FTA for the next cadet training class.  Ex. 7 at ¶¶ 8-9.  Approximately four months later, after the cadet class graduated, Plaintiff returned as head of the FTA.  ECF #46 at ¶ 111.

## V.    THE OIC CONDUCTS AN AUDIT OF THE FTA'S TRAINING

In January 2015, the OIC received a complaint from firefighter Lawrence Moore, who was stationed at the FTA.  Moore raised various allegations of racial discrimination and also claimed that Plaintiff instructed Captain Patrick Corrigan ("Captain Corrigan"), who was in charge of EMS training at the FTA, to order Moore to record inaccurate training information into an FTA database.  Ex. 10 (Moore's complaint);[8] Plaintiff 417:2-6; Votypka 108:24-109:14.  Director McGrath, upon learning of the complaint from firefighter Moore, directed Eckart to have the OIC conduct an investigation.  McGrath Dep. 56:3-16, Dec. 5, 2017.[9]

In late February 2015, as the OIC investigation was underway, the City conducted interviews for Assistant Chief of Fire.  Ex. 7 at ¶ 5.  Plaintiff and the other candidates were interviewed by a panel of four individuals.  Ex. 7 at ¶ 5.  This panel graded Plaintiff last among the candidates, and he did not receive a promotion to Assistant Chief.  Ex. 7 at ¶ 5.

The OIC conducted a thorough investigation of Moore's complaint, including a review of the FTA's training records.  Ex. 12 (4/30/15 Memorandum).[10]  Although the City could not corroborate Moore's allegations of racial discrimination, during the investigation, the OIC uncovered numerous missing and incomplete training records.  Ex. 12.  This was the fourth audit of the FTA's training records since 2011, by both internal and external reviewers, with many of the same deficiencies appearing in each.  Ex. 12.  On April 30, 2015, the OIC recommended that

---

[8] Authenticated at Votypka 108:5-22
[9] Excerpts from Director McGrath's deposition transcript are attached as Exhibit 11 and cited as "McGrath _:_."
[10] Authenticated at Votypka 200:20-201:6.

the City bring administrative charges against Chief Kelly, Assistant Chief Frank Chontos, Plaintiff (then head of the FTA), Captain Corrigan, and Captain Charles Kelley.  Ex. 12.

Once Chief Kelly received the OIC's recommendation, he himself conducted "a thorough review" of the OIC's findings.  Ex. 9 at ¶ 19.  As part of Chief Kelly's review, he spoke with Plaintiff and Captain Corrigan.  Ex. 9 at ¶ 22; Plaintiff 427:12-15; Corrigan Dep. 185:2-4, Dec. 12, 2017.[11]  During Chief Kelly's review, Plaintiff "had every opportunity to tell [Chief Kelly] his version of what happened" and he sent Chief Kelly information and documents, including "numerous emails related to the investigation."  Ex. 9 at ¶ 22; *see also* Plaintiff 430:6-433:5.

Following Chief Kelly's interviews of Plaintiff and Captain Corrigan and his review of the materials submitted, on July 16, 2015, Chief Kelly issued administrative charges against Plaintiff and Corrigan and recommended administrative charges against himself.  Ex. 9 at ¶¶ 18, 22.[12]  Around this time, Chief Kelly announced his retirement and that he would be the next Fire Chief of Olmsted Township.  Shortly thereafter, the media began requesting information about the audit and Kelly's departure.  Eckart Dep. 59:9-60:1, Dec. 4, 2017.[13]

To end the media's inquiries and speculation, the City's Director of Media Relations issued a press release.  Eckart II 59:13-60:18, 78:17-19.  The press release stated, in part, that the OIC "received a complaint from a firefighter assigned to the Fire Training Academy alleging possible falsification of official records" and that "Chief Patrick Kelly recommended administrative charges for Battalion Chief Sean DeCrane, Captain Patrick Corrigan and himself." Ex. 15 (9/15/15 press release);[14] Eckart II 60:22-25, 65:13-15.

---

[11] Excerpts from Patrick Corrigan's deposition transcript are attached as Exhibit 13 and cited as "Corrigan _:_."
[12] The charges for Plaintiff and Corrigan are substantially similar and attached to Kelly's declaration.  Ex. 9 at ¶ 18.
[13] Excerpts from day two of Eckart's deposition transcript are attached as Exhibit 14 and cited as "Eckart II _:_."
[14] Authenticated at Eckart II 58:6-59:2.

The City issued Kelly a written reprimand regarding his oversight responsibilities of the FTA.  Ex 7 at ¶ 6.  As for Plaintiff and Captain Corrigan, given that their administrative charges were nearly identical, the City scheduled a joint pre-disciplinary hearing for them on September 23, 2015.  Ex. 7 at ¶ 8.[15]  When the parties met, the City, Plaintiff, Captain Corrigan and the Union agreed to postpone the hearing to allow additional time for the FTA records to be brought in compliance ahead of the State's upcoming audit.  Ex. 7 at ¶ 8.  The City also was acceding to the Union's request that Plaintiff and Captain Corrigan be interviewed by the OIC.  McGrath 85:3-9; Chumita 184:9-21, 199:2-200:7; Ex. 7 at ¶ 8.  Subsequently, Votypka and Eckart interviewed Plaintiff and Corrigan.  Ex. 7 at ¶ 8.  During this period, Captain Corrigan also provided previously-unproduced records to the OIC.  Ex. 16 (10/12/15 Memorandum).[16]

