1          IN THE DISTRICT COURT OF THE UNITED STATES
              FOR THE NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION

3

   SEAN DeCRANE
4
                              Case No. 1:16CV2647
5          Plaintiff,

6      vs.                    Monday, April 8, 2019
                              2:32 p.m.
7
   EDWARD ECKART,            Volume 2
8  JAMES VOTYPKA,
   CHRISTOPHER R. CHUMITA,
9  THE CITY OF CLEVELAND,

10         Defendants.

11

12    TRANSCRIPT OF CONTINUED EVIDENTIARY HEARING PROCEEDINGS
        BEFORE THE HONORABLE CHRISTOPHER A. BOYKO
13              UNITED STATES DISTRICT JUDGE

14

15

16

17

18  Official Court Reporter:  Susan Trischan,RMR,CRR,FCRR,CRC
                              7-189 U.S. Court House
19                            801 West Superior Avenue
                              Cleveland, Ohio  44113
20                            216/357-7087

21  Proceedings recorded by mechanical stenography;
    transcript produced by computer-aided transcription.
22

23

24

25

1    APPEARANCES:

2

     For the Plaintiff:        Subodh Chandra, Esq.
3                              Ashlie Case Sletvold, Esq.
                               The Chandra Law Firm
4                              1265 West Sixth Street
                               Suite 400
5                              Cleveland, Ohio   44113

6

     For the Defendants:       Jon M. Dileno, Esq.
7                              David R. Vance, Esq.
                               Zashin & Rich – Cleveland
8                              950 Main Avenue
                               4th Floor
9                              Cleveland, Ohio   44113

10                             William M. Menzalora, Esq.
                               City of Cleveland
11                             Department of Law
                               601 Lakeside Avenue
12                             Suite 106
                               Cleveland, Ohio   44114
13

14

15

16

17

18

19

20

21

22

23

24

25

1          MONDAY, APRIL 8, 2019, 2:32 P.M.

2                  THE COURT:  Thank you.  Please be seated,

3      ladies and gentlemen.

4                  THE CLERK:  Your Honor, the case before the

14:32:54  5      Court this afternoon is the continuation of Sean DeCrane

6      versus Edward Eckart, Case Number 16CV2647.

7                  THE COURT:  All right.  Thank you.

8                  I see everybody who was here Friday is here

9      today.

14:33:04 10                  We're continuing the evidentiary hearing

11      and testimony.

12                  Mr. Dileno.

13                  MR. DILENO:  Thank you, Your Honor.  We

14      would call Kim Roberson.

14:33:11 15                  If I might, prior to the start of the

16      hearing, I think Mr. Chandra had indicated that

17      Mr. Bardwell, they may call him back to, I guess, respond

18      to maybe whatever testimony Ms. Roberson -- whatever

19      testimony will be elicited from her.

14:33:28 20                  We would ask that he be separated from the

21      Court for that purpose.

22                  THE COURT:  Mr. Chandra.

23                  MR. CHANDRA:  Your Honor, we are -- his

24      assistance is invaluable during the course of the

14:33:38 25      hearing.  He's familiar with the exhibits.  He has been

1    working with us on this matter.

2                      It would present a hardship for us under

3    those circumstances.

4                      THE COURT:  I'll allow him in the

14:33:46  5    courtroom, and I'll decide whether he should be recalled.

6                      Let's go.

7                      MR. DILENO:  Yes.  Thank you.

8                      THE COURT:  Ma'am, be sworn, please.

9                          KIMBERLY ROBERSON,

10        of lawful age, a witness called by the Defendants,

11              being first duly sworn, was examined

12                  and testified as follows:

13                      THE COURT:  Please have a seat.

14                      Please pull that microphone towards you.

14:34:36 15    Thank you.

16                      Mr. Vance, go ahead.

17          DIRECT EXAMINATION OF KIMBERLY ROBERSON

18    BY MR. VANCE:

19    Q.    Good afternoon, Ms. Roberson.  If you could please

14:34:42 20    state your name for the Court.

21    A.    Kim Roberson.

22    Q.    And what is your current position, Ms. Roberson?

23    A.    Public Records Administrator for the City of

24    Cleveland.

14:34:49 25    Q.    Do you work with any particular City department?

1    A.    The Department of Law.

2    Q.    And how long have you worked in the Department of

3    Law?

4    A.    Almost 20 years.

14:34:59 5    Q.    And have you worked in Public Records that entire

6    20 years or so?

7    A.    Yes.

8    Q.    Do you have any formal legal training?

9    A.    No.

14:35:08 10    Q.    How is it that you learned to do what you do within

11    Public Records?

12    A.    My initial training was by the Chief Counsel Leslie

13    Milton when I started, and continual training from

14    various attorneys in the department based on the sections

14:35:22 15    that they work in.

16    Q.    Mr. Chandra, in a declaration he filed with the

17    Court, stated that he worked closely with you in

18    Cleveland's Law Department.

19                Was Mr. Chandra someone that you took

14:35:34 20    direction from?

21    A.    Yes.

22    Q.    And what was your position in the summer of 2016?

23    A.    My position was Public Records Administrator.

24    Q.    Same thing?

14:35:41 25    A.    Yes.

1    Q.    And generally what were your duties at that time in

2    the summer of '16?

3    A.    As Public Records Administrator, you receive the

4    public records request, you -- via mail, e-mail, fax --

14:35:56 5    stamp them the day that they are received.

6              You log them into a -- into the Public

7    Records Log with a number, the date that they submitted

8    their request, the date that we received it, a

9    description of what it is that they are seeking to

14:36:10 10   obtain.

11             Then we designate the department and the

12   assigned person from those departments that we're

13   supposed to get the records from, and the assigned person

14   in the Law Department that will be responsible for

14:36:23 15   reviewing those records.

16   Q.    If you could, you should have an exhibit binder

17   there in front of you.

18             Flip to Exhibit E.  This document's

19   previously been identified last Thursday as a public

14:36:39 20   records request that was submitted on behalf of

21   Mr. DeCrane and is related to this matter.

22             Do you see that Exhibit E?

23   A.    Yes.

24   Q.    Okay.  And do you by chance know whose handwriting

14:36:51 25   is up there on the top right corner of that page?

1    A.    That handwriting is mine.

2    Q.    So in 2015, upon receipt of a public records

3    request like Exhibit E, what generally happens?

4    A.    This request, we would normally stamp it and then

14:37:06  5    we put a public records request number on it based on the

6    number that comes up in the log, indicate what is being

7    requested, and forward it to the departments and to the

8    Law Department staff for any kind of notations that they

9    need to make prior to us going to those departments.

14:37:26 10              Get the records from those departments, and

11    have the Law Department, once those records come to the

12    Law Department, we redact what it is that we know how to

13    redact based on support staff.  Then we give them to the

14    attorneys to review for any additional instructions that

14:37:42 15    they may have that they may not have provided to us to

16    put into the log, or via e-mail, and give to them to

17    review for release.

18    Q.    And you mentioned a log a couple times, I think,

19    now.

14:37:58 20              Could you go to Exhibit A, please?  I

21    realize this font is a little small, but in an effort to

22    get it condensed to a page, could you kind of tell me

23    what Exhibit A is?

24    A.    This is a -- this is the Public Records Log, this

14:38:27 25    is an excerpt from it.  It's not the entire log.  But

1    this is the log in which we would normally log

2    information into the system that we receive.

3    Q.    And you mentioned that one of the things you do is

4    log in instructions from the attorneys into the log?

14:38:44 5    A.    Yes.

6    Q.    Where generally would those be put?

7    A.    In the comment area.

8    Q.    Okay.

9    A.    As such are you seeking for specifics?

14:38:56 10    Q.    No, I don't want you to tell me what the attorneys

11    told you to put into the log, but I just want to know

12    exactly where the attorney instructions would go.

13    A.    The instructions would go in the comment area.

14    Q.    And you mentioned this is not a complete log, this

14:39:10 15    is just an excerpt from a handful of rows from the log.

16            Is that --

17    A.    Yes.  That is correct.

18    Q.    Okay.  And if you could flip to the second page of

19    that document.

14:39:22 20    A.    Okay.

21    Q.    That earlier public records request that we looked

22    at, Exhibit E, that was public records request 15-2220.

23            Do you see that there on the second page of

24    Exhibit A?

14:39:39 25    A.    Yes, I do.

1    Q.    And that's something that then in turn gets put

2    into the log, the information from 15-2220?

3    A.    Right.  Any special instructions, yes.

4    Q.    Now, is this log from Exhibit A, is this still

14:39:57 5    maintained by the City or does the City still use that

6    log?

7    A.    No, we do not.

8    Q.    You've gone to a new system?

9    A.    Right.  It's a system called Gov Q and A where we

14:40:09 10   enter the request into the system.  The system

11   automatically gives it a reference number which

12   previously would have been a public records request

13   number.

14          Based on how the request is submitted, it

14:40:22 15   may go directly to the department, or we will have to

16   assign it directly from the Law Department.

17   Q.    And there was some testimony last week that the

18   log, at least as of 2016, was maintained on SharePoint,

19   is that accurate?

14:40:36 20   A.    That is accurate.

21   Q.    And SharePoint, just as my understanding, and

22   correct me if I'm wrong, is that was a document such that

23   it could be accessed and then updated?

24   A.    Yes.

14:40:45 25   Q.    And then everybody would be able to see the updates

1    at the time they occurred?

2    A.    Yes.

3    Q.    Such that you weren't updating --

4                   MR. CHANDRA:  Objection to leading.

14:40:54  5                   THE COURT:  We can move it along.

6                   MR. VANCE:  Sure.

7                   THE COURT:  There's no jury, so let's go.

8    BY MR. VANCE:

9    Q.    So is the case then that the log was constantly

14:41:02 10  being updated, is that right?

11   A.    That is correct.

12   Q.    Now, are you familiar with Brian Bardwell?

13   A.    Yes.

14   Q.    And who is he?

14:41:10 15  A.    Brian Bardwell was the intern that came to the City

16   of Cleveland to work in the summer.