Due to the efforts of the OIC, the FTA records were brought back into compliance, and new recordkeeping processes were instituted.  Plaintiff 427:16-430:1; Corrigan 187:19-188:22, 191:2-193:9; Chumita 205:14-22.  On December 11, 2015, the State of Ohio's auditors reviewed the FTA's records.  Ex. 17 (12/17/15 Memorandum).[17]  The auditors concluded that the FTA's paperwork was in good order and that "they were aware of the review and problems at the FTA and all the changes were made for the better…"  Ex. 17.  As such, Votypka concluded that "the problems and deficiencies at the FTA seem to be corrected."  Ex. 17.  Eckart then recommended to McGrath that the City dismiss the administrative charges and McGrath agreed.  McGrath 101:16-25, 110:4-9; Eckart II 104:20-105:24.  However, at this time, Eckart was a lead contact for the City with the U.S. Department of Justice as to safety and security preparations and planning for the Republican National Convention ("RNC").  Ex. 7 at ¶ 9.

---

[15] Administrative charges are not discipline; rather, they result in a pre-disciplinary hearing to determine whether discipline is warranted.  Ex. 7 at ¶ 7.
[16] Authenticated at Eckart II 134:21-135:8.
[17] Authenticated at Votypka 251:3-13.

As Eckart was immersed in the daunting responsibilities of preparing for the RNC in late July 2016, he overlooked the issuance of a letter formally dismissing the administrative charges against Plaintiff and Corrigan.  Ex. 7 at ¶ 9.  Following the filing of the instant lawsuit, Eckart realized that he had not issued such a letter.  Eckart II 103:13-24.  Eckart then issued the letter withdrawing the administrative charges.  Eckart II 122:17-123:3.

## VI.    THE CITY PROMOTES ANGELO CALVILLO TO FIRE CHIEF

Following Kelly's retirement, the City named a member of his Command Staff, Frank Chontos, Acting Chief.  McGrath 138:4-25.  The City then requested and accepted applications for the Interim Chief position.  A two-person panel comprised of Eckart and Ken Ledford, the Fire Chief for the City of Bedford, was responsible for interviewing the four candidates. McGrath 139:20-140:21.  The two top-scoring candidates, Calvillo and Naida, were referred to Mayor Jackson for interviews.  McGrath 145:6-8; Calvillo Dep. 100:16-25, Dec. 11, 2017.[18]

In his interview with Calvillo, the Mayor observed a candidate who was willing to initiate change within a Fire Division that had been plagued by various scandals.  Jackson 29:10-32:25. As a result, the City promoted Calvillo to Interim Chief in October 2015.  Calvillo 27:6-7.

On December 11, 2015, the City posted a Civil Service Announcement regarding the permanent Chief position.  Ex. 7 at ¶ 10.  Interim Chief Calvillo, Gregory Glauner, and Plaintiff applied for the position.  Ex. 7 at ¶ 10.  In March 2016, a five-person panel interviewed and scored the three candidates.  Calvillo 109:2-5.  The panel included Civil Service Commissioner Lu Ambrose, then Mayoral Executive Assistant and former Safety Director Marty Flask, Assistant Safety Director Tim Hennessey, Chief of Public Affairs Natoya Walker Minor, and Toledo Fire Chief Louis Santiago.  Plaintiff 453:18-454:13.

---

[18] Excerpts from Chief Calvillo's deposition transcript are attached as Exhibit 18 and cited as "Calvillo _:_."

As for Plaintiff's interview, he admittedly did not want to participate in the interview, but his attorneys told him he should.  Ex. 19 (Plaintiff's texts at 6:06 PM and 6:26 PM).  Then, at the interview, Plaintiff got into an argument with interview panel member Flask.  Plaintiff 443:16-444:10.  As a result, Plaintiff scored the lowest amongst the three candidates.  McGrath 164:16-165:16.  Mayor Jackson then interviewed the top two candidates, and, on April 6, 2016, the City promoted Calvillo to the permanent Chief position.  Calvillo 27:1-2; McGrath 164:16-165:16.

## VII.    PLAINTIFF ACCEPTS A SIX-FIGURE JOB AND RETIRES FROM THE CITY

Plaintiff accepted a position working for Underwriters Laboratories making $100,000/year.  Plaintiff 467:2-15.  After receiving and accepting this offer, Plaintiff decided to retire.  Plaintiff 467:16-468:8.  On August 26, 2016 (the day after Plaintiff accepted the offer from Underwriters Laboratories), Plaintiff notified the City that his last day on the job would be September 11, 2016.  Plaintiff 459:18-460:6.  According to Plaintiff, it was a "hard decision" and he had "second thoughts" about retiring up to the week of his retirement.  Plaintiff 466:10-20.

Less than three months after his retirement, Plaintiff offered his services to teach classes at the Fire Training Academy.  ECF #46 at ¶ 355.  The City declined his offer.  Ex. 7 at ¶ 11.

## STANDARD OF REVIEW

Summary judgment is not "a disfavored procedural shortcut."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Rather, summary judgment is "an integral part of the Federal Rules."  *Id.*  Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Once Defendants make this showing, Plaintiff cannot merely rest on his pleadings, but must instead "set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex*, 477 U.S. at 324.