17   Q.    And do you remember what summer that was?

18   A.    2016.

19   Q.    And what involvement, if any, did you have with his

14:41:29 20  internship at the City?

21   A.    The attorneys that are responsible for assigning

22   the interns had asked if he could help in any way with

23   public records, and I said yes.

24                   And we assigned him to work on the older

14:41:50 25  requests to see if they were open, closed, and what the

1    current status was on them.

2    Q.    So did you actually direct him as to an assignment

3    relative to that?

4    A.    Once the attorney gave him the assignment for him

14:41:59 5    to come to Public Records, yes.

6    Q.    Okay.  And what was it that you asked him

7    specifically to work on?

8    A.    To start on the far drawers that were behind my

9    area, to start on '15s.

14:42:12 10            And he would take a box of records at a

11    time and go to his area and work on them to find out

12    which ones were open, closed, or needed additional

13    records from other departments.

14    Q.    And when you say "'15s," do you mean 2015 requests?

14:42:29 15    A.    2015 and 2016, if he was able to get to it.

16    Q.    And did you at any point in time ever direct him to

17    review 2014 requests?

18    A.    No.

19    Q.    What about earlier requests, for example, 2012 or

14:42:42 20    2013 public records requests, did you ever direct him to

21    do anything with those?

22    A.    Those requests have been boxed up and put into the

23    subbasement.

24    Q.    Okay.  So the filing -- you referenced filing

14:42:52 25    cabinets that were by your area, you said?

1    A.    I have a cubicle area.  The '14, 2014 records were

2    in my area in a file cabinet.  The '15s and '16s were

3    behind or, I should say, in front of my cubicle area

4    against the wall.

14:43:08  5    Q.    So the actual '12 and '13, they weren't even in

6    those filing cabinets?

7    A.    No, sir.

8    Q.    How is it that you know -- besides the fact that

9    that's what you directed him to do -- that he was working

14:43:24 10    on the 2015 public records requests?

11    A.    Say that again, please.

12    Q.    Besides you -- you directed him to work on the 2015

13    requests?

14    A.    That is correct.

14:43:33 15    Q.    Which you testified to.

16              How else do you know that that's what it

17    was that he was doing?

18    A.    I would see him take the files directly from the

19    drawers to his area.  I'm assuming that's what he was

14:43:45 20    working on since those were the instructions.

21              Other than that, I happened to be there one

22    evening and I walked around my area and I saw him

23    standing at the 2015s with a notepad.

24    Q.    Okay.  And do you recall what was part of that

14:44:03 25    notepad at all?

1    A.    I could see the listing of numbers and I could tell

2    that they were '15s, and he was making checkmarks.

3    Q.    Did you even ever discuss the '14 or the '12 or the

4    '13 requests?

14:44:14  5    A.    I do not recall any conversation about '12 or '13.

6          He did ask me about the '14s, and I told

7    him those were in my area and he did not have to concern

8    hisself with them.

9    Q.    So if Mr. Bardwell submitted a declaration that

14:44:32 10   said, "I was assigned to review records requests from

11   2014 and earlier to determine whether any closed requests

12   of 2014 and earlier were still sitting in the City's

13   filing cabinets for open requests," do you consider that

14   to be an accurate statement?

14:44:46 15   A.    No.

16   Q.    And same, similar question, if Mr. Bardwell

17   testified that he was responsible for reviewing the 2012

18   or the 2013 public records requests, would you consider

19   that to be an accurate statement?

14:45:00 20   A.    No.

21   Q.    Now, those filing cabinets that you referenced,

22   what exactly is it that are included in those?  What --

23   are they open, closed files?

24   A.    A combination of the two.

14:45:13 25         They're either open or they're still -- or

1    they're closed.

2              When we receive a public records request,

3    we make a folder for it, and all the correspondence

4    pertaining to that request goes into the folder.

14:45:27  5              That's correspondence between the

6    departments, the correspondence between support staff and

7    attorneys, correspondence from attorneys to support

8    staff, any issues or concerns that need to be made in

9    regards to the request based on the Law Department's

14:45:42 10   involvement.

11              When there's disagreements in regards to

12   what is released and what is not released based on the

13   records that are received from the departments,

14   they -- there's notations in there because I'm normally

14:46:00 15   copied on all the correspondence that goes on within the

16   Law Department pertaining to a public records request so

17   that I know where everything stands at that time.

18   Q.    So if Mr. DeCrane's public records request from

19   2015 was still open, would that have been something that

14:46:19 20   would have been in the filing cabinets there?

21   A.    Yes.

22   Q.    And if we could flip to Exhibit B, what is Exhibit

23   B, Ms. Roberson?

24   A.    Exhibit B is an e-mail that I received from our IT

14:46:49 25   person in the Law Department providing me a listing of

1    what was on the computer of Mr. Bardwell that he was

2    working on, and the documents that were on that computer.

3    Q.    And there's, by my count, four attachments as part

4    of that e-mail, is that right?

14:47:09 5    A.    That is correct.

6    Q.    Okay.  So what I'd like to do is let's walk through

7    those attachments one by one.  And they're here as part

8    of Exhibit B.

9    A.    There's one -- oh.

14:47:21 10    Q.    So the first, the first attachment, it's just

11    titled "15.docx"?

12    A.    Yes.

13    Q.    You should have a blue piece of paper separating

14    each one so --

14:47:30 15    A.    Oh, okay.  Okay.

16    Q.    That first document there, tell me what that is or

17    what you see there.

18    A.    This is a listing of public record numbers that was

19    apparently generated by Mr. Bardwell.

14:47:52 20                   This is the -- this is what I saw him at

21    the computer -- at the file cabinet working on.

22    Q.    Okay.  So when you saw him at the file, the '15

23    file cabinet, you saw him with a list --

24    A.    That looked like this, yes, and he was checking off

14:48:07 25    things, checking off numbers, apparently.

1          I couldn't tell what he was writing

2     specifically, but I do recall seeing this as -- from a

3     glance, the numbers.

4     Q.    And I see at least beginning with the first page,

14:48:24 5     15-1 all the way to the end it's 15-3048.  And they

6     appear to generally go sequentially.

7          And I'm hoping maybe just for the Court's

8     benefit you could explain the -- how the Public Records

9     Department numbers public records requests.

14:48:42 10   A.    We start off with the year and 001 and forward.

11    Q.    Okay.  So all these references here to 15-001,

12    15-0037, those are all -- that 15 represents 2015?

13    A.    That is correct.

14    Q.    Okay.  If you go to the next attachment, it's

14:49:08 15   titled -- and this would be after the blue piece of

16    paper -- "MCO text final."

17    A.    The next one --

18    Q.    It says "Policy matters Ohio" at the top?

19    A.    Yes.

14:49:23 20   Q.    Is it your understanding that that is the MCO text

21    final document that was sent to you by Mr. Guzman?

22    A.    Yes, it was.

23    Q.    Okay.  And then if you'd go to the next attachment

24    which is Mr. Guzman's e-mail, Exhibit B, PRR log.xlsx.

14:49:51 25        Do you see the document there that's after

1    that blue sheet of paper?

2    A.    Okay.

3    Q.    What is that document, the PRR Log?

4    A.    The information, some of the information definitely

14:50:13 5    looks like it came from the Public Records Log, but it

6    looks like it had been manipulated.

7                There's some information that we never put

8    in there like that.

9    Q.    Okay.  So the document that's attached as part of

14:50:29 10    the binder, that's not the complete Public Records Log --

11    A.    No, it is not.

12    Q.    -- that Mr. Guzman sent you, right?

13    A.    No, it's an excerpt from the log.

14    Q.    That's a --

14:50:36 15                MR. CHANDRA:  Your Honor, I just want to

16    lodge an objection based on the Rule of Completeness.

17                We don't know if this is the entire

18    document or excerpts from the document.

19                THE COURT:  No, we don't, but she can

14:50:48 20    answer that question.

21                So go ahead.

22    BY MR. VANCE:

23    Q.    Ms. Roberson, the document that we're discussing

24    now, is this the complete Public Records Log that

14:50:56 25    Mr. Guzman sent you?

1  A.    This is not a complete log.  It is excerpts from it

2  but, I mean, the log was -- this is, what's in this

3  binder is an excerpt.

4         He did send me the entire log.

14:51:12  5  Q.    Okay.

6         MR. CHANDRA:  I would like to relodge that

7  objection, Your Honor.

8         THE COURT:  The objection's noted.

9         Go ahead.

14:51:20 10  BY MR. VANCE:

11  Q.    That actual log itself, to print something like

12  that out, that would be a sizable, sizable document,

13  would it not?

14  A.    Yes, it would be.

14:51:28 15  Q.    And just so we can get a sense, the document that

16  you're looking at, it's got the rows, the row numbers on

17  the side there.

18         You see that?

19  A.    Yes.

14:51:38 20  Q.    And then it's got the various columns?

21  A.    Yes.

22  Q.    So one column or one row actually tracks over the

23  course of a handful of sheets of paper?

24  A.    Yes.

14:51:56 25  Q.    So each sheet of paper just reflects the different

1    columns still --

2                   THE COURT:  Let her testify.

3                   MR. VANCE:  Yes, sure.

4    BY MR. VANCE:

14:52:03  5    Q.    So just explain that a little bit more in detail

6    how exactly this public records -- what exactly is the

7    information on each of these pages here and how they

8    correlate.

9    A.    Okay.  I'm saying off of this log here that's here,

14:52:16 10    it says a public records number, it says a type, it says

11    requester and request date, request -- date received, the

12    request description, department, division, division

13    contact assigned to, if there was a Court contact, if we

14    were going to the Clerk of Court's office; comments,

14:52:43 15    status, modified, modified by, and item type and path,

16    which everything from -- I should say into Q, the

17    computer designates that information once you enter it

18    into the system.