## LAW AND ARGUMENT

Plaintiff's entire case rides on an assertion that the City believed that he, out of some 700 employees who had access to the information, was the person who told the media about the Fire Chief's deficient recertification records.  Plaintiff himself admits that he was not the tipster.  Yet, Plaintiff has concocted a supposed wild-eyed campaign of retaliation orchestrated by the City due to the City's alleged mistaken belief regarding something that did not happen.  His testimony confirms that he believes the City: initiated a proposed charter amendment and accompanying ballot initiative; the outsourcing of training; an investigation into Urine-gate; a review of the FTA training records; denied him promotions; and shut down his retirement party – all due to its mistaken belief that he was a tipster.

There is no evidence in support of these sensational claims.  First, Plaintiff cannot present evidence sufficient to establish that Defendants believed he was the tipster.  Extending the analysis, even if Defendants did believe Plaintiff to be the person who contacted the media, Plaintiff's case fails for a myriad of reasons.  As the head of the FTA, Plaintiff was the person primarily responsible for tracking the training of firefighters and notifying the City's Administration and third parties of deficiencies.  Therefore, even if he had notified the media of McGinnis' deficient records, such speech was not protected.

Moreover, the City's decisions to: present a change to its home-rule charter to a vote of the people (this is actually City Council's decision); investigate cadets' and FTA supervisors' deplorable actions associated with "Urine-gate"; look into allegations of race discrimination and records-tampering; and promote employees whose loyalties did not reside with Local 93 – were all legitimate business decisions regarding which no evidence of retaliation or intimidation exists.

-10-

## I.     PLAINTIFF'S RETALIATION CLAIMS LACK MERIT

Plaintiff styles his first claim as "First and Fourteenth Amendment Retaliation under 42 U.S.C. § 1983."  ECF #46 at 55.  Although Plaintiff does not detail or otherwise explain the nature of his retaliation claim under the Fourteenth Amendment, his claim is limited to his allegations under the First Amendment.  *See* ECF #46 at ¶¶ 373-384; *Ratliff v. DeKalb Cty.*, 62 F.3d 338, 341 (11th Cir. 1995) ("a constitutional claim for retaliation may be brought under 42 U.S.C. § 1983 pursuant to the first amendment, not the equal protection clause").

To prove a *prima facie* case of retaliation, Plaintiff must demonstrate:

(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017) (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)).  If Plaintiff can establish a *prima facie* case, the burden then shifts to the employer to demonstrate "by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct."  *Dye*, 702 F.3d at 295 (quoting *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010)).

### A.     Plaintiff Did Not Engage in Protected Speech

As a threshold matter, the Court must determine whether Plaintiff spoke as a citizen on a matter of public concern.  *Connick v. Myers*, 461 U.S. 138, 147 (1983).  Generally, the City allows its employees to speak on matters of public concern.  West Dep. 38:3-9, Dec. 4, 2017.[19] The City does not retaliate against employees that speak on matters of public concern.  West 73:24-74:12.

---

[19] Excerpts from Nycole West's deposition transcript are attached as Exhibit 20 and cited as "West _:_."

-11-

Here, it is undisputed that Plaintiff did not tip the media about McGinnis' lack of required training.  Plaintiff 239:18-23.  Even if he did, the speech would have been part of his duties and thus not protected.  *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes).  "In determining whether speech owes its existence to a public employee's professional responsibilities, the Sixth Circuit has identified a number of factors for courts to consider, including, the impetus for the speech, the setting of the speech, the speech's audience, and its general subject matter."  *Neiman v. Reid*, No. 1:12-CV-1645, 2015 U.S. Dist. LEXIS 42725, at *28 (N.D. Ohio Mar. 31, 2015) (*citing Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007)).  As the head of the FTA, Plaintiff, more than any other employee at the City, was responsible for tracking the Division's State-mandated recertification hours, noting deficiencies thereto, and notifying firefighters and the City's Administration of said deficiencies.  Plaintiff 217:13-19, 219:3-13, 233:15-235:15; Ex. 7 at ¶ 12.

Beginning in 2012, Plaintiff had permission to speak to the media about Division matters.  Plaintiff 140:11-142:15.  In fact, shortly before cleveland.com published the story about McGinnis, Plaintiff, "in his capacity as head of the Academy," spoke with a cleveland.com reporter about "McGinnis's training records."  ECF #46 at ¶ 62.  Plaintiff spoke freely with the media about a number of matters up until his retirement.  Plaintiff 317:1-13.

Given Plaintiff's duties as the head of the FTA and his authority to speak to the media on behalf of the Division, had he told the media about Chief McGinnis' training deficiencies, such speech would have been part of his duties and thus not protected.  *Garcetti*, 547 U.S. at 420-21, ("[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen").

-12-

**B.** **There was No Adverse Action that Would Deter Plaintiff from Engaging in Free Speech**

  *1.*   *Some of Plaintiff's Claimed Adverse Actions are Time-Barred*

Many of the retaliatory acts alleged by Plaintiff are barred by the two-year statute of limitations for § 1983 claims in Ohio. *Browning v. Pendleton*, 869 F.2d 989, 989 (6th Cir. 1989) (en banc). Plaintiff filed his Complaint on October 31, 2016. *See* ECF #1. The following events occurred prior to October 31, 2014 and are time-barred:

- Patrick Kelly's promotion to Interim Chief and subsequent promotion to permanent Chief on December 9, 2013 (ECF #46 at 95);

- The City's seizure of the FTA's records in August 2013 (Ex. 7 at ¶ 4); and

- The City's attempt to outsource the City's training, which discussions began in 2012-2013 before cleveland.com reported Chief McGinnis' training deficiencies. Plaintiff 374:3-380:7; Ex. 7 at ¶ 20.