19                   But this does not look like the log in its

14:53:06 20    entirety from the City of Cleveland.  We don't have a

21    type that we have put in here between the PR number and

22    requester.

23    Q.    So you believe that must have been something that

24    was added at some point?

14:53:23 25    A.    Yes.

1   Q.    Okay.  And that particular log, if you go back to

2   the first page, do you understand whether or not that log

3   that was sent to you by Mr. Guzman included the public

4   records request 15-2220?

14:53:44 5   A.    Yes, it does.

6   Q.    If you could flip to the last document there, after

7   the blue sheet of paper.

8   A.    Okay.

9   Q.    What is your understanding of that document,

14:54:03 10  Ms. Roberson?

11  A.    This is a document that I received from our IT

12  person of the information that was on Brian Bardwell's

13  computer.

14             It is totally -- I mean, it does have

14:54:20 15  information from the Public Records Log, but is totally

16  different.  It looks like it had been reorganized and

17  manipulated for his purposes.

18  Q.    Okay.

19             MR. CHANDRA:  Your Honor, objection again

14:54:32 20  based on Rule of Completeness.

21             THE COURT:  Well, let's forget about the

22  Rule of Completeness and talk about whether it's

23  accurate, Mr. Vance.

24             I mean, she's testifying that this somehow

14:54:45 25  is changed and she testified about other documents not in

1    the form that she remembers them, so is there an

2    explanation for that?

3                      MR. VANCE:  Sure.

4    BY MR. VANCE:

14:54:53  5    Q.    As to the last document, Ms. Roberson, when you're

6    talking about that looking different, are you talking

7    about that looking different from what?

8    A.    It looks different from "type," "key."  It says

9    "response sent" is usually over there as a comment, not

14:55:14 10    as a column.

11                      It has the "requester's name" and "date"

12    and the "date received."

13                      It has "request," but I don't know what the

14    "key" indicates.  I don't know what the "type" indicates

14:55:33 15    or the "response sent," which doesn't have

16    anything -- clarifications in there.  It just has a zero

17    in the columns and an R somewhere, in some of the

18    columns.

19    Q.    Okay.  Just so we're on the same page, you're

14:55:45 20    talking about the final attachment there, correct?

21    A.    The one -- yes.  The final --

22    Q.    Okay.

23    A.    There's another -- it -- yes, it is the final

24    attachment.

14:55:59 25                      THE COURT:  Ms. Roberson, Ms. Roberson, my

1    question is does it contain the same information that you

2    would find if it were in the order that it should be?

3                     THE WITNESS:  It does not contain all the

4    information.

14:56:12  5          WELL, it does contain the information, but

6    it contains more information than what's in our log,

7    which means he put additional information in there.

8                     THE COURT:  Go ahead, Mr. Vance.

9                     MR. VANCE:  I think I appreciate the

14:56:25 10   confusion here.

11                    MR. CHANDRA:  Objection to the assertion

12   without any foundation, Your Honor.

13                    THE COURT:  Let's have Mr. Vance try and

14   clear this up for us.

14:56:31 15                   MR. VANCE:  Sure.

16   BY MR. VANCE:

17   Q.   It seems as though are you comparing this document

18   to another document in terms of the content that's in it?

19   A.   Yes, I'm comparing it to the public records request

14:56:41 20   that's maintained by the Law Department.

21   Q.   So the actual Public Records Log, an example of

22   which was Exhibit A that we discussed?

23   A.   Correct.

24   Q.   So the question then I guess I have for you is the

14:56:52 25   attachment, what's here with the blacked out sheet that

1    you're looking at, the last attachment --

2    A.    Yes.

3    Q.    -- is that a complete copy of what was sent to you

4    by Mr. Guzman?

14:57:00  5    A.    Yes, it was.

6    Q.    Okay.  And that last attachment, that -- tell me it

7    appears to address -- you tell me what public records

8    request that last attachment addresses, if you would.

9    A.    What this last --

14:57:22 10    Q.    The last, correct.

11    A.    What does it address?

12    Q.    Yes.  What public records request specifically.

13              I don't need all of them, but is it a

14    certain year or --

14:57:33 15    A.    It's not a response.  It's the year 2015, but it's

16    not a response that the Law Department submitted to

17    anyone.

18    Q.    Okay.  But the document itself appears to include

19    the 2015 public records requests?

14:57:43 20    A.    Yes.

21    Q.    And do you know if the 15-2220 request submitted on

22    Mr. DeCrane's behalf is included on this particular

23    attachment?

24    A.    Yes, it is.

14:58:25 25    Q.    And is it your understanding that Mr. Bardwell had

1    this on his computer, the computer he was working on?

2    A.    That is correct.

3                MR. CHANDRA:  Objection.  Foundation, Your

4    Honor.

14:58:32  5                THE COURT:  You know, it's not necessary.

6                Overruled.

7    BY MR. VANCE:

8    Q.    If you could flip to Exhibit F, please,

9    Ms. Roberson.

14:59:05 10                Could you tell me what Exhibit F is,

11    please?

12    A.    Exhibit F is a copy of a request from our Public

13    Records Log from the year 2000 -- entered as 2001 which

14    indicates that it's the request number, which at that

14:59:25 15    time we did not indicate it by year, the requester, the

16    date of the request, the date received, the request

17    description, the department, the status, and whether it

18    was open, closed or hold -- on hold.

19    Q.    And how about Exhibit G, could you tell me what

14:59:44 20    Exhibit G is, please?

21    A.    Exhibit G is a copy of a sheet from the Public

22    Records Log from 2004.

23                Everything's been redacted so there's no

24    details for me to refer to except at the bottom it says

15:00:10 25    "Attorney/Client privilege, work product of counsel."

1    Q.    Do you know why the difference between the 2001 and

2    the 2004 log?

3    A.    That was by the direction of the Law Department

4    director at the time.

15:00:25  5    Q.    And do you recall which Law Director that was?

6    A.    The "for attorney/client privilege," Director

7    Chandra Subodh -- Subodh Chandra, I'm sorry.

8    Q.    So it's your understanding that Mr. Chandra had

9    directed the Public Records Department to make the

15:00:46  10   entirety of the Public Records Log attorney/client

11   privilege, work product of counsel?

12                   MR. CHANDRA:  Object, Your Honor.

13   A.    Yes.

14                   THE COURT:  Overruled.

15:00:54  15   BY MR. VANCE:

16   Q.    And these, these logs, I mean, explain to me

17   what -- so you have Exhibit A, Exhibit F and Exhibit G

18   are all logs.

19   A.    You said A?

15:01:04  20   Q.    Exhibit A, the first one we went over.

21   A.    Okay.

22   Q.    Exhibit F and Exhibit G.

23                   You've described all of them as the Public

24   Records Log?

15:01:22  25   A.    Correct.

1    Q.    Are they all just basically the same document, but

2    different years?

3    A.    They are the same document, different years, that

4    is correct.

15:01:35 5              The only difference is one's

6    attorney/client privilege and the others are not.

7    Q.    And if you could flip to Exhibit D for me for the

8    moment.

9    A.    Did you say B?

15:01:49 10   Q.    D as in --

11   A.    Dog.

12   Q.    -- David, dog.

13   A.    David, okay.

14              Okay.

15:01:56 15   Q.    Could you tell me what Exhibit D is, please?

16   A.    Exhibit D is a response from a public records

17   request that we received from Brian Bardwell.

18              We responded on October 6th, 2017.  He had

19   asked for a copy of the Public Records Log, and it's our

15:02:21 20   response to him.

21   Q.    And did you provide him the entirety of the Public

22   Records Log?

23   A.    We did not provide the entirety of the Public

24   Records Log.

15:02:32 25              We provided everything up until comments

1    based on that information being of a confidential nature

2    to the Law Department.

3    Q.    Generally speaking, can you tell me a little bit

4    about maybe what confidential information may be included

15:02:51  5    in the log?

6    A.    Okay.  On the log, there's times that we receive

7    requests, and the Chiefs of the Law Department will look

8    at the request and -- or I will even know based on the

9    nature of the request that it's a potential litigation.

15:03:08  10    So if it's a potential litigation, that is notated in the

11    log.

12                    If there are special instructions that are

13    provided to the support staff in regards to that request,

14    we indicate that in the log as well.  Those are comments

15:03:26  15    that go back from support staff to the attorneys.

16                    If the attorneys have a disagreement in

17    regards to what is considered responsive and not

18    responsive, there's communication that goes on and we

19    make those notations in the log where it might be a

15:03:44  20    communication from the Director to one of the Chiefs.

21                    And there's constant conversation back and

22    forth.  There might be conversation in regards to the

23    drafts that are prepared.  We have -- normally have more

24    than one person look at a draft that might be from an

15:04:07  25    attorney.

1    Q.    When you say "draft," draft what?

2    A.    A draft response to a public records request.

3                And there's a decision of what is being

4    considered, something to produce as responsive versus

15:04:20  5    what should not be produced as responsive, and sometimes

6    the attorneys agree and they talk about it sometimes via

7    e-mail, sometimes verbally, but they'll make a notation

8    to us that they'll get back to us at a certain time.

9                And the departments also will stress their

15:04:38 10    concerns regarding any public record request responsive

11    documents that they're forwarding if they feel that

12    there's a major concern regarding it.

13    Q.    And you referred to special instructions.

14                Who would special instructions be coming

15:04:51 15    from?

16    A.    Various attorneys in the Law Department or, I

17    should say, in regards to that request, the attorney that

18    is assigned to review that request.

19    Q.    And the special instructions are given to you?

15:05:04 20    A.    Yes.

21    Q.    Or to somebody on your staff?

22    A.    That is correct.

23                And normally if they put it in as an e-mail

24    and since there's more than one support staff, we just

15:05:13 25    want everybody to be aware of those special notations in

1    case they happen to come across that request because

2    somebody might be out of the office or they received a

3    follow-up phone call from someone.

4                 MR. VANCE:  I have no further questions at

15:05:31  5    this time.