  *2.*   *Most of the City's Alleged Actions Do Not Constitute Adverse Actions*

It cannot be stressed enough that <u>from the time the media story first broke regarding McGinnis' training records to the time of Plaintiff's retirement he was not disciplined and did not receive any type of reduction in rank, pay, or benefits</u>. Ex. 7 at ¶ 13. Moreover, increased scrutiny at work or "an employer's commencement of an investigation" are not adverse actions. *Kuivila v. City of Newton Falls*, No. 4:14-cv-01593, 2016 U.S. Dist. LEXIS 17041, at *60 (N.D. Ohio Feb. 11, 2016). Additionally, the administrative charges Plaintiff trumpets as an adverse action, were not adverse because no discipline flowed from those charges. *Magley v. Wright*, No. 5:98-CV-012, 2001 U.S. Dist. LEXIS 4612, *18-27 (W.D. Mich. Mar. 30, 2001) (no adverse action when written discipline never imposed); *see also Rowser v. Alliant*, 126 Fed. Appx. 310, 311 (7th Cir. Mar. 8, 2005) (holding that a rescinded suspension with no accompanying loss in pay, benefits, or other material harm not an adverse employment action under Title VII).

-13-

The only actions Plaintiff alleges that qualify as adverse are Plaintiff's claims of a failure-to-promote and constructive discharge.  As for the latter, Plaintiff cannot come close to establishing that he was constructively discharged.  To establish a constructive discharge, Plaintiff must prove the City's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign.  *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 664 N.E.2d 1272, syllabus at ¶ 4 (Ohio 1996).  Likewise:

> …the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit. To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined.

*Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

As noted, Plaintiff was not disciplined or demoted, nor did he suffer a reduction in pay.  Moreover, his only reassignment was from the FTA to the Chief's Command Staff at Fire Headquarters – wherein, after four months, he was assigned back to the FTA.  Plaintiff was eligible to retire in January 2016 but did not retire until nine months later and only after securing a job making substantially more money than he made working for the City.  Plaintiff 168:22-170:5; Plaintiff 459:18-460:6, 467:14-468:8; Ex. 7 at ¶ 16.

Retiring also was a "hard decision" that Plaintiff second-guessed up until the week of his retirement.  Plaintiff 466:10-20.  Then, less than three months after his retirement, Plaintiff volunteered to teach multiple classes at the FTA.  ECF #46 at ¶ 355.  If the working conditions at the City were truly intolerable, Plaintiff would have retired the moment he became eligible to do so, and he never would have volunteered to return and teach at the FTA.

Plaintiff's constructive discharge claim fails for the additional reason that Defendants did not act with the intention of forcing Plaintiff to quit, and there is no evidence suggesting

-14-

Defendants had such an intention.  Ex. 2 at ¶ 3; Ex. 7 at ¶ 14; Ex. 21 at ¶ 3 (Declaration of C. Chumita); *see Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012) (evidence employer intended to force employee to quit required to prove constructive discharge).  Plaintiff's "hurt feelings" or "suspicion and conjecture" regarding Defendants' intentions are insufficient to support a constructive discharge claim.  *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 479 (6th Cir. 2002).

### C.    If Any Adverse Actions Occurred, There is No Causal Connection between Plaintiff's "Speech" and the Claimed Adverse Actions

#### 1.    *Defendants Did Not Know Who the Tipster Was*

Incorporated into the causal connection prong of Plaintiff's *prima facie* case, is a requirement that "the defendant must have known about the protected activity in order for it to have motivated the adverse action."  *Thaddeus-X v. Blatter*, 175 F.3d 378, 387, n.3 (6th Cir. 1999).  Plaintiff claims the entirety of the alleged retaliation flowed from Eckart's incorrect belief that Plaintiff leaked former Chief McGinnis' lack of required certification to the media.  To that end, Plaintiff's only "evidence of such" is an alleged comment made by Eckart (which Eckart denies – Eckart I 192:3-13) in which he allegedly told Plaintiff that it was coincidental that Plaintiff told him of McGinnis' deficiencies in January and then the leak occurred some six months later.  Plaintiff 260:10-19.  However, this alleged comment does not establish that Eckart or anyone else mistakenly believed it was Plaintiff who leaked the story.

It is unrefuted – and Plaintiff himself admits – that every firefighter in the Division of Fire – some 700 firefighters and ranking officers – had access to the Division's training records, including the ability to review the recertification records of Chief McGinnis.  ECF #46 at ¶ 57. According to Plaintiff, many employees in the Division of Fire knew of McGinnis' deficient records.  Plaintiff 215:15-25.  Hence, the pool of possible tipsters was enormous.  While Eckart assumed someone from the Division tipped the media, he did not know who did so.  Eckart I

164:3-8.  In fact, the identity of the tipster did not matter to him, as leaks regularly occur in Public Safety.  Eckart I 154:24-155:21.