6                 THE COURT:  Thank you, Mr. Vance.

7                 Mr. Chandra.

8                 MR. CHANDRA:  Thank you, Your Honor.

9          CROSS-EXAMINATION OF KIMBERLY ROBERSON

15:05:56 10   BY MR. CHANDRA:

11   Q.    Good afternoon, Ms. Roberson.

12   A.    Good afternoon.

13   Q.    We're well-acquainted from our work together years

14   ago.

15:06:10 15   A.    Yes.

16   Q.    Right?

17                Okay.  You would agree with me that in the

18   notations field for the public records request 15, I

19   believe it is, 2220, the one regarding the subject matter

15:06:43 20   of Sean DeCrane, that there is no confidential

21   information from attorneys contained in the field that

22   can be used for that purpose, correct?

23   A.    I could not say that unless I actually saw the

24   field.

15:07:00 25   Q.    Okay.  So as you sit here in court today, you

1    cannot tell Judge Boyko that there is any confidential or

2    attorney/client privilege or attorney work product

3    information related to the Sean DeCrane-related public

4    records request that is a part of the Public Records Log

15:07:27 5    that you contend Brian Bardwell accessed, correct?

6    A.    I can't say that.

7    Q.    Okay.  Am I going too fast for the court reporter?

8                All right.  So I'd like to turn you, if I

9    could, to the exhibit binder with the numbers in it.  You

15:07:57 10    should have two exhibit binders in front of you.  We're

11    going to get you the other one here.

12                MR. VANCE:  Could we also get a copy,

13    please?

14                MR. CHANDRA:  I think it's the one you got

15:08:10 15    last week.

16                MR. VANCE:  We never got one last week.

17                MR. CHANDRA:  Oh, okay.  I don't think I

18    have one.  There you go.

19                MR. VANCE:  Thank you.

15:08:17 20    BY MR. CHANDRA:

21    Q.    Okay.  So it's, I think, the same thing as in

22    yours, but if you could take a look at --

23                THE COURT:  Be nice if I had one, too.

24                MR. CHANDRA:  Oh, I'm sorry, Judge.

15:08:49 25                Just a moment, Your Honor, I'm sorry.

1          What we can do, I think, is work off of the
2     defense exhibit binder.
3          Okay.  All right.
4          Can I put it on the Elmo, Judge?  Sorry
15:09:36   5     about that.
6          THE COURT:  The Elmo?
7          MR. CHANDRA:  Yeah.  For some reason we're
8     short on the binder here.
9          THE COURT:  If you need this for the Elmo,
10    go ahead.
11         MR. CHANDRA:  Yeah, that would be great.
12         THE COURT:  As long as I can see it on the
13    screen, go ahead.
14         MR. CHANDRA:  Now my binder is gone, my
15:10:06  15    tabs are gone now.
16    BY MR. CHANDRA:
17    Q.   Okay.  So what I'd like to do, Ms. Roberson, is
18    show you the declaration that you submitted to the Court
19    previously, or at least that the City's counsel submitted
15:10:24  20    on your behalf.
21         And Elmos have changed a little bit since I
22    last used one.
23         THE CLERK:  It will focus by itself.
24         MR. CHANDRA:  Oh, it will.  All right.
15:10:51  25    Okay.

1    BY MR. CHANDRA:

2    Q.    So if you could take a look at this, and you signed

3    this under penalty of perjury, right?  You did this under

4    oath?

15:10:58  5    A.    Yes.

6    Q.    Okay.  So if you take a look at Paragraph 9 of this

7    document, and is it going to auto focus?

8                 Can you read it okay?  Seems a little out

9    of focus.

15:11:16 10                 There we go.  Got it.

11                 THE CLERK:  Leave it on auto focus.

12                 MR. CHANDRA:  Okay.

13    BY MR. CHANDRA:

14    Q.    Could you read that paragraph out loud, please?

15:11:26 15    A.    Sure.  "During his internship at the City,

16    Mr. Bardwell became privy to confidential information,

17    including, but not limited to, how long it typically

18    takes the City to respond to public records requests, the

19    Department of Law's involvement with the requests, and

15:11:46 20    the manner in which the City processes requests."

21    Q.    Okay.  So did you come up with the verbiage for

22    Paragraph 9?  Did you draft this verbiage?

23    A.    No, I did not.

24    Q.    Okay.  And fair to say that this was drafted for

15:11:59 25    you by the City's lawyers?

1    A.    That is correct.

2    Q.    All right.  So let's take each of the things in

3    turn that you say are included, but not limited to, in

4    this confidential information.

15:12:13  5    A.    Okay.

6    Q.    Now, the Public Records Log that the City

7    maintains, includes a field for when the record was

8    received, correct -- or when the records request was

9    received, correct?

15:12:30 10    A.    Yes.

11    Q.    And it also contains a date field for when the

12    public records request was complied with, if it was

13    complied with, correct?

14    A.    That is correct.

15:12:41 15    Q.    And that time span then naturally would include the

16    time period that it took for the City to respond to the

17    public records request, correct?

18    A.    Yes.

19    Q.    And from time to time, people, including -- you saw

15:12:59 20    the example of Brian Bardwell making a records request

21    for the log.

22          From time to time, people do request the

23    Public Records Log as to whatever it is you are willing

24    to give them, right?  People request that?

15:13:12 25    A.    People do request the log.

1    Q.    And that log, when you comply with it, does include

2    the date of a request and the date of compliance,

3    correct?

4    A.    It indicates if it was open or closed.

15:13:29 5               It doesn't always have the date that it was

6    responded to.

7    Q.    Okay.  But would you agree with me that there is

8    nothing secret about when the public records request was

9    received by the Law Department, correct?

15:13:44 10   A.    There is nothing privy, no.

11   Q.    Okay.  And there's nothing secret about when it is

12   that that particular request was complied with, correct?

13   A.    It depends upon the information, additional

14   information that may have been in that comment box.

15:14:01 15   Q.    Right.  And I'm not asking about that.

16   A.    Okay.

17   Q.    Okay?  I'm just asking about when that particular

18   request is considered closed by the City.

19   A.    When it is considered closed by the City, we could

15:14:14 20   tell you that it's closed without providing any of the

21   comments there.

22   Q.    No, and I understand.  I'm not asking about the

23   comments.

24               I'm asking about the column and the fields

15:14:24 25   that you just testified to about when the public records

1    request was closed.

2              Can we agree that that is not confidential

3    information?

4    A.    It is not confidential information.

15:14:37  5    Q.    Okay.  So let's turn then -- and so, for example,

6    if a media organization were -- just take this as a

7    hypothetical -- a media organization were interested in

8    writing a story about how long it is that the City

9    typically takes to respond to public records requests, it

15:14:58 10    would be able to obtain public records from the City,

11    including potentially the Public Records Log, to try to

12    make that determination and calculate those numbers over

13    a span of time.

14              Would you agree with that?

15:15:13 15    A.    Not in its entirety.

16    Q.    Right.  But at least as to the narrow issue of when

17    records requests came in and when they were completed,

18    according to the City's own records, correct?

19    A.    We process the request, and when we complete a

15:15:31 20    request, we make notations as we go along.

21              It doesn't -- it doesn't maintain history.

22    Q.    What --

23              THE COURT:  Ms. Roberson, you're -- I don't

24    think you're addressing the question.

15:15:44 25              Let's talk about dates.

1          THE WITNESS:  Okay.

2          THE COURT:  You have a date that the record

3    is requested.

4          THE WITNESS:  Yes.

15:15:49 5          THE COURT:  And then you have a date that

6    it is considered closed.

7          THE WITNESS:  That is correct.

8          THE COURT:  Okay.  I believe what

9    Mr. Chandra is asking is that is not confidential, the

15:15:58 10   date request, the date closed, is that correct?

11          THE WITNESS:  That is correct.  However,

12   there's no field.  It just says "Date closed."

13          THE COURT:  Understood.

14          Mr. Chandra.

15:16:09 15          MR. CHANDRA:  Thank you, Your Honor.

16   BY MR. CHANDRA:

17   Q.    All right.  So moving on to the next item here, the

18   Department of Law's involvement with the requests, you'd

19   agree with me that it's no secret that at the City of

15:16:23 20   Cleveland, the process for facilitating responses to

21   public records requests is housed within the City of

22   Cleveland's Law Department, correct?

23   A.    Yes.

24   Q.    And we've already established you're not an

15:16:36 25   attorney, correct?

1    A.    That is correct.

2    Q.    And the function that you perform does not require

3    you to exercise legal judgment in any way, correct?

4    A.    Correct.

15:16:47  5    Q.    All right.  And so the fact that the Department of

6    Law is involved with the requests at the City of

7    Cleveland is a matter of at least public knowledge to

8    people who -- most of the people who send in public

9    records requests to the City.

15:17:05  10                  Fair enough?

11    A.    Somewhat.

12    Q.    Okay.  In other words, some people do send requests

13    directly to a department or a division, right, trying to

14    bypass the City of Cleveland Law Department?

15:17:18  15    A.    They try, but it doesn't always work.

16    Q.    Okay.

17    A.    But they do try.

18    Q.    Let's make sure we don't talk over each other --

19    A.    Okay.

15:17:26  20    Q.    -- so that the court reporter can get a good

21    transcript.

22                  And in addition, the fact that some lawyers

23    sometimes -- let me rephrase.

24                  The fact that sometimes Assistant Law

15:17:46  25    Directors are involved in giving legal advice as to

1   whether or not certain records should be produced, the

2   fact that lawyers are sometimes involved in that is also

3   not a secret to people who send in public records

4   requests on a regular basis, right?

15:18:00 5   A.    We do not refer requesters to the attorneys that

6   are assigned to review those records.

7   Q.    Well, sometimes those attorneys get involved, say,

8   in mediation processes at the Supreme Court of Ohio or in

9   Congress --

15:18:19 10   A.    That -- I'm sorry.  Go ahead.