Not only did Eckart not know who tipped the media, neither did Votypka or Chumita. Votypka 28:18-24, 70:2-7; Chumita 62:11-63:10 (did not know and was not suspicious of anyone).  Mayor Jackson and Director McGrath also did not know and never talked about who may have tipped the media.  Jackson 80:24-81:15; McGrath 131:4-13.  Nor did Mayor Jackson care who leaked the story, as leaks occur all the time at City Hall.  Jackson 75:21-76:14.

Moreover, some six months had passed from the time Plaintiff had told Eckart of McGinnis' deficient records and the date the media contacted the City about it.  Therefore, the absence of temporal proximity between the two events strongly suggests that nobody could have reasonably assumed the tipster was Plaintiff, to the exclusion of dozens, if not hundreds, of other possible candidates.  It is impossible for Eckart, or anyone else to have retaliated against Plaintiff, when they did not know of the source of the leak.

### 2. Plaintiff Cannot Establish that the Alleged Mistaken Belief Was a Motivating Factor for an Adverse Employment Action.

Assuming Plaintiff can impart knowledge of the protected activity to Defendants, he still must prove that protected speech was a "'substantial or motivating factor' of the adverse action." *Ehrlich v. Kovack*, No. 16-4751, 2017 U.S. App. LEXIS 17958, *9-10 (6th Cir. Sept. 14, 2017) (quoting *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003)).  The inquiry is "essentially but-for cause." *Id*.  Plaintiff may establish causation with direct or circumstantial evidence. *Dye*, 702 F.3d at 305.

Direct evidence requires statements about the protected activity in conjunction with the alleged adverse action. *Somogy v. Southeast Local Sch. Dist.*, No. 5:06CV3047, 2007 U.S. Dist. LEXIS 64745, *14 (N.D. Ohio Aug. 31, 2007) (*citing Carter v. City of Miami*, 870 F.2d 578, 581

(11th Cir. 1989)) ("Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, […] constitute direct evidence of discrimination.").  Plaintiff can point to only the one aforementioned "coincidence" conversation between him and Eckart.

Even if Eckart "knew" the tipster was Plaintiff, there is not a scintilla of evidence that anything that happened to Plaintiff was motivated by Eckart's desire to retaliate against him.  Likewise, there is no evidence that anything Votypka or Chumita may have done to Plaintiff was motivated in the least by a belief he tipped the media.  Ex. 2 at ¶ 3; Ex. 7 at ¶ 14; Ex. 21 at ¶ 3.

Absent direct evidence of retaliation, Plaintiff must prove his retaliation claims with indirect evidence that causally links the media tip to the claimed adverse actions.  *Kuivila*, 2016 U.S. Dist. LEXIS 17041, at *59.  The employee must identify "specific, nonconclusory allegations reasonably linking" the employee's speech to the adverse action.  *Bailey v. Floyd Cty. Bd. of Educ.*, 106 F.3d 135, 144 (6th Cir. 1997).

### 3.   *Temporal Remoteness Between the Tip in mid-2013 and the Claimed Adverse Actions Undermines the Connection*

The mere fact that the alleged adverse actions occurred after the tip is not evidence of a causal connection.  Courts routinely reject such attempts to invoke the *post hoc ergo propter hoc* logical fallacy.  *Bailey*, 106 F.3d at 145.  Plaintiff's failed promotion to the Interim Chief position that Calvillo received in October 2015 (Calvillo 27:6-7) and Calvillo's promotion to the permanent Chief position in April 2016 (Calvillo 27:1-2) were both more than two years after the July 2013 tip.  That these events occurred so long after the protected activity undermines any argument that the tip influenced the promotion decisions.  *Neiman*, 2015 U.S. Dist. LEXIS 42725 at *32-33 (nine month gap between protected activity and the adverse employment action insufficient "to support an inference of wrongful retaliation").

### 4.     The City Treated Others the Same as Plaintiff

Plaintiff's testimony demonstrates that the City treated him the same as others.  Plaintiff claims that Eckart and former Safety Director Flask were attacking the entire Division of Fire. Plaintiff 323:18-324:15.  Per Plaintiff, Eckart was targeting not just him but the entire Division. Plaintiff 337:16-338:6.  Indeed, with regard to every employment-related action that Plaintiff asserts was retaliatory, he was either not impacted, or was one of many impacted:

- The City's "decision" to place a ballot initiative to a vote of the City's residents to allow the Mayor to appoint Assistant Fire Chiefs as he is currently permitted to appoint Deputy Chiefs in the Division of Police.[20] (This was a decision of City Council that impacts all potential promotional candidates to the position.)

- The City's audit of the FTA's re-certification records of firefighters (Impacts all firefighters with deficient re-certification records.  (The City ultimately disciplined 18 firefighters – not Plaintiff.)

- The City's audit of the FTA's training records. (Potentially impacting those responsible for their maintenance.  Charges were recommended against five employees, and three employees were charged, including Plaintiff.  Former Chief Kelly was disciplined. Plaintiff was not.)

- The City's two Chief's promotions and one Assistant Chief's promotion.  (For each of these three promotions, Plaintiff was one of many employees who were not promoted.)

- The City's investigation into "Urine-gate."[21]  (The City disciplined a number of employees, including Plaintiff's second-in-command, who received a double demotion, which a neutral arbitrator upheld. Ex. 7 at ¶ 15.  Plaintiff received no discipline although the vile events occurred on his watch.)