11   Q.    I'm sorry, did you say they have?

12   A.    Uhm-uhm.  I was letting you finish.

13   Q.    Okay.  Why don't we just stop there?

14   A.    Okay.

15:18:29 15   Q.    Did you hear the question?

16   A.    No, I did not.

17   Q.    All right.  Let me rephrase then.

18        Sometimes Assistant Law Directors are

19   involved in mediation processes, either at the Ohio

15:18:41 20   Supreme Court or in the Ohio Court of Claims, the Court

21   of Common Pleas here in Cuyahoga County, or the Eighth

22   District, correct?

23   A.    Yes.

24   Q.    And that wouldn't be a secret to the litigants on

15:18:56 25   the other side of those cases, right, the involvement of

1    the Law Department?

2    A.    (Witness nods).

3    Q.    All right.  And from time to time when you and the

4    other people in the Public Records Department -- and by

15:19:08  5    the way, all three of you are nonlawyers, right?

6    A.    Correct.

7    Q.    And all three of you sometimes field phone calls

8    from people who have requested public records asking

9    where their records are, right?

15:19:22 10    A.    Correct.

11    Q.    And from time to time, you tell them that attorneys

12    in the Law Department are reviewing those documents for

13    potential redactions or as to whether those records

14    should be produced, correct?

15:19:35 15    A.    I will tell them that it is in the reviewing

16    process in the Law Department.

17    Q.    Okay.  So again, that's not a secret or

18    confidential, correct?

19    A.    Correct.

15:19:50 20    Q.    And this last point, "The manner in which the City

21    processes requests," from Paragraph 9 of your

22    declaration, you see that?

23    A.    Yes.

24    Q.    Now, when you're referring to the manner, what are

15:20:06 25    you referring to in that sentence?

1          Do you know?

2     A.    Okay.  The manner in which the City processes the

3     requests, meaning the Law Department's involvement in

4     that request.

15:20:20 5    Q.    So it's the same thing that we just discussed?

6     A.    Um-hmm.

7     Q.    Okay.  And in general, there's nothing confidential

8     about that, right?

9     A.    For the most part, I would say.

15:20:32 10   Q.    Okay.  All right.  And I'd like you, if you would,

11    to look at the exhibit on -- I'm going to show you this

12    news article that ran on March 1st, 2018 and this is

13    Exhibit 24, Tab 24.

14               MR. CHANDRA:  And it's actually in the

15:21:10 15   Court record, Your Honor, as Page ID Number 2497 and

16    document 57-23.

17    BY MR. CHANDRA:

18    Q.    So this news article that ran, did you wind up

19    seeing this article that ran about the controversy in

15:21:24 20   this case over the secrecy of public records?

21    A.    Yes.

22    Q.    Okay.  And if you look toward the bottom here and

23    the paragraph, could you please read the paragraph here

24    that's bracketed that says, "Law Director Barbara

15:21:45 25   Langhenry"?

1    A.    "Law Director Barbara Langhenry said that she would

2    not agree that all information was confidential.  The

3    records, though, include some notes from attorneys and

4    communications with clients that she would defend as

15:21:55  5    private."

6    Q.    Okay.  So and you have no reason as you sit here

7    today to contradict Ms. Langhenry's assertion, correct?

8    A.    No.

9    Q.    All right.  So I'd like you to take a look at the

15:22:14  10    exhibit that you were shown earlier by Mr. Vance, Exhibit

11    E, and I'm going to put that on the screen as well.

12                You remember looking at this document?

13    A.    Yes.

14    Q.    Now, what's the date on this public records

15:22:40  15    request?

16    A.    August 25th, 2015.

17    Q.    And your handwriting labeled it as PR number,

18    public records request number 15-2220, correct?

19    A.    Yes.

15:22:55  20    Q.    Now, you testified earlier that you would number

21    the public records requests in numerical order as they

22    were received, correct?

23    A.    As I received them.

24    Q.    All right.  So it would be fair to infer from the

15:23:08  25    face of this document that by around August 25th, 2015 or

         1    thereabouts when you received this, that by that point in

         2    2015 there were already 2,220 public records requests

         3    received in the Cleveland Law Department or by the City

         4    of Cleveland, correct?

15:23:29 5    A.    Yes.

         6    Q.    All right.  And if you look at the requester's

         7    name, who is the requester?

         8    A.    W. Craig Bashein.

         9    Q.    Okay.  And that's B-A-S-H-E-I-N, and the company

15:23:44 10   name is Bashein and Bashein, correct?

        11    A.    That is correct.

        12    Q.    So there is nothing there to indicate that this

        13    request is coming from Sean DeCrane, at least on those

        14    fields, correct?

15:23:58 15   A.    That's correct.

        16    Q.    And the Public Records Log of the City of Cleveland

        17    would also contain the name of the requester as -- it

        18    should contain the name as W. Craig Bashein, correct?

        19    A.    Yes.

15:24:15 20   Q.    All right.  So would you agree with me that from

        21    the face of the request, you cannot tell, as the Public

        22    Records Administrator for the City of Cleveland, that

        23    this request is submitted on behalf of Sean DeCrane, with

        24    this counsel, as adverse to the City regarding Sean

15:24:41 25   DeCrane, correct?

1    A.    That's not something that I look for.  I mean,

2    that's not any of my business.

3    Q.    Okay.  You don't care who the requester is,

4    correct?

15:24:49  5    A.    Right.  The requester can ask for anything that

6    they want.

7    Q.    Okay.  And from time to time you might get lawyers

8    or law firms asking for public documents where they don't

9    represent the people who are named in the request,

15:25:01 10    correct?

11    A.    That is correct.

12    Q.    All right.  And you testified a few moments ago

13    that by around August 25th, 2015, you already had 2,220

14    requests, but can we agree that many of those requests

15:25:23 15    would often contain numerous subparts to them so it

16    wouldn't be just for one document or one category of

17    documents, correct?

18    A.    Correct.

19    Q.    So as a consequence, you could be looking at many

15:25:38 20    thousands -- not just 2,220 by August 25th of 2015 --

21    many thousands of categories of documents that would have

22    come in already by that point, correct?

23    A.    Yes.

24    Q.    And I want to ask you just by way of background a

15:25:56 25    little bit of what -- about what was going on at the

1    Cleveland Law Department at this time.

2                    This time period, August 25th, 2015 --

3    which I think based on the time frame you've testified

4    about would have been about a year or so before Brian

15:26:15   5    Bardwell was an intern, correct?

6    A.    Yes.

7    Q.    Okay.  So by August 25th, 2015, about how long was

8    this, to the best of your recollection, after the

9    shooting death of Tamir Rice?

15:26:39  10                    Do you recall that being in or around

11    November of 2014?

12    A.    Yes.

13    Q.    Okay.  And is it fair to say that from November,

14    2014 forward, even through this time period, that the

15:26:50  15    City of Cleveland was bombarded with public records

16    requests, not just locally, but from around the world

17    related to that case?

18    A.    Yes.

19    Q.    So is it fair to say that in this time period,

15:27:02  20    there was an unusually high number of public records

21    requests that was out of the ordinary from what you had

22    experienced up to that point in your career at the City?

23    A.    Yes.

24    Q.    Okay.  And is it fair to say that in addition to

15:27:19  25    receiving those requests, that you as the Public Records

1       Administrator and the other Public Records staff that

2       work with you, were receiving numerous follow-up

3       telephone calls from the requesters related to the Tamir

4       Rice case demanding compliance with the records requests?

15:27:38  5   A.    Yes.

6       Q.    And those weren't just coming from City of

7       Cleveland media but were coming from all around the

8       world, correct?

9       A.    Yes.

15:27:45 10   Q.    All right.  So is it your sworn testimony that at

11      least by -- let's talk about August of 2015 -- that the

12      City of Cleveland was caught up with all of its public

13      records requests from 2012 and 2013 by August of 2015?

14      A.    The only way I would know that is to go back and

15:28:13 15   look.

16      Q.    And no one -- well, let me withdraw that.

17                  You've not done that as part of the

18      preparation for your testimony today, correct?

19      A.    No.

15:28:22 20   Q.    And can we also agree that by 2014 -- or by this

21      time frame, August of 2015, that all of the public

22      records requests that came in from 2014 were all

23      completely complied with?

24      A.    No, I can't say that either.

15:28:43 25   Q.    And can you -- are you also in a position to

1    testify under oath to Judge Boyko that by the summer of

2    2016, that all public records requests that came in from

3    2014 had been fully complied with by the City of

4    Cleveland Law Department?

15:29:01  5    A.    No, they had not been.

6    Q.    Okay.  So it is fair to say that there would have

7    been a backlog?

8              By the time Brian Bardwell became an intern

9    in the summer of 2016, there would have remained a

15:29:15 10   backlog of requests at least from 2014 that had not yet

11   been complied with, correct?

12   A.    Yes.

13   Q.    And many of those related to the Tamir Rice case,

14   correct?

15:29:26 15   A.    Possibly.

16   Q.    Okay.  Well, in fact, Ms. Roberson, you took leave

17   from the City.  I'm not going to ask you for any

18   confidential health information, but I want to try to

19   establish a time frame here.

15:29:41 20            You took leave from the City at what point?

21   Approximately what month to what month?

22   A.    December 9th, 2014 through May of 2015.

23   Q.    Okay.  So for that period that you were out

24   on -- that was a medical-related leave, is that correct?

15:30:03 25   A.    That is correct.

1    Q.    All right.  In the time period that you left, is it

2    fair to say that the backlog that the City of Cleveland

3    was experiencing in complying to -- with the public

4    records requests that it had received already, continued

15:30:17  5    to increase because you weren't there to facilitate it?

6                    I'm not faulting you for that.

7    A.    No.

8    Q.    But it's a fact, isn't it?

9    A.    There was a backlog, yes.

15:30:26 10    Q.    And that backlog actually increased as a result of

11    your absence, correct?

12    A.    Yes.

13    Q.    Right.  And when you returned from your medical

14    leave -- in the spring of 2015, you said it was?

15:30:38 15    A.    Yes.