- The City's decision to explore the outsourcing of the FTA.  (Would have resulted in the reassignment of all employees assigned to the FTA with no accompanying adverse employment actions.)[22]

- The City's decision to cancel Plaintiff's s last-day event for failing to abide by Division of Fire policy.  (Chief Calvillo, who did not know or think Plaintiff was the tipster, cancels all such last-day events that are not in accordance with policy.)

---

[20] *See* Plaintiff 332:24-334:6 (Plaintiff alleges the City made this decision in retaliation against him).
[21] *See* Plaintiff 343:10-344:4 (Plaintiff alleges the Urine-gate investigation and discipline was retaliatory to him).
[22] *See* Plaintiff 178:18-180:13 (Plaintiff admits that even if the City outsourced the training he would not lose his job or rank).

As demonstrated, to subscribe to Plaintiff's strained and far-sweeping theory of retaliation, one would have to believe that the City made usual and customary management-type decisions that affected dozens, if not hundreds, of employees – all for the purpose of retaliating against him because he may have leaked a story to the media.  That leaks occur regularly at the City increases the implausibility of Plaintiff's theory.

Plaintiff cannot rely on his dubious subjective beliefs of retaliation.  *See Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987) ("vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983"); *see also Hollowell v. Society Bank & Trust*, 78 Ohio App.3d 574, 580-581, 605 N.E.2d 954 (6th Dist. 1992) ("self-serving statements by the charging party that he believes he was discriminated against … are not enough").  In sum, Plaintiff is unable to prove the media tip is causally connected to any adverse action.  Plaintiff's § 1983 claim fails for this additional reason.

### D.   Even if Plaintiff Could Establish a *Prima Facie* Case of Retaliation, the City Would Have Taken the Same Action Absent the Protected Conduct

Even if Plaintiff could establish a *prima facie* case of retaliation (he cannot), Defendants can "avoid liability" by "demonstrat[ing] 'by a preponderance of the evidence that the employment decision[s] would have been the same absent the protected conduct.'"  *Dye*, 702 F.3d at 294-95 (*quoting Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010)).

As for the decisions made by Mayor Jackson, Safety Director McGrath, former Chief Kelly, current Chief Calvillo, former OIC Manager Votypka, OIC Investigator Chumita, and Assistant Safety Director Eckart, the evidence irrefutably demonstrates that such would have been made absent any mistaken belief that Plaintiff was the tipster.  Although his testimony directs us there, Plaintiff cannot be arguing seriously that placing a charter amendment on the ballot was an act of retaliation against him, particularly when this is something that City Council

-19-

(not the City) did.  Likewise, the City's decision to explore the outsourcing of the FTA has no such sinister ties.  In fact, the confirmed evidence is that the City was exploring the outsourcing of the FTA months before the McGinnis information was ever leaked to the media.  Plaintiff 374:3-380:7.  Additionally, the City never outsourced the training.  Jackson 125:17-127:7.

Equally far-fetched is that the City's investigation into Urine-gate was unnecessary and merely done to get back at Plaintiff.  Is Plaintiff really suggesting that the theft of Chief McGinnis' picture, the defiling of his picture in a public urinal by employees and cadets, and the distribution of a photograph of the defiled picture to others and McGinnis himself was not worthy of a thorough investigation and discipline?  A neutral arbitrator determined otherwise – upholding the double-demotion of Plaintiff's right-hand man at the FTA.  Ex. 7 at ¶ 15.

As for the administrative charges brought against Plaintiff, as noted, he, of course, was not disciplined regarding the FTA's poor recordkeeping.  Moreover, Plaintiff, Captain Corrigan and even the State of Ohio, all acknowledge that the changes that were instituted following the OIC's investigation would have a positive impact on the FTA's future records maintenance.  Plaintiff 427:16-430:1; Corrigan 187:19-188:22, 191:2-193:9; Chumita 205:14-22; Ex. 17.

Furthermore, Plaintiff acknowledges that dating back to 2012 (before the McGinnis tip) the Safety Director's office, including Eckart, had the entire Division of Fire under the microscope and was scrutinizing it more heavily than other Divisions.  Plaintiff 161:4-18, 165:9-166:20.  Even after the tip, Plaintiff acknowledges Eckart was targeting the entire Division.  Plaintiff 337:16-338:6; *see also* Jackson 113:17-114:3 (there was friction between Eckart and the entire Division of Fire).

Finally, regarding Plaintiff's three unsuccessful bids for promotion, Plaintiff's:  history of loyalty to Local 93; his actions to subvert the policy decisions of the City's Administration; and,

the ongoing severe issues occurring at the FTA under Plaintiff's leadership – Urine-gate, dozens of firefighters with deficient training, and the deficiencies regarding the in-house training records – all led to Plaintiff not being selected for promotion.  As for the latter, the severe problems occurring at the FTA are thoroughly discussed above, and would factor into any decision-maker's evaluation of a candidate seeking the highest ranks within the Division of Fire.

Plaintiff, moreover, has had a long history of opposing the City's Administration as the Secretary of Local 93 from approximately 2000 to 2007 and from 2010 to 2011.  Plaintiff 25:10-26:16.  In more recent years, his opposition to the Administration's decisions manifested itself in downright subversive acts.  For instance, in 2014, when the City was reviewing the potential outsourcing of the FTA to Cuyahoga Community College ("Tri-C"), <u>Plaintiff, incredibly, contacted a captain in the Elyria Fire Department, who was an instructor at Tri-C's Fire Academy, for the purpose of convincing him not to teach Cleveland's cadets if the City outsourced the training there</u>.  Ex. 22 (email exchange).[23]  In turn, that fire captain notified Tri-C's manager of fire training, that he would not train the City's cadets.  Ex. 22.  Plaintiff also was actively assisting Local 93 with its grievance challenging the City's decision – even preparing to testify against the Administration in that proceeding.  Plaintiff 397:18-398:1.