16    Q.    -- the number of uncomplied with public records

17    requests had actually been greater than when you left,

18    correct?

19    A.    Yes.

15:30:50 20    Q.    All right.  How much greater, approximately?

21                    And I'm not faulting you.  I'm just asking

22    for facts.

23    A.    I don't know.

24                    MR. VANCE:  Objection to this whole line of

15:31:01 25    questioning.  At some point where are we going?

```
 1                    MR. CHANDRA:  I'm getting there.

 2                    THE COURT:  Could have been asking the same

 3      thing on your end.

 4                    I'm allowing a lot more than really should

 5      be coming in, but I want to see if anybody can tie it

 6      together at the very end.

 7                    Overruled.

 8                    Go ahead, Mr. Chandra.

 9      A.    The reason I don't know that is because by me not

10      being there, the other staff members were working on

11      things that were most current, and that's the reason why

12      we needed assistance from an intern to assist in the

13      backlog of '15.

14      Q.    Right.  But also needed -- you needed assistance

15      for a backlog that remained from 2014 and 2016, isn't

16      that correct?

17      A.    There wasn't as much in '14, and that was something

18      that I wanted to handle directly because I was there.

19      Q.    And there was also a backlog for 2013 of uncomplied

20      public records requests, correct?

21      A.    There may have been some.

22      Q.    Okay.  How many?

23      A.    I don't know.

24      Q.    And how about 2012?

25      A.    I don't know.
```

1    Q.    But there was a backlog, right?

2    A.    Normally we've gone back to the -- to the various

3    requesters and asked them if they were still interested

4    in those requests, responsive documents.

15:32:06  5           If they were not, we considered them closed

6    so there may have been a backlog but we attempted to

7    address them all.

8    Q.    And, in fact, do you recall that you sent me such a

9    request, asking whether that a long-pending public

15:32:19 10  records request, whether I still wanted compliance with

11   it years later?

12           Do you recall that?

13   A.    Yeah, it wasn't me, but yes.

14   Q.    Okay.  And you recall the answer was yes?

15:32:26 15  A.    Um-hmm.

16   Q.    Even though it was from years earlier?

17   A.    Um-hmm.

18   Q.    And the answer to that was yes, so that the record

19   is clear?

15:32:35 20  A.    Yes.

21   Q.    All right.  So it would be fair to say that by the

22   time Brian Bardwell arrived in the summer of 2016 to

23   assist you with the public records request compliance

24   process -- which you asked him to do, correct?

15:32:54 25  A.    I -- I accepted his help through the attorney that

            1    asked me.

            2    Q.    Okay.  And at that time there was a backlog of

            3    uncomplied with public records requests going back to

            4    2012 at least, correct?

15:33:14    5    A.    I can't say that.

            6    Q.    And you can't not say that either?

            7    A.    And I can't not say that, but I'm not going -- it's

            8    under oath.

            9          I don't know.

15:33:23   10    Q.    Okay.

           11    A.    But I do know that there was '14s, but you're

           12    talking about '12 and '13s, that I -- I would have to go

           13    back and look at the records.

           14    Q.    Okay.  Would you agree that if there was such a

15:33:33   15    backlog going back to 2012, it would have made no sense

           16    logically in terms of the City's compliance with public

           17    records requests obligations to simply ignore older

           18    requests and skip ahead to 2015?

           19    A.    Instructions are to address the '15s and 16s.

15:34:03   20          I was willing to do the '14s because I was

           21    there and I had more involvement with those files.

           22    Q.    What about the '13s and '12s?

           23    A.    If they were there, we would have gone back to them

           24    as well.

15:34:15   25    Q.    All right.  So meaning you would have assigned

1    those to Brian Bardwell?

2    A.    No, not necessarily.

3    Q.    All right.  So did you ever discuss with Brian

4    Bardwell the Sean DeCrane-related public records requests

15:34:34 5    from W. Craig Bashein specifically?

6    A.    No.

7    Q.    And so as you sit here testifying to Judge Boyko

8    today, you have no information that would suggest that

9    Brian Bardwell saw any confidential information related

15:34:53 10    to Sean DeCrane's public records request, isn't that

11    correct?

12    A.    No, I cannot say that either because he took files

13    out of the file cabinets, took them to his area to go

14    through those files --

15:35:05 15    Q.    You --

16    A.    -- for the year of 2015.

17    Q.    You cannot testify from your personal knowledge

18    that Brian Bardwell took the Sean DeCrane-related file

19    from the 2015 filing cabinet and took it back to his

15:35:26 20    desk, correct?

21    A.    I mean, I didn't see him do it.

22    Q.    So you have no personal knowledge that he did do

23    it, correct?

24    A.    He took all the files from the drawers so he had

15:35:34 25    access to the --

1        THE COURT:  You're not answering the

2   question, Ms. Roberson.

3        Do you have personal knowledge that he did

4   it, yes or no?

15:35:41  5        THE WITNESS:  No, I did not see him

6   actually do it.

7        THE COURT:  Thank you.

8   BY MR. CHANDRA:

9   Q.    All right.  And in addition to that, you have no

15:35:46 10   information that he saw or accessed any privileged or

11   attorney work product information related to Sean

12   DeCrane, correct?

13        You have no personal knowledge of that,

14   correct?

15:36:00 15   A.    Personal knowledge, no.

16   Q.    All right.  Now, let's turn to the Exhibit B from

17   the defense binder.  And that is the e-mail from Alberto

18   Guzman.

19        Do you see that on your screen?

15:36:39 20   A.    Yes, I do.

21   Q.    Okay.  So you have no personal knowledge that the

22   documents attached to Mr. Guzman's e-mail were actually

23   documents that were on the computer that Brian Bardwell

24   was working on when he was at the City?

15:37:00 25        You have no personal knowledge of that,

1    correct?

2    A.    Personal knowledge in what manner?  Because I did

3    see the properties where it was created and modified by a

4    law clerk during that time frame.

15:37:14  5    Q.    That's not my question, was it?

6    A.    That's the personal knowledge that I have.

7    Q.    You have personal knowledge -- my question was do

8    you have personal knowledge that the documents attached

9    to Mr. Guzman's e-mail here in the exhibit binder were

15:37:30 10    documents that Brian Bardwell had on the computer he was

11    working on?

12              My question was about Brian Bardwell; not

13    about law clerks generally.

14    A.    Okay.  Well, I can only go by the information that

15:37:44 15    was given to me by the IT person.

16    Q.    Okay.  So you --

17    A.    No, I don't have any personal knowledge myself.

18    Q.    Okay.  And so you also have no personal knowledge

19    about whether, what's attached to this exhibit, is a

15:37:54 20    complete rendition of all of the information that was on

21    that computer, whoever it was used by?

22    A.    The only document that I saw was the one that I had

23    referred to earlier.

24              And I did see that.

15:38:07 25    Q.    What document are you talking about?

1    A.    The document that had the listing of all the '15 PR

2    numbers.

3    Q.    Okay.

4    A.    I actually saw that in his hand.

15:38:15 5    Q.    Okay.  In whose hand?

6    A.    In Brian Bardwell's hand.

7    Q.    Okay.  So this document that lists off public

8    records requests from 15-0001 forward, right, that is the

9    document you're talking about?

15:38:34 10    A.    Yes.

11    Q.    Now, how many days did Brian Bardwell work on

12    assisting you in helping catch up the City's compliance

13    with public records requests?

14    A.    I have no idea.

15:38:43 15    Q.    Do you have any basis for contradicting

16    Mr. Bardwell's testimony if he testified that it was just

17    two or three days?

18    A.    He would know.  I wouldn't.

19    Q.    Okay.  So you don't have any basis for

15:38:55 20    contradicting his testimony on that point, right?

21            We agree on that?

22    A.    Um-hmm.

23    Q.    And, in fact --

24            THE COURT:  Is that a yes?

15:39:03 25            THE WITNESS:  Yes.

```
 1                    THE COURT:  Okay.
 2        Q.   You do have a basis for contradicting --
 3                    THE COURT:  No, I wanted to make sure for
 4        the record instead of "Um-hmm."
 5                    MR. CHANDRA:  Thank you, Your Honor.
 6                    THE WITNESS:  Sorry.
 7        BY MR. CHANDRA:
 8        Q.   And you were the one who pulled Brian Bardwell off
 9        of the project, correct?
10        A.   I am not the one that pulled Brian Bardwell off of
11        the project.
12        Q.   But did you --
13        A.   I had no authority.
14        Q.   Okay.  Fair enough.  But you conveyed to Brian
15        Bardwell that he was being pulled off the project,
16        correct?
17        A.   I did not convey to Brian Bardwell that he was
18        being pulled off a project.
19        Q.   You have no recollection of doing that?
20        A.   No.
21                    He came to me and said what was going on,
22        and I told him that I wasn't the person that he needed to
23        speak with; he needed to speak to the attorney that was
24        over the interns for the summer.
25        Q.   Do you have any knowledge of who communicated to
```

1    Brian Bardwell that he was being pulled off of the public

2    records compliance project?

3    A.    No.

4    Q.    And were you -- did you gain any information about

15:40:04 5    why it is that he was pulled off of that project?

6    A.    There were several things.

7    Q.    Go ahead.

8    A.    The first one was he never signed a

9    confidentiality.  They did not do a background check on

15:40:16 10    him.  And based on them not having those documents, they

11    wanted to remove him from doing any further public

12    records requests.

13    Q.    Who is "they"?

14    A.    The law administration.

15:40:30 15    Q.    Who?

16    A.    Well, the first person -- I'm not sure of the exact

17    person, but I know that the Director of Law and the Chief

18    Counsel and Jillian, I can't remember her last name,

19    were -- was involved in his removal of working on public

15:40:51 20    records.

21    Q.    And you came to learn it was because Mr. Bardwell

22    had successfully sued the City regarding public records

23    compliance some ten years earlier, correct?

24    A.    No, I --

15:41:01 25                MR. VANCE:  Objection.  Misstates her

1    testimony.