Plaintiff's actions were known to the City's Administration (Ex. 7 at ¶ 17), and while such were not unlawful or precluded Plaintiff from applying for the position of Chief of Fire, they would reasonably raise the concern of a conflict of interest for someone who wishes to occupy the highest position in the Division.

Plaintiff's subversive acts went even further.  Plaintiff was actively working with members of City Council to undermine the City's efforts to outsource training.  The following

---

[23] Authenticated at Plaintiff 386:10-387:7 and Ex. 7 at ¶ 17.

texts between Plaintiff and City Councilperson Martin Keane, in discussing Eckart and the FTA-outsourcing plan, establish Plaintiff's covert acts to impede the Administration's efforts:

> [Plaintiff]:    [Eckart] is a lying cheating bastard.  I have to go in front of him for a promotional hearing next week.  Not a prayer
>
> [Keane]:    He's Stupid though.  There has to be a way to shine a light on it.
>
> [Plaintiff]:    I have to testify in an arbitration on Monday about the FTA and his outsource plan.  Can someone get his emails and phone records

Ex. 23 (Plaintiff's texts at 2:56 PM and 3:37 PM).[24]

Plaintiff's subversive acts did not end there.  In his ongoing efforts to block the City's outsourcing decision, he wrote the following to the Fire Chief of the City of Minneapolis:

> My name is Sean DeCrane and I am the Director of Training for the City of Cleveland.  I have learned our city is considering outsourcing the training at our academy to a local Community College.  *I would like to collect some information to block this attempt* and was hoping you might be able to assist.

Ex. 24 (email exchange) (emphasis added).[25]

Hence, it is with this history of a dysfunctional FTA under his stewardship, and a myriad of actions designed to undermine the decisions of Mayor Jackson and his Administration that Plaintiff was, unsurprisingly, not promoted to Assistant Chief or Chief.

## II.    PLAINTIFF'S INVASION OF PRIVACY CLAIM IS BASELESS

A false light invasion of privacy claim is difficult to prove.  *Welling v. Weinfeld*, 113 Ohio St.3d 464, 866 N.E.2d 1051, ¶ 51 (Ohio 2007).  For Plaintiff, it is impossible, as Eckart has not made or published misrepresentations about Plaintiff.

---

[24] Authenticated at Plaintiff 411:6-412:20.  This represents just a small sampling of Plaintiff's communications with these parties in his ongoing effort to obstruct City Administration.  Although some of these communications were not known by Mayor Jackson, Director McGrath, or Eckart at the time, as discussed above, what was known and understood was that Plaintiff was actively trying to impede the City's implementation of its decision and these communications represented more of the same.
[25] Authenticated at Plaintiff 384:13-385:21.

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Id.* at syllabus. Plaintiff refers to his administrative charges as the source of his invasion of privacy claim. ECF #46 at ¶¶ 385-392. However, former Chief Kelly – not Eckart – decided to issue Plaintiff administrative charges. Ex. 9 at ¶ 18. Additionally, Eckart did not draft the administrative charges, nor publish them. Ex. 7 at ¶ 18; Eckart I 93:25-94:3.

The only City document referencing the administrative charges that possibly could meet the "publicity" requirement of a false light claim is the City's September 15, 2015 press release. Ex. 15. The Mayor's Director of Media Relations – not Eckart – made the decision to issue this press release. Eckart II 60:22-61:4, 65:13-15. Additionally, the press release is accurate in that it references that administrative charges were brought against Kelly, Plaintiff and Corrigan – a true statement. *See* Ex. 15; Eckart II 79:20-22; *Miller v. Davis*, 653 Fed. Appx. 448, 461 (6th Cir. 2016) ("truth is a defense to an action for false-light invasion of privacy").

Eckart did not place Plaintiff on administrative charges. Nor did Eckart decide to issue the press release about the administrative charges, which, by the way, was accurate. As a matter of law, Plaintiff's false light invasion of privacy claim against Eckart fails.

## III. PLAINTIFF'S INTIMIDATION CLAIM AND CLAIM FOR CIVIL RECOVERY UNDER OHIO REV. CODE § 2307.60(A)(1) ARE BASELESS

Plaintiff's third and fourth claims against Eckart, Votypka, and Chumita also fail as a matter of law, as both claims require criminal convictions, but none of the three individual Defendants has been convicted of a crime related to this matter. Ex. 2 at ¶ 4; Ex. 7 at ¶ 19; Ex. 21 at ¶ 4. Specifically, Plaintiff's third claim is for intimidation based on criminal statute Ohio

Rev. Code § 2921.03(A) and (C). ECF #46 at ¶¶ 393-399. Plaintiff's fourth claim seeks civil recovery under Ohio Rev. Code ¶ 2307.60 based on Eckart, Votypka, and Chumita allegedly committing the crime of intimidation. ECF #46 at ¶¶ 400-404.