2                    THE COURT:  She can answer.

3    A.    I didn't know that.

4                    MR. CHANDRA:  Okay.  I'm wrapping up, Your

15:41:11 5    Honor.

6                    THE COURT:  All right.

7    BY MR. CHANDRA:

8    Q.    For whatever number of days it is that Mr. Bardwell

9    was working with you --

15:41:26 10    A.    Okay.

11    Q.    -- on helping clear public records backlog for

12    whatever time period, would you agree that part of that

13    process was that he was filling out a tracking sheet as

14    to each record he was helping close or records request he

15:41:42 15    was helping close, and then giving those to you to log

16    into the public records database?

17    A.    That may have been his objection, but I never

18    received anything from him.

19    Q.    So it's your testimony from your recollection that

15:41:56 20    Mr. Bardwell never handed you any tracking sheets to

21    assist you in catching up the Public Records Log?

22    A.    Correct.

23    Q.    What's your recollection of how it is that he would

24    communicate to you that he had completed work?

15:42:12 25    A.    There was little communication between Brian

1    Bardwell and myself.

2    Q.    Okay.  So based on the fact that there was little

3    communication, as you sit here today, you can't tell

4    Judge Boyko what public records requests he completed and

15:42:28  5    which ones he didn't?

6    A.    That is correct.

7    Q.    All right.  This computer that you've described in

8    your testimony as Brian Bardwell's computer, do you know

9    whether that computer was left completely idle at the Law

15:42:53 10    Department and not used by anybody else from the time

11    period that Mr. Bardwell was a law clerk in the summer of

12    2016 and whatever time period it was that it was being

13    checked to see what documents he had used on there?

14    A.    No, I don't personally know.

15:43:07 15    Q.    And when was the computer, to your knowledge,

16    checked for that purpose?

17    A.    I would not know that.

18              I would have to speak to our IT

19    representative for the Law Department.

15:43:18 20    Q.    Okay.  So if I could have you look at Exhibit B

21    again, you see this e-mail from Alberto Guzman?

22    A.    Yes.

23    Q.    What date is that e-mail?

24    A.    August the 2nd, 2016.

15:43:32 25    Q.    So for some reason, Alberto Guzman was sending you

1    an e-mail with the subject "Bardwell files," correct?

2    A.    That is correct.

3    Q.    Why?

4    A.    Because at the -- at the time they wanted to know

15:43:49  5    what he was working on because he had not signed papers,

6    confidentiality papers, and there was no background check

7    had been completed on him.

8    Q.    Who is "they"?

9    A.    The administration.

15:44:00 10    Q.    Who?

11    A.    The City of Cleveland administration.

12    Q.    There must have been a human being who told you

13    this.

14          What's that person's name?

15:44:06 15    A.    Okay.  Barbara Langhenry, the Director; human

16    resources, I don't know who specifically in that

17    Department of Human Resources, but the information came

18    from Jillian.  I think her last name is Dinehart.

19    Q.    Do you know if someone else used that computer

15:44:22 20    after Mr. Bardwell did?

21    A.    No, I do not know.

22    Q.    Do you know where that computer is kept?

23    A.    No, I do not know.

24    Q.    So you see the e-mail asks, "Take a look and see if

15:44:37 25    you want me to give him access to them"?

1    A.    That is correct.

2    Q.    Who is the "Him"?

3    A.    Brian Bardwell.

4    Q.    Okay.  So why is it that you were making -- or that

15:44:47 5    inquiry was being made of you, to your knowledge?

6              Was there some context from the

7    conversation you were having with Guzman?

8    A.    This is again coming from the Law Department

9    Director and Chief Counsel and Jillian, to make sure of

15:45:04 10    what it was that he was doing on the computers.

11    Q.    But, Ms. Roberson, the question is coming to you

12    from Mr. Guzman as to whether or not you want Mr. Guzman

13    to give Mr. Bardwell access to those documents, correct?

14    A.    That is correct.

15:45:21 15    Q.    So was there -- is it possible that there was a

16    request from Mr. Bardwell to get access to certain

17    documents?

18    A.    Mr. Bardwell came to me and said, "I don't have

19    access to some documents," and that's when I told him

15:45:37 20    again to go to Jillian Dinehart, who was responsible for

21    him.

22    Q.    All right.

23    A.    His assignments.

24    Q.    Let's move on.

15:45:50 25              I'd like you to take a look at Exhibit G in

1    the binder, please.

2                      And let's turn it this way.  And this was

3    the document that you said was a Public Records Request

4    Log from around 2004, correct?

15:46:08 5    A.    Yes.

6    Q.    And the -- you see the big redaction there,

7    correct?

8    A.    Yes.

9    Q.    But you'd agree that the date of the request and

15:46:16 10    the date that it was received, what the request is, those

11    are all a matter -- and even the requester, those are all

12    a matter of public record and are not attorney/client

13    privileged information, correct?

14    A.    I would have said that.

15:46:29 15    Q.    Okay.  So let's take a look at Exhibit D, and we

16    can see here from Exhibit D -- first, we're going to try

17    to focus it a little bit here -- this is the public

18    records request from Brian Bardwell that is records

19    request 17-1917, correct?

15:47:15 20    A.    Yes.

21    Q.    And Mr. Vance was asking you questions about this,

22    correct?

23    A.    Yes.

24    Q.    You have no knowledge of whether this request was

15:47:23 25    made on Brian Bardwell's behalf individually or on behalf

1    of anybody else, correct?

2    A.    There's an e-mail behind all of that that says his

3    name and his e-mail address.

4    Q.    Right.  I'm just saying you don't know whether he

15:47:44  5    was making this on someone else's behalf or on his own

6    behalf, right?

7              You don't know one way or the other, right?

8    A.    Correct.  Yes.

9    Q.    And to the best of your knowledge, did you comply

15:47:58 10    with this records request completely?

11    A.    Yes.

12    Q.    Well, if you could take a look at the -- read

13    through the e-mail and see if that affects your testimony

14    on that point.

15:48:37 15              Tell me when you're ready.

16    A.    I'm ready.

17    Q.    Okay.  So would you agree that you did not produce

18    the full log that would have contained all information

19    regarding all public records requests?

15:48:49 20    A.    All the information was not provided based on

21    attorney/client privilege, work product.

22    Q.    Okay.  And in the end -- the records production

23    that you did here, do you know whether or not any

24    information regarding Sean DeCrane was provided?

15:49:10 25    A.    No, I do not.

1   Q.   Do you know whether any confidential information

2   regarding Sean DeCrane was provided?

3   A.   I doubt it.

4   Q.   All right.

15:49:18 5            MR. CHANDRA:  One moment, Your Honor.

6            THE COURT:  Go ahead.

7            MR. CHANDRA:  If I could just have a moment

8   to check my notes, Your Honor, I think we may be

9   finished.

15:49:39 10  BY MR. CHANDRA:

11  Q.   Oh, a couple more points.

12            You were describing in your testimony a

13  little while ago about the process that the City of

14  Cleveland follows for complying with public records

15:49:50 15  requests.

16            That process is also described on the

17  City's own website, correct?

18  A.   Yes.

19  Q.   Would you agree that your job is stressful because

15:50:13 20  of the backlog of requests?

21  A.   It has been.

22  Q.   And the persistent follow-up requests from people

23  frustrated that they're not getting their records?

24  A.   We all are.

15:50:26 25  Q.   All right.  And there aren't enough people to

```
 1    handle the volume of requests coming in?

 2    A.    At the time there, that is correct.

 3    Q.    Meaning back in 2016, 2015?

 4    A.    Correct.

 5    Q.    My last question is simply this:  As you sit here

 6    testifying to Judge Boyko today, do you have any personal

 7    knowledge that Brian Bardwell acquired any confidential

 8    information related to the Sean DeCrane public records

 9    requests during his time at the City?

10    A.    I have no personal knowledge to that effect.

11    Q.    And you also have no personal knowledge that he

12    shared any such information with The Chandra Law Firm or

13    with Sean DeCrane, correct?

14    A.    Correct.

15              MR. CHANDRA:  All right.  I have no further

16    questions, Your Honor.

17              THE COURT:  Thank you, Mr. Chandra.

18              Mr. Vance.

19              MR. VANCE:  Yes.  Thank you.

20         REDIRECT EXAMINATION OF KIMBERLY ROBERSON

21    BY MR. VANCE:

22    Q.    Ms. Roberson, you just referenced or a reference

23    was just made to the City's website on public records and

24    the processes described there relative to public records.

25              Do you recall that testimony?
```

1    A.    Yes.

2    Q.    Anywhere on that website does it say anything about

3    specific disagreements that the internal Department of

4    Law may have relative to responses?

15:52:13  5    A.    No, it does not.

6    Q.    Does it say anything about draft responses that the

7    City's attorneys draft that you testified to earlier?

8    A.    No.

9    Q.    Is that information ever publicly available?

15:52:25  10    A.    No.

11    Q.    Do you consider that information to be

12    confidential?

13    A.    Yes.

14    Q.    In terms of how long it typically takes to respond

15:52:34  15    to a public records request, what are the types of things

16    that impact that?

17    A.    Obtain the records from the departments, making

18    sure that they are providing all the responsive records

19    to that request.

15:52:53  20            When we receive those responsive documents,

21    the support staff redacts based on the knowledge that

22    they have, and then we turn them over to the attorney for

23    the final review and any additional redactions that need

24    to be made.

15:53:11  25            If there's been correspondence between the

1    departments or within our, our department,

2    attorney-to-attorney, then that is also discussed as

3    well.

4                    There's more than one person that usually

15:53:25 5    looks at a draft just to make sure.  If there's

6    disagreements in what should be released and what

7    shouldn't be released, that is discussed as well by the

8    attorneys --

9                    THE COURT:  Mr. Vance.

15:53:37 10   A.    -- and by the Director as well.