Ohio Rev. Code § 2921.03(C) provides a civil remedy for damages resulting from the commission of the offense of intimidation. This civil remedy provision is not unique to Ohio's intimidation statute. Rather, the same provision appears in Ohio's criminal falsification statute and Ohio's sham legal process statute with all three statutes identically stating:

> A person who **violates this section** is liable in a civil action to any person harmed by the violation for injury, death, or loss to person or property incurred as a result of the **commission of the offense**…

Ohio Rev. Code §§ 2921.03(C), 2921.13(G), 2921.52(E) (emphasis added).

Addressing this language, in the context of the criminal falsification statute, the Sixth Circuit Court of Appeals held that <u>a criminal conviction was a condition precedent to bringing a civil cause of action</u>. *Slorp v. Lerner, Sampson & Rothfuss*, 587 Fed. Appx. 249, 261 (6th Cir. 2014). As explained by the Sixth Circuit, the "[u]se of the word 'offense' makes clear that civil liability is predicated on criminal guilt…it does not create civil liability absent criminal conviction." *Slorp*, 587 Fed. Appx. at 26; *see also Replogle v. Montgomery County*, No. 3:09-cv-102, 2009 U.S. Dist. LEXIS 130719, *13-14 (S.D. Ohio May 1, 2009); *Allen v. Pirozzoli*, No. 103632, 2016 Ohio App. LEXIS 1688, 2016-Ohio-2645, ¶ 18 (8th Dist. April 21, 2016).

The language the Sixth Circuit analyzed in *Slorp* (Ohio Rev. Code § 2921.13(G)) is identical to the language before this Court (Ohio Rev. Code § 2921.03(C)), and this Court should reach the same conclusion. Since Eckart, Votypka, and Chumita have not been convicted of intimidation (*see* Ex. 2 at ¶ 4; Ex. 7 at ¶ 19; Ex. 21 at ¶ 4), Plaintiff's third claim for intimidation against Eckart, Votypka, and Chumita fails as a matter of law.

-24-

Ohio's general statute allowing for civil recovery for criminal acts – Ohio Rev. Code § 2307.60 – likewise requires a predicate conviction.  Ohio Rev. Code § 2307.60, provides "[a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law . . . ."  Ohio Rev. Code § 2307.60(A)(1).  The U.S. District Court for the Northern District of Ohio has repeatedly held recovery under this statute "depends on the existence of a criminal conviction."  *Ortiz v. Kazimer*, No. 1:11 CV 01521, 2015 U.S. Dist. LEXIS 38496, *34-35 (N.D. Ohio Mar. 26, 2015); *Jane v. Patterson*, No. 1:16 CV 2195, 2017 U.S. Dist. LEXIS 55952, *10 (N.D. Ohio Apr. 12, 2017).

As Eckart, Votypka, and Chumita have not been convicted of a crime, Plaintiff's fourth claim under Ohio Rev. Code § 2307.60 fails as a matter of law.[26]

## CONCLUSION

For the above reasons, Plaintiff's claims have no merit, and the Court should grant Defendants' Motion for Summary Judgment in its entirety.

Respectfully submitted,

*s/ David R. Vance*
**Jon M. Dileno (#0040836)**
 jmd@zrlaw.com
**David R. Vance (#0083842)**
 drv@zrlaw.com
**Zashin & Rich Co., L.P.A.**
950 Main Avenue, 4th Floor
Cleveland, OH  44113
T:  (216) 696-4441
F:  (216) 696-1618

---

[26] For further argument regarding the failings of Plaintiff's third and fourth claims, please see: Defendants' Motion for Partial Judgment on the Pleadings (ECF #13), including Defendant's Reply Memorandum in Support of their Motion (ECF #18); Defendants' Opposition to Plaintiff's Motion for Leave to File Second Amended Complaint (ECF #17); and Defendants' Opposition to Plaintiff's Motion to Certify a Question of Ohio Law to the Ohio Supreme Court (ECF #22).

**Stacey M. Pellom (#0095292)**
 spellom2@city.cleveland.oh.us
**City of Cleveland Department of Law**
601 Lakeside Avenue, Room 106
Cleveland, OH  44114
T:  (216) 664-2800
F:  (216) 664-2663

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

The undersigned certifies that the Court assigned this case to the standard track, but, at Defendants' request (ECF #47), the Court increased the page limitation for dispositive motions to 25 pages.  This filing adheres to the 25-page limitation.

*s/ David R. Vance*

**Jon M. Dileno (#0040836)**
 jmd@zrlaw.com
**David R. Vance (#0083842)**
 drv@zrlaw.com
**Zashin & Rich Co., L.P.A.**

**Stacey M. Pellom (#0095292)**
 spellom2@city.cleveland.oh.us
**City of Cleveland Department of Law**

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2018 the foregoing document was filed via the Court's electronic filing system and will be served on all parties via that system.

*s/ David R. Vance*

**Jon M. Dileno (#0040836)**
 jmd@zrlaw.com
**David R. Vance (#0083842)**
 drv@zrlaw.com
**Zashin & Rich Co., L.P.A.**
950 Main Avenue, 4th Floor
Cleveland, OH  44113
T:  (216) 696-4441
F:  (216) 696-1618

**Stacey M. Pellom (#0095292)**
 spellom2@city.cleveland.oh.us
**City of Cleveland Department of Law**
601 Lakeside Avenue, Room 106
Cleveland, OH  44114
T:  (216) 664-2800
F:  (216) 664-2663

*Attorneys for Defendants*