11                    THE COURT:  I do have a question.

12                    Ms. Roberson, if someone in your department

13   redacts information and then it goes to the Law

14   Department you said for further redaction?

15:53:50 15                    THE WITNESS:  The attorney.

16                    THE COURT:  The attorneys, I'm sorry.

17                    Do the attorneys or have they ever in your

18   experience unredacted something that was redacted in your

19   department?

15:54:02 20                    THE WITNESS:  Yes.

21                    THE COURT:  It does happen?

22                    THE WITNESS:  Yes, it does within our

23   department, yes.

24                    THE COURT:  Thank you.

15:54:07 25                    Go ahead, Mr. Vance.

1          MR. VANCE:  Thank you.

2     BY MR. VANCE:

3     Q.    Exhibit B, if you could flip to Exhibit B, briefly.

4     A.    Okay.

15:54:21 5     Q.    I believe you testified to earlier that Exhibit B

6     was an e-mail you received from Alberto Guzman with what

7     he stated were documents from the computer Brian Bardwell

8     was using?

9     A.    Yes.

15:54:31 10    Q.    Do you have any reason to doubt Mr. Guzman's

11    statements?

12    A.    No.

13    Q.    All right.  If you could go to -- do you have the

14    binder, the other binder?

15:54:43 15    A.    Yes.

16    Q.    Exhibit 28, and I'll put it up on the Elmo.

17    A.    Okay.

18    Q.    Do you see Exhibit 28 there?

19    A.    Yes.

15:55:07 20    Q.    What is Exhibit 28, Ms. Roberson?

21    A.    It's a declaration from Alberto Guzman in regards

22    to him being the supervisor of hardware evaluations at

23    the City of Cleveland Department of Law and the equipment

24    that was used by Brian Bardwell while he was an intern

15:55:31 25    with the City of Cleveland.

1    Q.    And there's multiple documents there; there's pages

2    behind that declaration?

3    A.    Yes.

4    Q.    Just if you would, just flip through those very

15:55:40  5    briefly, if you could take a look at those.

6                 Sorry, for the --

7    A.    Okay.

8    Q.    Let's focus on this one first.

9                 MR. CHANDRA:  Your Honor, again objection

15:56:10 10    based on Rule of Completeness here.

11                 MR. VANCE:  The declaration itself actually

12    says that these are excerpts from documents that were on

13    Mr. Bardwell's computer.

14    BY MR. VANCE:

15:56:18 15    Q.    The first one here, if we could, it says -- there's

16    a number four there.

17                 Do you see that?

18    A.    Yes.

19    Q.    Does that look at all similar to the fourth

15:56:25 20    attachment to that e-mail that Mr. Guzman sent you in

21    Exhibit B?

22    A.    In Exhibit B?  The very last one.

23    Q.    The last attachment, the fourth attachment --

24    A.    Right.

15:56:58 25    Q.    -- to Exhibit B.

1          And then if you could go to the first

2     document between -- behind the Guzman declaration,

3     please.  It's got the "1" up in the top right corner?

4     A.    Yes.

15:57:13  5     Q.    Does that look like any document that was attached

6     to Exhibit B that Mr. Guzman sent you?

7     A.    Yes.

8     Q.    And what document does that look like to you?

9     A.    This is a listing of the document of all the

15:57:28 10     numbers that I saw Mr. Bardwell working on.

11     Q.    The first attachment to that Exhibit B, right?

12     A.    Right after Alberto Guzman, this, this one here?

13     Q.    Yes.

14     A.    Yes.

15:57:42 15     Q.    And that's the first attachment to Exhibit B, that

16     '15 document?

17     A.    Yes.

18     Q.    Do you have any reason to doubt Mr. Guzman's

19     declaration?

15:57:53 20     A.    None at all.

21     Q.    Ms. Roberson, do you know approximately what time

22     frame it was that Mr. Chandra deemed the entire Public

23     Records Log attorney privilege and work product?

24     A.    It had to be, I would say, his second year as Law

15:58:29 25     Director.

1    Q.    So that would have been 2000 --

2    A.    Because there was a discussion about the log and

3    the information that was contained on the log, and so the

4    decision was made to make it attorney/client privilege.

15:58:41  5    Q.    The entirety of the log, correct?

6    A.    The entire log, correct.

7              MR. VANCE:  I have no further questions.

8              THE COURT:  Thank you, Mr. Vance.

9              Mr. Chandra.

15:58:48 10              MR. CHANDRA:  A few, Your Honor.

11         RECROSS-EXAMINATION OF KIMBERLY ROBERSON

12    BY MR. CHANDRA:

13    Q.    If, in fact, there were, in your Public Records

14    Log, confidential attorney advice regarding the Sean

15:59:16 15    DeCrane public records request in particular, that PR

16    15-2220, if such information existed, you would have been

17    fully capable of bringing it to court today, correct?

18    A.    If I had been asked.

19    Q.    Right.  And no one asked you to, right?

15:59:39 20              MR. VANCE:  Objection.

21              THE COURT:  Overruled.

22              And please speak into the microphone.

23              Did anyone ask you to bring that?

24              THE WITNESS:  No, no one asked me to.

15:59:48 25

BY MR. CHANDRA:

Q.   So as you sit here today, you have no idea whether there was any confidential information related to Sean DeCrane that are part of the records of the City of Cleveland, correct?

A.   No, not without seeing it.

Q.   Right.  And as you sit here today, you don't know whether Mr. Bardwell, in his two or three days of working on addressing the public records requests backlog, actually ever laid eyes on anything related to Sean DeCrane?

A.   Correct.

Q.   All right.  And you have no basis for -- well, let me ask you, approximately in the summer of 2016, before Mr. Bardwell started assisting you, if one were looking at the public records request log -- the complete log, not just excerpts -- on a computer screen, about how many pages would that log go on and on at that time frame?

A.   Just for 2015?  I --

Q.   No, I didn't ask about that.

A.   Oh, okay.

Q.   I'm just saying the entire Public Records Request Log, if a law clerk were to access that, if you were to access that, just at the time that Mr. Bardwell was starting in the summer of 2016, about how many pages

1    would that screen go on and on that you'd have to page

2    through?

3    A.    Depending on looking at the descriptions and so

4    forth, I'd say about three hundred pages.

16:01:28  5    Q.    Okay.  And it would be in pretty small font to look

6    at the whole thing on the screen?

7    A.    Probably a ten font.

8    Q.    And if someone were to testify that there would be,

9    you know, ten to 20,000 lines there to go through, does

16:01:47 10   that sound about right?

11   A.    Possibly.

12             MR. CHANDRA:  I have no further questions.

13   Thank you.

14             THE COURT:  Thank you, Mr. Chandra.

16:01:57 15             Ms. Roberson, thank you very much, ma'am.

16   You can step down.

17             THE WITNESS:  Thank you.

18             (Witness excused).

19             THE COURT:  Okay.  I believe that's it,

16:02:31 20   ladies and gentlemen.

21             I will have cross-briefs.

22             MR. CHANDRA:  Your Honor, I actually wanted

23   to call Mr. Bardwell.

24             THE COURT:  Not necessary.  I have

16:02:40 25   everything I need.  I heard him.  I heard her.  We're

1    done.

2              Cross-briefs due a week from today, 4:00

3    o'clock.  I will specify the page limit when I think

4    about this a little bit back in my chambers.

16:02:52  5              Heard and submitted, and I'll rule as

6    quickly as I can, to move it along.

7              MR. CHANDRA:  Your Honor, one request that

8    we have, if the Court would please consider it, is

9    because they bear the burden on the motion and because we

16:03:05 10   don't know what additional allegations are going to be

11   framed through the cross-brief, we ask that we be

12   permitted the opportunity to file a response brief to

13   whatever is filed rather than have cross-briefs.  And

14   then, you know, we don't care if they want to reply at

16:03:17 15   that point.

16             THE COURT:  I will look at the

17   cross-briefs, Mr. Chandra, and if I think I need a

18   response I will order it.

19             MR. CHANDRA:  Thank you, Your Honor.

16:03:22 20             THE COURT:  Heard and submitted.  Thank

21   you.

22             MR. DILENO:  One final request.

23             Mr. Vance is going to be out of town for a

24   few days next week.

16:03:31 25             Is there any way to get a little more --

205

```
 1                    MR. VANCE:  This week.
 2                    MR. DILENO:  This week, I'm sorry.
 3                    -- a little more time to address the
 4      cross-brief issue?
16:03:39  5           THE COURT:  How long are you gone for?
 6                    MR. VANCE:  Four days, between now and when
 7      it's due.
 8                    THE COURT:  All right.  I'll cut it in
 9      half.
16:03:44 10           Wednesday, 4:00 o'clock.
11                    MR. VANCE:  Thank you, Your Honor.
12                    THE COURT:  Okay.  We're adjourned.  Thank
13      you, everyone.
14                    MR. CHANDRA:  Thank you, Your Honor.
16:03:49 15           THE CLERK:  All rise.
16                    (Proceedings concluded at 4:04 p.m.)
17                             -  -  -  -
18
19
20
21
22
23
24
25
```

1

2                     C E R T I F I C A T E

3                     I certify that the foregoing is a correct

4     transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8

9     **/s/Susan Trischan**

10    /S/ Susan Trischan, Official Court Reporter

11    Certified Realtime Reporter

12

13    7-189 U.S. Court House

14    801 West Superior Avenue

15    Cleveland, Ohio 44113

16    (216) 357-7087

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2

3   **WITNESSES:**                                      **PAGE**

4     DIRECT EXAMINATION OF KIMBERLY ROBERSON              135

5     BY MR. VANCE

6     CROSS-EXAMINATION OF KIMBERLY ROBERSON               160

7     BY MR. CHANDRA

8     REDIRECT EXAMINATION OF KIMBERLY ROBERSON            195

9     BY MR. VANCE

10    RECROSS-EXAMINATION OF KIMBERLY ROBERSON             201

11    BY MR. CHANDRA

12

13                          * * * * *

14

15

16

17

18

19

20

21

22

23

24

25