Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 1

STATE OF OHIO,            )
COUNTY OF CUYAHOGA.       )


        IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF OHIO
                  EASTERN DIVISION

SEAN DECRANE,              )
                           )
     Plaintiff,            )
                           )
      vs.                  ) CASE NO.: 1:16-CV-02647
                           )
EDWARD J. ECKART,          )
et al.,                    )
                           )
     Defendants.           )


                - - - - -
   THE VIDEOTAPED DEPOSITION OF MAYOR FRANK JACKSON
             TUESDAY, DECEMBER 5, 2017
                - - - - -


        The videotaped deposition of
MAYOR FRANK JACKSON, called by the PLAINTIFF for
examination pursuant to the Ohio Rules of Civil
Procedure, taken before me, the undersigned,
Kristin L. Fryman, Notary Public within and for the
State of Ohio, taken at The Chandra Law Firm,
1265 West 6th Street, Suite 400, Cleveland, Ohio,
commencing at 9:05 a.m., the day and date above
set forth.
                - - -

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 2

```
 1    APPEARANCES:
 2        On behalf of the Plaintiff:
 3            ASHLIE CASE SLETVOLD, Esq.
              The Chandra Law Firm
 4            1265 West 6th Street, Suite 400
              Cleveland, Ohio 44113
 5            216.578.1700
              ashlie.sletvold@chandralaw.com
 6
              PATRICK HANEY, Esq.
 7            The Chandra Law Firm
              1265 West 6th Street, Suite 400
 8            Cleveland, Ohio 44113
              216.578.1700
 9            patrick.haney@chandralaw.com
10
        On behalf of the Defendants:
11
              JON M. DILENO, Esq.
12            Zashin & Rich
              Ernst & Young Tower
13            950 Main Avenue, 4th Floor
              Cleveland, Ohio 44113
14            216.696.4441
              jmd@zrlaw.com
15
              STACEY M. PELLOM, Esq.
16            City of Cleveland
              Department of Law
17            601 Lakeside Avenue, Room 106
              Cleveland, Ohio 44114
18            216.664.2310
              spellom@city.cleveland.oh.us
19
     ALSO PRESENT:
20   Alex Cook, Videographer
     Sean DeCrane, Plaintiff
21   Edward Eckart, Defendant
22                          - - -
23
24
25
```

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 3

1     MAYOR FRANK JACKSON'S VIDEOTAPED DEPOSITION INDEX

2    EXAMINATION BY:                    PAGE NO.:

3    MS. SLETVOLD...........................4

4

5              PLAINTIFF'S EXHIBIT INDEX

6    EXHIBIT NO.:                    PAGE NO.:

7         1    ...........................85

8         2    ...........................132

9         3    ...........................134

10

11                   - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 4

```
 1                      - - -
 2            THE VIDEOGRAPHER:  We're on the record.
 3            The time is 9:05.
 4            Today's date is December 5, 2017.
 5            We're here in the case Sean DeCrane
 6       versus Edward Eckart, et al.,
 7       Case No.: 1:16-CV-02647, in the United States
 8       District Court, for the Northern District
 9       of Ohio, Eastern Division.
10            Will the attorneys present please
11       identify themselves for the record?
12            MS. SLETVOLD:  Ashlie Case Sletvold, from
13       The Chandra Law Firm, with Patrick Haney, on
14       behalf of Plaintiff Sean DeCrane.
15            MR. DILENO:  Jon Dileno, law firm of
16       Zashin & Rich, and Stacey Pellom, from the
17       law department is here as well, representing
18       the City of Cleveland, and the mayor.
19                 MAYOR FRANK JACKSON,
20       of lawful age, called by the PLAINTIFF for
21       examination pursuant to the Ohio Rules of Civil
22       Procedure, having been first duly sworn, as
23       hereinafter certified, was examined and testified as
24       follows:
25                 EXAMINATION OF MAYOR FRANK JACKSON
```

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 5

1    BY MS. SLETVOLD:

2        Q      Good morning, Your Honor.

3        A      Good morning.

4        Q      We just met outside.  And as I said, my

5    name is Ashlie Case Sletvold.  I represent

6    Sean DeCrane.

7               You understand that you're here today to

8    give testimony in a First Amendment retaliation suit

9    that Sean DeCrane has filed against the City and

10   some of its personnel, correct?

11       A      Yes.

12       Q      Is there any reason that you can't give

13   truthful and accurate testimony here today?

14       A      No.

15       Q      Are you taking any medications that might

16   impact your ability to remember things?

17       A      No.

18       Q      Have you been deposed before?

19       A      Yes.

20       Q      How many times?

21       A      I don't recall.  It hasn't been that

22   many, less than five.

23       Q      When's the most recent time?

24       A      I can't remember that either.  It's been

25   quite a while.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 6

1      Q    Okay.  So because it's been a little bit
2  since you've been through this process, we'll go
3  through some -- just sort of preliminary
4  ground rules.
5           It's very important that, because we're
6  taking a transcript of your testimony here today,
7  that you give audible answers, such as a "yes" or
8  a "no."
9           The transcript doesn't reflect "uh-huh"
10  or things of that nature as well as "yes" or "no."
11           Will you agree to give me "yes" or "no"
12  answers today?
13      A    Okay.
14      Q    Can we also agree to refrain from
15  speaking over each other?
16           So I'll finish my question, and then you
17  can finish your answer before we move on to
18  the next.
19      A    That would be good.
20      Q    Sounds like a plan.
21           If you don't understand something that I
22  ask, will you please tell me, so that I can fix
23  my question?
24      A    Okay.
25      Q    And if you answer my question, is it fair

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 7

1    for me to assume that you did understand it?

2        A    I guess so, yes.  Yes.

3        Q    If you need a break at any time, please

4    ask me.

5        A    Okay.

6        Q    Have you reviewed any documents in

7    preparation for your deposition here today?

8        A    Yes.  I skimmed through the complaint.  I

9    think I got about halfway through.  I was busy

10   yesterday, so I could only get about

11   halfway through.

12       Q    And when you say "the complaint," you

13   mean the complaint filed in this case?

14       A    Yes.

15       Q    Did you review any other documents, other

16   than skimming through half the complaint?

17       A    Yes.  I looked at one document that

18   basically gave a timetable.  It was a timetable of

19   interviews that I had conducted.

20       Q    Interviews that you had conducted?

21       A    For -- in regards to the position of

22   chief of Fire.

23       Q    Understood.  Do you recall which round of

24   fire chief promotional interviews that was?

25       A    That was the one with Mr. DeCrane.  That

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 8

1    was the first one.  And the last one, it was with

2    Chief Calvillo.

3              So it was that period -- I forget the

4    dates.  It might have been 2013 to 2015 or '16,

5    something like that.

6         Q    Okay.  So was it the round of promotional

7    interviews where Angelo Calvillo was selected as the

8    fire chief?

9         A    That was the last one.

10        Q    That was the last one?

11        A    Right.  Right.

12        Q    Were there others that you reviewed for

13   today's deposition?

14        A    I didn't review -- I didn't review

15   any -- I looked at the timetable; at the date -- at

16   the year and the date.  And the first one was -- I

17   believe it was McGinnis -- Mr. McGinnis, Mr. Kelly

18   and Mr. DeCrane.

19        Q    And did those documents refresh your

20   recollection about what interviews you had

21   taken -- undertaken?

22        A    It was a document, but it was just one

23   page with dates on it.  That's all.

24        Q    Did that timeline of dates refresh your

25   recollection about when things had transpired

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 9

1    regarding this case?

2        A    It helped me to understand the sequence,

3    yes.

4        Q    Because you were involved in those

5    promotional interview processes --

6        A    Right.

7        Q    -- going back to when Daryl McGinnis was

8    selected as chief?

9        A    That's correct.

10       Q    Anything else you reviewed besides part

11   of the complaint and the timetable you just

12   described?

13       A    No, not that I recall.  No.

14       Q    If you wouldn't mind, will you describe

15   for us what your responsibilities are, as mayor, as

16   it relates to the Department of Public Safety?

17       A    Other than overseeing their operation and

18   getting a direct report from the directors -- the

19   director of the department and the chief of

20   whichever division it is -- basically that's it.

21            I don't run the show.  I'm not -- I'm not

22   a policeman or a fireman or a paramedic, so I don't

23   run their operation.

24            But I do meet weekly with the

25   safety director and the police chief.  And when

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 10

1    there are issues that come up that -- around Fire

2    or EMS, I meet with the head of those divisions and

3    have weekly meetings.

4        Q    Do you also meet with the

5    assistant safety directors regarding the running of

6    Public Safety?

7        A    Very seldom.  But periodically -- it all

8    depends on what's happening.  If it's -- if it was

9    something around EMS and Fire, I would meet with

10   Assistant Director Eckart.  He would be brought in,

11   just for that moment, to talk about whatever

12   that was.

13            And then if it were something around EMS,

14   it would be Director Eckart.  And if it were Police,

15   it would usually be handled by the director, since

16   Director McGrath and Director Flask were both

17   police chiefs.

18       Q    And so do you rely on the safety director

19   and the assistant safety directors in terms of the

20   day-to-day operations of the Division of -- or the

21   Department of Public Safety?

22       A    Yes.  On the administrative side, I rely

23   primarily on the chiefs to own the operation.  On

24   the administrative side, it is the director and the

25   assistant director.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 11

1        Q      You said you have weekly meetings with

2    Safety Director McGrath?

3        A      Uh-huh.

4        Q      This is one of those examples of when

5    a "yes" or a "no" would be better than an "uh-huh."

6        A      Yes.  I'm sorry.  Yes.

7        Q      Was your frequency of meeting with

8    Director Flask the same when he held the position of

9    safety director?

10       A      Yes.  It's been a policy, since I've been

11   mayor.  I wanted to meet, on a regular basis, with

12   Safety, the director and primarily the police chief,

13   as we looked at the stats and what was going on.

14              And again, whenever needed and

15   appropriate, if something came up, then I would

16   bring in whichever division head was in charge of

17   whatever issue came up.

18       Q      So when are these weekly meetings?  Are

19   they a set date and time?

20       A      Uh-huh.  Thursdays, at one o'clock.

21       Q      How long has that been the case?

22       A      At least a decade, at least.  I think I

23   started almost when I first became mayor, so that

24   would be 12 years.  But I know at least a decade.

25              I met with -- at first, it was with

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 12

1    Director Flask and Chief McGrath, and now it's with

2    Director McGrath and Chief Williams.

3        Q    Do you also have phone conversations or

4    e-mail interactions with the safety director

5    throughout the week, other than those

6    in-person meetings?

7        A    Well, I don't do e-mails, but I

8    do -- like today, the director called me about a

9    couple of homicides that occurred last night.

10            And so he'll call me in regard -- if

11   something is happening, he'll call me.  If there are

12   homicides, he'll call me and tell me that it

13   happened and give me some update as to what's

14   going on.

15            There was a fire.  There may be a

16   fatality in a fire that occurred last night also, so

17   he called me about that.  And that was just this

18   morning.

19       Q    In your role as mayor, you have the

20   discretion and authority to appoint the director of

21   Public Safety, correct?

22       A    Uh-huh.  Yes.

23       Q    And is it fair to say that

24   Director McGrath serves at the pleasure of

25   the mayor?

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 13

1       A      That's true.

2       Q      And it was the same for Director Flask

3   when he was in that position?

4       A      That's right.

5       Q      And you chose Director McGrath for his

6   current position?

7       A      Yes.

8       Q      And likewise for Director Flask when he

9   held the position?

10      A      Yes.

11      Q      What is Mr. Flask's current role in your

12  administration?

13      A      For lack of a better term, he's a -- he

14  does troubleshooting for me, you know.  If there

15  are -- I get complaints or I get inquiries that I

16  just need to have vetted or to -- and looked at,

17  then he'll check it out for me.

18             He worked with me when they were having

19  problems with the billing and customer service at

20  Utilities, and I sent Ms. Dumas, my

21  finance director, down there to work on that.  He

22  worked on her team.

23             To do that -- the same thing, when we had

24  an interim position or things going on at the

25  airport, he was familiar with airport business.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 14

1    Then I would send him over there.

2            The same thing with personnel -- he has a

3    wide range of understanding and experience of

4    the City, its -- and how it operates, its

5    bureaucracy.

6       Q    And you trust Mr. Flask, in terms of his

7    role in your administration?

8       A    Yes.  Uh-huh.

9       Q    You rely on his judgment?

10      A    Yes.  I ask his advice.  Yes.

11      Q    Is the same true of current director,

12   McGrath?

13      A    Yes.

14      Q    Did you appoint Mr. Eckart as the

15   assistant director of Public Safety?

16      A    Yes.

17      Q    Do you remember when that was?

18      A    It was when Director Flask was the

19   director.  I don't remember what year that was, but

20   it was when Director Flask was the director.

21           And he -- we were -- the position was

22   open, and he recommended Mr. Eckart to be the

23   assistant director.

24      Q    And you took his recommendation?

25      A    Yes.  And I had worked with

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 15

1    Commissioner Eckart, when he was commissioner of EMS

2    for some years.  And so we had had our interactions

3    around that, so I knew him.  I knew him.

4        Q    Was there a particular project you

5    appointed him to lead?

6        A    Who?  Assistant Director Eckart?

7        Q    Yes.

8        A    I did not.  But I know that

9    Director Flask and Director McGrath both used his

10   expertise in EMS and his knowledge of Fire.

11            Because one of the things we were doing,

12   at that time, was attempting to do an integration

13   between the two divisions.  And so there was -- and

14   he had knowledge of -- well, he was commissioner

15   of EMS, and he had knowledge of Fire.

16       Q    Where did he develop that knowledge

17   of Fire?

18       A    I don't know.

19       Q    Did he ever work in the Division of Fire?

20       A    Not to my knowledge.

21            But, you know, Fire and EMS sometimes are

22   seamless, they -- particularly when they go out on

23   runs.

24            Since Fire is a first responder, they

25   many times get to the scene first, before -- on a

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 16

1   medical emergency, before any EMS, because
2   of -- they're more logistically located.  They're
3   better located.
4          And so when -- Fire usually is the
5   first responder, and then EMS comes along.  So they
6   have a pretty good operational relationship, in
7   the way in which they perform that emergency medical
8   service, so they interact quite well on the scene.
9      Q    And Mr. Eckart was charged with
10  integrating those divisions?
11     A    No, he wasn't.  The director was charged
12  with that, along with our attorney, who was
13  negotiating, with Local 93, the integration.
14         And it had been going on for -- it always
15  had been talked about, but it never occurred.  And
16  we had begun the discussions in the last
17  collective bargaining agreement, I believe it was.
18         And so between the attorney and
19  Director -- it might have been McGrath -- no.  It
20  was Flask.  Then they began to have a serious
21  discussion around integration, rather than just
22  having a sidebar conversation.  So we -- it was part
23  of a negotiation.  We were negotiating.
24     Q    What's the status of the
25  proposed integration?

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 17

1       A       It is -- it has not happened.

2       Q       To what do you attribute that?

3       A       You know, there's -- anytime you -- it's

4    cultural- and operational-embedded things.

5               And around a contract, when you're

6    looking at a Fire contract, an EMS contract, they're

7    different in merging those two and looking at

8    seniority and looking at other kind of operational

9    needs that need to happen.  And when people go to

10   work, one is 24 on and 48 off; the other one

11   works 10 hours, those kinds of -- all those kinds of

12   things.

13              There's a -- with Fire, they live in

14   a house, a station, and, you know, they develop

15   relationships, as you do when you live in -- with

16   somebody for days on end, and EMS doesn't do that.

17              So there's all these kind of cultural and

18   operational things, and it just didn't happen, even

19   though we still intend to get there sooner or later.

20      Q       Who kept you apprised of the status of

21   the integration talks?

22      A       The director.  The director did.

23              And sometimes, if it got to a key point

24   in the negotiation, the attorney would call, along

25   with the director.  And then Mr. Eckart would

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 18

1    be -- that's one of the times that, if the director
2    felt like it or it got to a certain point, he would
3    ask Mr. Eckart to come in and clarify a
4    certain point, but not around the negotiation.  That
5    usually was with the attorney.
6              And so it would usually be the three of
7    them, either by phone or on one of our
8    Thursday meetings, something like that.
9    Q      So where did you gain your understanding
10   of the cultural and operational differences that may
11   make integration a challenge?
12   A      Twenty-seven years of serving as a
13   public official and interacting with
14   both -- some -- you know, some -- you just learn it.
15   You learn it, if you get involved in it.
16             Because when you're in -- when I was in
17   council and when I was council president -- when I
18   was in council and council president, there were
19   key points in time when there were
20   budgetary problems.  There were layoffs that were
21   occurring, and then -- so you get to interact,
22   particularly when I was in -- as council president.
23             And then when I became mayor, there was
24   the contract negotiations, the conversations we were
25   having, and then there were issues that would

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 19

1    pop up.  They would just pop up.  No matter who the

2    chief was, these issues would pop up.  And then

3    you'd have to address them.

4            So I just learned it from being at

5    City Hall for 27 years.

6        Q    Does Mr. Eckart have a good understanding

7    of the cultural and operational differences that may

8    have made integration a challenge?

9        A    I would imagine so, yes.  Yes.

10           You know, he was relied on.  That was

11   his -- it was his responsibility to oversee those

12   two divisions, so yes.

13       Q    Does Mr. Eckart, likewise, serve in his

14   position at the pleasure of the mayor?

15       A    Yes.

16       Q    Since Mr. Eckart has been the

17   assistant safety director, how frequently have you

18   interacted with him -- let's start with in person?

19       A    In person, very seldom, to be honest

20   with you.

21           It would be part of the -- a weekly

22   meeting, or he -- I know there was -- at one time,

23   he was thinking about retiring and moving on, and we

24   had a discussion then and then those kinds

25   of things.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 20

1              But very seldom one-on-one, other than in
2       the hallway, on the elevator, at the -- and then
3       even then, it wasn't always a conversation
4       around business.  It was just a conversation.
5              But primarily, it would be when he was
6       brought in.
7        Q    When was Mr. Eckart thinking of retiring?
8        A    I don't know -- a couple of years back, a
9       couple of years back.
10             I know he -- Mr. Eckart had retired and
11      was re-hired.  And then Mr. Eckart was looking to
12      retire and just be retired, I guess.  He didn't
13      share the reason for it.
14             And then he -- and then he changed
15      his mind, and he came back in and asked me if it was
16      okay for him to -- if we continued him being
17      assistant director.
18             I said, yes.
19       Q    So did he take any steps towards
20      retirement that you're aware of or --
21       A    Not on his second term -- I don't know.
22      You'd have to ask him.  I don't know.  I know he did
23      on the first term.
24       Q    So when you say that he came back in and
25      asked if it would be okay for him to continue, as

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 21

1    assistant director --

2        A     Right.

3        Q     -- had he taken some step, other than

4    just saying to you that he was thinking

5    about retiring?

6        A     I think it was a conversation of what was

7    on his mind.  It was a conversation of what was on

8    his mind.

9              He was thinking about, you know, maybe

10   I'll -- maybe I'll retire.  Maybe -- you know, I'm

11   thinking about it.  You know, I'm just giving you a

12   heads-up, Mayor.

13             And then some time later or a few months

14   later, he said he had made up his mind, and he was

15   going to ask if he could stay.

16             And I said, yes.

17       Q     How often do you interact with Mr. Eckart

18   by phone?

19       A     Very seldom, very seldom.

20             Again, that would be something that would

21   be initiated through the director or initiated

22   through the lawyer, if there's negotiation going on

23   and there's need for clarification for something.

24             Or it might be vice versa.  I would be

25   talking to the director and Mr. Eckart, and then

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 22

1    we'd call the lawyer for clarification.

2            And it was primarily around the

3    integration.

4       Q     And just so we're clear, as we're going

5    through the day, I don't want you to tell me

6    anything about what communications you had

7    with counsel.

8       A     Uh-huh.

9       Q     And anything involved in, you know, what

10   counsel has said to you, what you've said to counsel

11   in your capacity as a city official.

12      A     Right.

13      Q     I'm not asking about any of that.  I'm

14   not asking you to testify about any of that, just so

15   we're clear.

16      A     Okay.

17      Q     So is it fair to say that, typically,

18   when you need something or if you have a question

19   regarding something with EMS or Fire, you interact

20   with your director of Public Safety, and he deals

21   directly with Mr. Eckart on that?

22      A     Right.  Or -- right.  Or that may be a

23   time that we may get Mr. Eckart on the phone, or it

24   may be a time I'll ask him something.

25            And he said, well, I'll have the

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 23

1    assistant director come in next Thursday and explain
2    that to you, something like that.
3         Q    Other than issues related to the
4    integration, what would be the types of things that
5    would require you and your safety director to get
6    Mr. Eckart on the phone?
7         A    Well, there were -- we had challenges
8    at EMS sometimes.  We were looking at how do we have
9    a better response time.
10             As I said, Fire and EMS work very well on
11   the ground, you know.  On the ground, they
12   do -- they're like -- they're seamless.  They do
13   very well.
14             And so we were looking at how do we have
15   a better response time from EMS.
16             If there were things going on around
17   promotion and looking at the promotions, you know,
18   the process of promotion, if there were cadet
19   classes that were coming in for EMS or Fire,
20   we would sometimes be reviewing what was the
21   demographic of that, that kind of stuff.
22        Q    So do you rely on Mr. Eckart as part
23   of Fire and EMS promotional processes?
24        A    Yes.  Yes.  I relied on him in terms of
25   him explaining to me the process.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 24

1            Because you have to remember that with

2    Fire, other than the chief, everything is union, and

3    so there's a process to that.

4            And what happens is he would sometimes

5    explain to me what the process is and bring in the

6    list -- or if there was a list of promotions, say

7    we're promoting lieutenants or captains or

8    battalion chiefs or something like that, and I'd

9    have to swear them in, then he would -- he would

10   give me the demographics of that.

11           It's a pretty prescribed promotion.

12   Other than chief, it's pretty prescribed.

13      Q    So for the chief promotional process, you

14   have more flexibility.

15           Is that fair to say?

16      A    Well, basically complete flexibility.

17   Because it's -- if my understanding of the charter

18   is correct, it's an at-will position.

19      Q    The chief of Fire?

20      A    Yes.

21      Q    And so do you rely on Mr. Eckart, in

22   terms of facilitating that promotional process, when

23   you have a vacancy in the fire chief spot?

24      A    No.  I rely on the process that was

25   set up.  It was set up by, I think, Director Flask,

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 25

1    and there's a process.  And I do this with Safety.

2    It's just not Fire.  It's Safety in general.

3              I will have -- since I don't -- I'm not

4    a fireman.  I'm not a policeman.  I rely on the

5    division to run itself and to -- and I take

6    recommendations from the division.

7              So the -- even with Police, I did -- an

8    example -- just an example, a couple of days

9    ago -- or last week, I interviewed a couple of

10   people for deputy chief of Special Operations, so it

11   would be assistant chief, for Special Operations, in

12   Police.

13             So that process of vetting who would come

14   to me to be interviewed -- even though it's my

15   choice -- I don't -- I just don't go in there and

16   say, I want this person; I want that person.

17             I let the division go through a process.

18   And they -- then they send me people, and then I

19   interview people.

20             Usually, they send me two.  Sometimes

21   they'll send me three.

22             I did the same thing last week for the

23   chief of animal control, the dog warden.  That

24   position became vacant, and so I'm -- they sent me a

25   couple of people.  I interviewed them.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 26

1           So it's just natural.  I rely on it,

2     their process, the internal process, to send me

3     candidates.  Then I will interview them.

4           After I interview them, on our

5     Thursday meetings, I would have a discussion with

6     the safety director.

7           And on the Police side, I would have a

8     discussion with the chief, and usually we would

9     reach consensus as to who we picked.

10          But ultimately, it would be my choice.

11          And the same thing with Fire.

12    If -- there would be an interview, and I would have

13    a discussion with the director.

14          And at the end of that, then I would make

15    a choice.  And I would say 90 percent of the time,

16    in Fire and Police, about 90 percent of the time,

17    we agree, you know.

18          When we don't, then I -- my decision is

19    what happens.

20    Q    When you say "we," who do you mean?

21    A    I mean whoever is having the discussion.

22          If it's the director -- in Police, it

23    would be the -- well, let me back up.

24          When we were choosing a police chief,

25    then I had -- it was just me and the director,

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 27

1    because I didn't have a police -- I was to interview
2    a police chief.
3              It's the same thing with Fire.  It would
4    be me and the director.  We would have that
5    discussion.
6        Q    In terms of Fire promotional -- you know,
7    fire chief promotional processes, in the past few
8    years, you said you rely on the folks to send
9    you candidates?
10       A    Yes.
11       Q    Who precisely are you relying on to send
12   you candidates, in terms of the names of the
13   individuals?
14       A    It's -- I don't -- whoever does the
15   initial interviewing screening, whoever that
16   is -- and I know the safety director is involved.
17   I know Mr. Eckart is involved -- I don't know who
18   else is involved -- but whoever it is that vets
19   them, who -- there's a -- there's a group, and they
20   vet them.
21             I don't pick the group, you know.  I
22   don't determine who they are.  I just -- all I look
23   for is for them to send me at least two candidates
24   to interview.  Sometimes they send three.
25       Q    At their discretion?

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 28

1      A    Yes, whichever -- however they want to do
2    it.  They could send them all, if they want, but I
3    discourage that.
4          I tell them to give me -- give me two,
5    for sure.  And if you -- if something -- if it's
6    close and you want me to look at a third person,
7    I'm fine.
8      Q    What is Mr. Eckart's role in the vetting
9    process in the fire chief promotional --
10     A    I know that he is part of the vetting.  I
11   don't know -- I don't know how they -- I don't know
12   if they have a formal chart where they rank or,
13   you know, give scores.  I don't know -- that part I
14   don't know.
15     Q    So you rely on the director and
16   Mr. Eckart to work that out amongst themselves?
17     A    They work that out, and then they send me
18   a couple of candidates.
19     Q    And has that been the same going back to
20   the promotion of Daryl McGinnis to the fire chief
21   position?
22     A    Yes.  Uh-huh.
23     Q    Were you involved -- or how were you
24   involved in the decision of selecting Mr. McGinnis?
25     A    I made the decision.  I made

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 29

```
 1   the decision.
 2            They -- I think it was McGinnis, Kelly
 3   and DeCrane, and I interviewed the three of them.
 4   That was a time they sent me three, and I
 5   interviewed the three of them.
 6            And then I made a decision.  I did have a
 7   conversation with the director at our next weekly
 8   meeting, and then -- and then I made the decision to
 9   go with Mr. McGinnis.
10       Q     Why did you choose Mr. McGinnis in
11   that round?
12       A     I'm recollecting, so let me --
13   let me -- what I do is:  -- when you're in a
14   position like mine, it's every -- day-to-day stuff
15   is not routine.  And we live in a world today where
16   what's good today, and is very helpful, will give
17   you the blues tomorrow.  And so you have to be very
18   fluid and flexible.
19            And so I look at what is -- what are we
20   trying to accomplish at that moment.
21            The thing that we were attempting to do
22   was deal with this integration.  That was a -- that
23   was a priority.
24            At that time, we were looking at
25   integration.  And I know that -- or I think, when I
```

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 30

1    was interviewing the candidates, I actually asked

2    them about integration.

3              And in my opinion, Mr. McGinnis was

4    the -- at that time, for what we needed to have

5    done, was the best candidate to do that on the

6    integration.

7              He was less-wedded to -- how should I say

8    this? -- he was less-wedded to the culture,

9    so to speak.

10   Q      What culture do you mean?

11   A      The culture of Fire, you know, and the

12   culture of the position of the union -- of Local 93.

13   He was less-wedded to that.

14             He was more willing to do things that

15   he -- that were not going to sit well within the

16   culture or within the union, things like that.

17   Q      What kind of things?

18   A      Well, like he put EMS into firehouses,

19   which was a big deal back then.  Now it's not

20   as -- it's not as big.

21             Because one of the reasons why Fire is

22   always -- almost always the first on the scene,

23   they're better-located.

24             And sometimes we had -- EMS wagons would

25   sit in a field; yes, sit in a field.  And they'd

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 31

1   have the engines running to stay warm in the winter
2   or something like that, because they had no base.
3           Or they'd be in between calls, and they'd
4   just stop somewhere.  So there's no base for them.
5   We usually had them at a -- in an emergency room at
6   a hospital or something like that.
7           So they weren't ideally situated
8   throughout the city to have a better response to
9   calls for service.
10          Where Fire is; it really is.  And they're
11  very good at what they do when they get there.
12          But the protocol of who transports and
13  who has -- who are paramedics, who are not
14  paramedics, all of these other kind of things, what
15  they can do -- and stabilizing patients and all of
16  that.
17          To me, it was always more important to
18  have EMS get there as quick as possible or even be
19  first, because that was their job.  And in order to
20  do that, we had to have them better-positioned.
21          So Mr. McGinnis was very willing
22  to -- again, for lack of a better term, force
23  EMS wagons and ambulances into a fire station.
24          And that's a very difficult thing when
25  you have, like I said, the -- our firemen and women,

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 32

1    they live together, and they get to know each other.

2              It's like having a stranger come to your

3    house and want to spend the -- a week, you know.

4              It gets problematic, you know.

5              And so -- but after a while -- now, it

6    works pretty well.  I think they reached some level

7    of acceptance of each other.

8              But back then, it was -- it was -- that

9    was a -- that was a very challenging thing, and he

10   was willing to do stuff like that.

11             He was willing to talk about integration

12   in a way that would do those things that we felt had

13   management rights, that were not part of the

14   collective bargaining.

15             And of course, when he would do it, he

16   would get the grievance, and then we'd have to go

17   through the whole grievance process.

18             But he was willing to do those kinds of

19   things, rather than just saying, no, that won't

20   work, that won't work, that won't work; they won't

21   accept that, they won't accept that.

22             So at that time, because of his attitude

23   and the way he -- his makeup, he was -- he was the

24   best -- I still believe that he was -- at that time,

25   he was the best choice for that position.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 33

1       Q     Did Mr. Flask --

2       A     Based on what we wanted to get done.

3       Q     Did Mr. Flask agree that Mr. McGinnis was

4    the best choice?

5       A     Yes.  Well, Mr. Flask, Director Flask

6    would -- none of them would argue with me.  They

7    would -- they would give me their opinions as

8    to -- as to different things.

9             But at the end of the day, I make the

10   choice.  And even, I guess, technically, it's the

11   director who makes the choice.

12            But at the end of the day, it would be

13   me, and so I chose Mr. McGinnis.

14            And now, Mr. DeCrane did a good job, and

15   so did Mr. Kelly on the interview.  But they were

16   not as flexible as Mr. McGinnis.

17      Q     How do you mean?

18      A     Again, Mr. McGinnis was willing to do

19   things contrary to the culture, and he was willing

20   to do things that were -- we believed were

21   management rights, with collective bargaining, and

22   make those kind of decisions, even though we knew we

23   were going to get a grievance.

24            And this was all around integration,

25   integration.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 34

1      Q     So what was Mr. Flask's opinion, that he
2    shared with you, in terms of the McGinnis
3    promotional --
4      A     I can't remember.  I can't remember that.
5    I can't remember exactly.  I just remember that
6    being my focus in the choice of the chief.
7            Because -- you know, they say never
8    add things if you're not asked -- but Mr. O'Toole
9    had been the acting chief for some time and had done
10   a pretty good job, in terms of being the
11   interim chief.
12           I remember Mr. DeCrane actually said, in
13   his interview, that he believed that Mr. O'Toole was
14   the best choice of all.
15     Q     But you didn't interview Mr. O'Toole,
16   did you?
17     A     No. No.  He wasn't --
18     Q     Why not?
19     A     He wasn't sent to me.
20     Q     Who made that decision?
21     A     You have to ask the committee.  It's a
22   process eliminated -- they -- you know, so I got
23   whoever they sent me.
24     Q     Okay.  Do you remember there being any
25   disagreement amongst you and Mr. Flask and

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 35

1    Mr. Eckart, in terms of the decision to promote

2    Mr. McGinnis?

3         A     No.  No.  There was no -- people may have

4    had opinions, of which I can't remember now.

5         Q     You don't remember there being any kind

6    of fight about it?

7         A     No.  No.  There was -- there was no -- no

8    arguing about it, no.  We agreed that we -- that we

9    needed to move in this direction with integration,

10   and that he was the best fit.

11        Q     How did -- you mentioned Mr. DeCrane's

12   interview briefly.

13            What else do you remember about

14   Mr. DeCrane's interview and how he came across in

15   that round where Mr. McGinnis was selected?

16        A     Mr. DeCrane is a very competent

17   firefighter.  He's got vast experience, and it came

18   out if you looked at his record, you looked at what

19   he's -- you know, what he's done, if you looked at

20   his knowledge, not only of the operation, but of the

21   personnel.

22            Because that's key in a leadership role.

23   You have to know your people, and he had pretty good

24   knowledge of that.

25            He also had a pretty -- a very good

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 36

1    knowledge of the collective bargaining agreement.
2    And he had a very good knowledge and understanding
3    of the culture of the division.  That he understood.
4            I did not get from him, however, that he
5    would be as aggressive and as willing to do those
6    things necessary to promote integration.
7            But in terms of -- and again, if it would
8    be a normal time and you're just going in normal
9    directions and things like that, it might have been
10   a different choice.  It might have been a
11   different choice.
12       Q    Do you think Sean DeCrane would have made
13   a good fire chief?
14       A    In a different time, Yes.  Yes.  Yes.
15   Yes, in a different time.
16            In the time that he was interviewed and
17   in a time of -- in which the direction we wanted to
18   go, he was -- he would not have been the best choice
19   for what we wanted to get accomplished.
20            But yes, he would have been a great
21   fire chief.
22       Q    What about his background and
23   qualifications would have suited him well for
24   success as a fire chief?
25       A    He just knows -- he just knows the

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 37

1    division.  He knows the division.  He's a

2    firefighter.

3              Firefighters are individuals in and of

4    themselves, you know.  He's a firefighter.  And

5    they -- it's a culture, and he is -- he completely

6    understands the culture.  He completely understands

7    the collective bargaining.  He knows operations.  He

8    knows all of those things.  He knows those things.

9         Q    Do you think that the

10   rank-and-file firefighters would have supported

11   Sean DeCrane as chief of division?

12        A    They would have supported -- I think they

13   would have supported DeCrane.  They would probably

14   have supported O'Toole, Kelly.

15             They had probably more problems with

16   McGinnis being chosen, because they knew that he

17   would be somebody who would force change.

18        Q    And you understood that going in?

19        A    That's what I picked.  That's exactly

20   right.  Yes.  That's what I picked.  I needed

21   change.

22        Q    And was Mr. McGinnis able to

23   deliver that, other than what you mentioned with

24   putting the EMS --

25        A    He was moving in the right direction

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 38

1    until he ran into his difficulties.  But yes, he was

2    moving in the right direction.

3          And there were -- there were some very

4    tense and contentious moments within the division,

5    not just with -- not just with

6    traditional mentality, but even with people who

7    probably were wanting change, but, you know, not the

8    Daryl-McGinnis style, you know, because he was

9    pushing it.  He was pushing it pretty hard.

10    Q     Did you get the impression from

11    interviewing Sean DeCrane, in that 2013 promotional

12    round of interviews, that he didn't support

13    integration?

14    A     Yes.  I think he -- it's not that he did

15    not support integration -- I believe that

16    Mr. DeCrane would -- and again, I'm -- he'd have to

17    correct me if I'm wrong -- but my impression is that

18    Mr. DeCrane was okay with integration under certain

19    conditions, and it's -- and I think those conditions

20    would have been a Local 93 condition, which I would

21    not accept.

22    Q     How do you mean?

23    A     Well, we would go broke, you know.  The

24    whole -- the whole -- the way in which the Local 93

25    collective bargaining is and the way they

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 39

1    operate -- and to have EMS come on and operate the
2    same way, you know, it's a -- it would be a
3    huge expense to bring EMS into that kind of
4    operation.
5              So what we needed to do was to
6    have -- and this is why when we were doing
7    collective -- trying to negotiate the integration,
8    why it just wouldn't work -- because there was the
9    issue of seniority.  And you have EMS people who are
10   not firefighters, but you have firefighters who
11   are paramedics.
12             So -- but if an EMS person is -- has
13   seniority and they then go into that whole round of
14   promotions and they wind up being captains and
15   battalion chiefs -- but they don't -- they're not
16   firefighters -- he'd have a problem with that,
17   and 93, in general, would have a problem with that.
18             And that was one of the major issues that
19   we had to work through in regards to -- in regards
20   to integration.
21             And we thought we had it figured out,
22   but, you know, it just didn't get there.
23             So it's examples like that.
24             So he -- my opinion is that Mr. DeCrane
25   would support integration.  He would support it.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 40

1    But he would support it under certain conditions,

2    and those conditions would be more in line with the

3    Local 93 contract and the culture of Fire.

4            Mr. McGinnis would support integration,

5    but he'd be willing to buck the culture and to look

6    at the contract in a way that there would be more

7    administrative rights in regards to it.

8        Q    What was it about the interviews that led

9    you to believe that Mr. McGinnis, I guess, was

10   less-closely aligned with Local 93 and its

11   interests, than Mr. DeCrane?

12       A    I don't think they -- he was

13   less-closely aligned.  I think he was willing to do

14   what he had to do.

15           If -- again, you didn't ask the question,

16   so I'm at my own risk -- but Mr. McGinnis was a

17   firefighter too.

18           And at the end of the day, they're -- if

19   you -- if you push them to the edge, they'll be on

20   the same spot, even if they disagree with each other

21   or they don't like each other.  They will be

22   firefighters at the end.

23           So he was a firefighter.  He was a

24   firefighter, and he's not -- he's not somebody who

25   would deliberately undermine another firefighter in

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 41

1    a sense like that.

2              If I may give you an example, he would

3    defend actions, as well as force change in behavior

4    in culture.  So he wasn't just anti-Fire.  He was a

5    firefighter.

6              But he was willing to make -- do those

7    things necessary, because he believed in

8    integration.  We believed in integration.

9              And he knew that, in order to get it,

10   there were certain things that had to be changed,

11   culturally and contractually, in order to make

12   that happen.

13        Q    So he was more willing to go against

14   sort of what you saw as the union's interest, than

15   Mr. DeCrane was?

16        A    Not the union's interest -- the culture,

17   which you can't separate 93 from the Fire culture.

18   You can't separate them.

19              There's only one person who is not part

20   of 93, and that's the chief.  But the chief has been

21   raised through 93.

22              So even though they're not technically a

23   member of Local 93, the union, they come up

24   through 93.  Their whole -- their whole career

25   is 93.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 42

1      Q      Where did Mr. Kelly fall, in terms of his

2   willingness to support integration and, you know,

3   in terms of the things you've been talking about,

4   comparing Mr. DeCrane and Mr. McGinnis?

5      A      Mr. Kelly was more understanding of

6   what -- Mr. Kelly was -- is very smart.

7             Again, you have to remember, all three of

8   them are firefighters, so they know -- they

9   know Fire, and they know the culture.

10  They know -- all three of them know it.

11            Mr. Kelly was more in line with, yes,

12  you're right, this has got to be done, this has got

13  to be done.

14            But I didn't get the sense from him that

15  he was willing to do it or would -- or would take

16  the flak for doing it.

17     Q      Like McGinnis would?

18     A      Oh, yes.  Mr. McGinnis would take

19  the flak.  He'd take the flak.

20     Q      So did Mr. DeCrane or Mr. Kelly seem

21  more willing to support the integration?

22     A      All three of them would support

23  the integration.

24     Q      How about support the integration in the

25  way you wanted to do it?

Deposition of Mayor Frank Jackson, taken December 5, 2017

                                                    Page 43

1       A    It's support it in the way that it had to

2    happen, that would be, hopefully, budget-neutral,

3    that would work out these contractual differences,

4    that would help to lead to budget neutrality, and to

5    deal with the thing around seniority, all this other

6    kind of stuff, and who would -- who would be in line

7    to be the leadership of the division.

8            And one of the biggest issues they were

9    having was whether or not Fire would

10   become -- medical would be prioritized and

11   predominated by medical -- or fire suppression.

12           Firefighters did not want to become

13   medical people.  They would gladly be -- do it, but

14   they wanted to be firefighters.  That's what they

15   are, firefighters, if that answers your question.

16      Q    So I guess what I'm looking for is:  Did

17   you think that Mr. Kelly or Mr. DeCrane would be a

18   better partner, in terms of trying to integrate the

19   Fire and EMS services, you know, based on

20   that 2013 interview?

21      A    At that time -- at that time,

22   Mr. McGinnis was the best choice.  At that time, he

23   was the best choice.

24      Q    Setting aside Mr. McGinnis, between --

25      A    Between the two?

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 44

1        Q     Yes.

2        A     Between the two, I would say Mr. DeCrane

3    would be the most rigid.  He would be the

4    most rigid.

5              And Mr. Kelly would not be as aggressive

6    as Mr. McGinnis, but would get there.  But it would

7    take him longer, and he would be more cautious.  He

8    would be more concerned about what other

9    firefighters thought about him and his relationship

10   with them.

11             Do you see -- but he would -- he was the

12   most flexible of the two.  Mr. DeCrane would

13   probably be the most rigid.

14       Q     In terms of his adherence to Local 93

15   culture, as you've described it?

16       A     Mr. DeCrane is a firefighter, yes, a

17   traditional firefighter.  That's right.

18       Q     When did Mr. Eckart first come to you

19   with a concern about Mr. McGinnis' training hours?

20       A     I don't know.  It was early on.  I think

21   it was early on.  I can't recall, to be honest with

22   you.

23             But I think it was early on, he -- and I

24   don't remember this completely.  But it was -- it

25   was mentioned to me that there may be some problems

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 45

1   with his certifications or something like that.

2           So I just asked -- I think he was already

3   chief.  He was already chief.  So I asked him, do I

4   have a problem?  Do you have a problem?

5           And he told me, no.

6       Q    You don't remember Mr. Eckart coming

7   to you, before Mr. McGinnis was sworn in as chief,

8   and letting you know that there might be a problem?

9       A    I don't -- I can't recall.  I know it was

10  early on.  I don't recall if it was before or after.

11  I really don't.

12          I'm thinking it was afterwards.

13  I'm thinking it was after, but I don't -- it could

14  have been before.  I know it was early on.  It was

15  early.  It was early.

16      Q    When you say "early on," you mean

17  early on in Mr. McGinnis' tenure as chief?

18      A    That's what I'm trying to say.  I'm

19  believing it's early on in his tenure as chief.

20          If you -- if the facts are that it was

21  before I swore him in, I wouldn't be surprised if it

22  was then also.

23      Q    You wouldn't dispute that if that was

24  Mr. Eckart's testimony?

25      A    No, I wouldn't dispute that.  No.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 46

1      Q     Okay.  And isn't it true that Mr. Eckart
2    told you that Sean DeCrane is the one who warned
3    Mr. Eckart originally about Mr. McGinnis' training
4    deficiencies?
5      A     That I don't recall if -- I don't recall
6    if he did or not, but he may have.  I just don't
7    recall it.
8            I know he told me about the deficiency.
9    That I do know.
10     Q     You know Mr. Eckart told you about the
11   deficiencies?
12     A     Yes.  Uh-huh.
13     Q     And you don't remember him telling you
14   where he got that information?
15     A     I don't recall.  I wouldn't be -- if he
16   said that he told me, then I would -- I wouldn't
17   deny that.  I wouldn't deny that.  It could be.
18     Q     Did you consider the issue with
19   Mr. McGinnis' potentially deficient training hours
20   or certification problems to be a significant issue?
21     A     Yes.  He couldn't be a firefighter.  He
22   couldn't -- which means he couldn't be the chief.
23     Q     How soon after Mr. Eckart notified you of
24   this potential issue, did you speak to Mr. McGinnis?
25     A     Pretty -- I don't know if it was -- it

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 47

1    was pretty immediate -- not immediate right now.  I
2    didn't pick up the phone.
3              But it was -- it was -- because I had to
4    get -- I had to get past that, you know, because I
5    do have a life outside of picking fire chiefs.
6              So I had to -- I had to -- you know, I
7    had to -- you know, what?  What is this?
8              You know, call McGinnis for me, call him.
9              You know, what about this?
10   Q    I'm sorry.  Did you say you asked someone
11   to call McGinnis for you?
12   A    No.  I'm thinking that's my attitude.
13   That's the way I would approach it.  I'm not saying
14   that's what I did.
15             But that -- in my mind, that's the way
16   I -- I got -- I'm doing things.  And so when
17   something comes up like that out of the blue,
18   you know, then I will say, what?
19             So I need to put it to rest quick.
20             So that's what I'm saying.
21             Your question was how quickly -- it was
22   quick.  I don't know how quickly.  I don't know if
23   it was the same day, the next day.  I don't know
24   when, but it was quick, because I needed to get
25   it -- get past it.  I had -- I have other things

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 48

1    to do.

2        Q    And you said that you called him on the

3    phone, meaning Mr. McGinnis?

4        A    I don't know if I called him on the phone

5    or in person, but I did talk to him.  Yes.

6        Q    And what was his response?

7        A    He told me -- he told me not to worry

8    about it.  There was nothing to it.

9        Q    And did you do anything to follow up

10   on that?

11       A    No.  I took him at his word.

12       Q    Did you discuss Mr. McGinnis' potential

13   training issue with anyone, besides Mr. Eckart and

14   Mr. McGinnis?

15       A    Probably Director Flask, at that time,

16   would have probably been the person I talked to

17   about it, but no -- other than that, no.

18            And I would say Flask.  I would not

19   have not talked to Director Flask about it.

20       Q    You would not have not talked to him

21   about it?

22       A    Yes.  I think I would have talked

23   to Flask, yes, because he is the director.

24       Q    Did you ask Mr. Flask or Mr. Eckart to

25   investigate whether this training hours issue was a

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 49

1    potential problem?

2        A     I don't recall doing that, no.  I don't

3    recall doing that.

4        Q     Were you confident, after speaking to

5    Mr. McGinnis, that he did not have an issue with his

6    training hours?

7        A     Say what?

8        Q     Were you confident after speaking with

9    Mr. McGinnis --

10       A     Yes.  I took him at his word.

11   Yes.  Uh-huh.

12             Because, you know, in this business,

13   there's -- you have to -- you know, that's -- you

14   have to develop relationships with people.

15             And part of that relationship is your

16   word.  And if you wind up lying to people, then you

17   -- that's not a good relationship.  And it goes

18   downhill pretty quickly after that.

19       Q     So other than speaking to Mr. McGinnis,

20   neither you, nor -- as far as you know -- the

21   director or assistant director of Public Safety,

22   took any further steps to confirm --

23       A     I don't -- I don't know if they did

24   or not.  I know I -- I don't -- I don't

25   believe -- no, I don't know.  I really -- I know I

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 50

1    didn't.  I didn't do anything.

2        Q    You didn't task anyone with --

3        A    No.  No.

4        Q    -- going and looking into the

5    training issue further?

6        A    No, I did not.  No, I don't -- I don't

7    believe so, no.

8        Q    When did the issue of McGinnis' training

9    hours come up next?

10       A    It came up -- I would -- it came up in a

11   phone call.  I think it was in the evening.  It

12   might have been in the evening or something, where I

13   got a call -- and I believe it was from Flask.

14   I think it was from Flask -- and said there's a

15   problem.  We got an inquiry in regards to

16   Chief McGinnis' training records, and it --

17            And I said -- and I said, well, okay.

18            And then he said, well, and that -- and

19   they're inquiring as to whether or not he had met

20   his requisite hours, and doing whatever he needed

21   to do.

22            And, you know, I think I asked, well,

23   did he?  You know?

24       Q    Good question.

25       A    And so -- and I believe at that time -- I

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 51

1    don't know if it was on that call or if it was

2    another call -- that they said that they believed

3    there was a deficiency.

4              I don't know if it was then.  They were

5    just informing me there was an inquiry.

6              But I think there was another call -- or

7    maybe even in that call -- I forget which -- where

8    they were saying there was -- could be merit

9    to this.

10   Q    Let me make sure I understand.

11             When you say they were informing you, who

12   do you mean by "they"?

13   A    Whoever was on the phone, and I --

14   Q    Do you remember who was on the phone?

15   A    It would probably -- I know it was Flask,

16   probably Eckart, and I don't know who else,

17   probably Eckart.

18   Q    Do you remember there being more than

19   just the two of them?

20   A    Probably my communications people.

21   Q    Who would be?

22   A    At that time, it would have probably been

23   Maureen Harper, who was my chief of communication,

24   and that's -- she would have gotten the inquiry, and

25   then would have probably called Director Flask and

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 52

1    Director Eckart and then called me.

2              So I'm thinking -- I'm thinking -- I'm

3    trying to get you in trouble -- but thinking that

4    the reason they called me is because they might have

5    done some digging and found that --

6              Mayor, there possibly could be some merit

7    to this.

8              That's why I can't recall if it was then

9    or shortly after then, but I know there was

10   this call.

11       Q    Is determining whether a candidate has

12   the requisite qualifications, including training

13   certification hours, part of what you expect to be

14   part of the vetting process before candidates are

15   presented to you for interviewing for

16   chief positions?

17       A    Yes, that's right.

18       Q    So did you take any action in response to

19   learning that that hadn't been done in terms of the

20   McGinnis promotional process?

21       A    Other than -- other than being not happy

22   and letting them know about it and disciplining

23   their action -- remember, these people are at-will,

24   so they -- I don't need to discipline them.  I just

25   fire them -- so other than them recognizing that I

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 53

1   was not pleased.

2       Q     How did you share that you were

3   not pleased?

4       A     They knew I was not pleased.

5       Q     How did they know?

6       A     They -- I guess the tone of my voice and

7   my conversation with them, that how does this

8   happen?

9       Q     With whom specifically?

10      A     Whoever was on the phone call.

11      Q     And your best recollection is that it was

12  Mr. Flask and Mr. Eckart?

13      A     And probably my communications person,

14  yes.

15      Q     And Ms. Harper?

16      A     Uh-huh.

17      Q     Okay.  Now, when you say that there was

18  an inquiry, what do you mean by "inquiry"?

19            Where was that coming from?

20      A     The media.  It was coming from the media.

21  That's how my communications people got involved.

22      Q     Do you typically get notified when

23  there's a request from the media?

24      A     No.  Huh-huh.  I get -- that's why I'm

25  thinking that they may have told me there might have

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 54

1    been merit, there was merit to it, on that one

2    phone call, because they would not call me

3    every time the media makes an inquiry.

4              We get -- I don't know how many hundreds

5    of them in a week -- or I don't know how many.

6    The law department could tell you -- but it's a

7    huge number, and a lot coming out of Public Safety,

8    a huge number comes out of public -- so they don't

9    tell me every time.

10             If something is happening and -- then

11   they'll -- then they'll tell me that, you know, I've

12   got this -- I've got this inquiry.

13        Q    Who makes the decision about whether a

14   media inquiry is sufficiently important to bring to

15   your attention?

16        A    Communications.

17        Q    So that would have been Ms. Harper in

18   this instance?

19        A    Uh-huh, communications.

20        Q    How many different conversations do you

21   recall when the issue of Mr. McGinnis' training

22   deficiencies was discussed after this inquiry came

23   in from the media?

24        A    You mean with my people, or you mean with

25   my staff, or just anybody?

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 55

1       Q     With anybody.

2       A     A few times.  A few times.  Particularly,

3    the head of -- Mr. Szabo came in my office.

4             And I'll tell you why he came in my

5    office.  Because what happened, when I learned that

6    there was some deficiency in Mr. McGinnis'

7    certification, I then instructed the safety director

8    to go get all of the records.  I told him to go get

9    all of the records.

10            I said, if it's happening with him, and

11   he was -- at one time, was head of that whole

12   training division, I want to know who else -- who

13   else has this problem, you know, and how deep does

14   this really go?

15            And so I instructed them to go over there

16   and just sequester all of the training records, is

17   what I did.

18            So then what happened was I was on the

19   phone whenever that -- that was on the phone call,

20   and then whenever -- so a few days later, I remember

21   we were in this discussion around integration or

22   something, and we were doing some other stuff.

23            And Mr. Szabo, who is the Local 93 head,

24   he wanted an appointment with me.

25            So he came in, and he would -- his

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 56

1    conversation was, you know -- you know, we were

2    developing a good relationship.  We were getting

3    along, and people were settling in.  And we're

4    trying to do the best we can on this integration.

5              And so, you know, he just -- he just

6    started talking.

7              And then he says, and then this thing

8    about the records happened, and you know that's

9    going to create problems about us being able to move

10   forward with stuff.

11             I said -- I said, well -- I said, well,

12   what's the problem?  What's the problem?

13             And then I said to him -- I said, well,

14   you know, Mr. Szabo, what's good for the goose is

15   good for the gander.  You know, you -- and I said to

16   him -- I said, well, and tell me this, the --

17             Because, remember, I talked to you about

18   firefighters are firefighters.  Even in the end of

19   stuff, they usually stick together, and I know that.

20   That's their culture.

21             I said, how is it that y'all throw your

22   own chief under the bus?

23             I said, if he didn't have his

24   certification, that's on him.  If he lied to me,

25   that's on him.  I'll deal with him.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 57

1           But how is it that y'all do this?

2           You know, I just asked him the question,

3    because he came in to express to me how we were all

4    getting along and how things were progressing.

5           And all of a sudden, you know, mayor,

6    when they came over and took those records,

7    you know, that creates a problem.

8           I said, how does it create a problem?

9    If, in fact, everybody did what they were supposed

10   to do, then there's no problem.

11          But then I said, but let me ask you a

12   question, Mr. Szabo, how do you throw your own chief

13   under the bus?  How do you do that?

14      Q    What did you mean by that?  Did you think

15   someone had thrown McGinnis under the bus?

16      A    In terms of firefighters, that's throwing

17   you under the bus.  I'm telling you firefighters are

18   firefighters.

19          I'll give you an example.  After I

20   suspended Mr. McGinnis from duty, and as the things

21   were unfolding and it was pretty obvious that he had

22   not done what he was supposed to do, and -- he would

23   have been terminated for that and plus lying to me.

24          He came in, after he resigned, to debrief

25   with me.  And he, you know, thanked me for the

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 58

1    opportunity to be chief and all this stuff.

2              And you know what this thing he said to

3    me at the end?

4              He said, mayor, don't be too hard

5    on them.

6              I said, chief, you -- what are you

7    asking me?

8              He said -- he said, you know what?

9              He said, don't be too hard on them,

10   you know.  Some of them may have made mistakes,

11   you know.  They didn't do it.  Don't be too --

12             I said, you're nothing but a firefighter.

13             I said, to the end -- now I'm putting it

14   in context.

15             I said, to the end, they just threw you

16   under the bus, for whatever reason, and now you come

17   here to ask me to be lenient on them?

18             I said, you're nothing but a

19   firefighter, man.

20             And that was the end of the conversation.

21             So that's the context of it.  When I'm

22   looking at this firefighter, and I'm -- and

23   firefighters usually don't do that now.

24             There's one thing I can say about them.

25   They usually don't -- they'll squabble.  They'll do

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 59

1    whatever they do.  They'll disagree, even around

2    gender issues, racial issues or whatever it is, but

3    they tend to be -- at the end, they're firefighters.

4         Q    Help me understand what you mean when you

5    say that a media inquiry about McGinnis'

6    training hours somehow means that someone is

7    throwing McGinnis under the bus.

8         A    No.  A media inquiry is nothing.  I get

9    them every day.  I mean I get media inquiries

10   every day.

11             Like I said, it could be dozens of them a

12   day.  And in Safety, that's not unusual, so that's

13   not it.

14             It is the fact that it turned out to be

15   true, which means somebody had some knowledge

16   of it, right?

17             And so when the media asked about it,

18   my assumption was that it was those -- whoever had

19   knowledge about it.

20        Q    What do you mean by that?

21        A    Well, the assumption was that

22   whoever -- somebody had the -- I don't have

23   knowledge of records at the fire division.

24             I mean you don't have knowledge of

25   records at the fire division.  That's why we

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 60

1   sequestered the things.

2           That's when -- right when we went down

3   there and got them, so we would gain knowledge of

4   them, and to find out who had not done things

5   accordingly, and found that there were quite a few

6   people who had not met their minimum requirements.

7           We worked with the State, rather than

8   terminating -- we worked with the State, in order to

9   give them a time to do their catch-up and stuff

10  like that.

11          I think out of that whole situation,

12  there might have been 35, 40, 45 firefighters.

13          One got terminated, ultimately, after a

14  couple of years.  They just refused, for whatever

15  reason, to get current on what they needed to get

16  current, and they wound up being fired.

17          But everybody else -- everybody else was

18  given time.  They all caught up.  Everything was

19  fine.  Everything was fine, and so we began to

20  move ahead.

21          And so that's my point about whoever had

22  knowledge, it -- my assumption -- my assumption was

23  that who had knowledge was somebody who had

24  knowledge of the way things operate over there in

25  the Division of Fire.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 61

1      Q     Who did you think that might be?

2      A     I didn't know.  It could have

3   been anybody.  I mean every -- one of

4   those 35, 45 firefighters knew it, because they

5   weren't -- they didn't do their stuff right,

6   you know.

7      Q     So did you assume that someone with

8   knowledge of the Fire Training Academy's records had

9   alerted the media that there was an issue with

10  Mr. McGinnis' training records?

11     A     I'm not -- somebody -- I believe it was

12  somebody in Fire, yes.  I -- that I believed.

13           And that's what my whole thing around,

14  you know, how do y'all -- meaning

15  firefighters -- how do y'all, firefighters, throw

16  another firefighter -- and this man is the

17  chief -- under the bus?  How do you do that?

18     Q     Okay.  So when you say -- you know, use

19  the expression that someone is throwing him under

20  the bus, you mean notifying the media about his

21  training deficiencies?

22     A     Well, under -- yes.  You know,

23  when -- it's different when you -- when you throw

24  somebody under the bus, you mean for them to get run

25  over, right?

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 62

1      Q     That's fair.

2      A     Well, that's distinctly different in

3   behavior than I have experienced with Fire.

4            Now, they may -- they may bounce

5   each other around or do something like that.  But

6   they usually don't do that, not to that extent,

7   where they want somebody just to be run over.  They

8   usually don't do that.

9      Q     And that was your impression of what

10  alerting the media to Mr. McGinnis'

11  training deficiencies was going to do, was to run

12  him over, figuratively speaking?

13     A     Well, I believe -- well, yes, they threw

14  him under the bus.  Yes.

15     Q     Did you have any discussions with anyone

16  about who might have been responsible for alerting

17  the media to Mr. McGinnis' deficiencies?

18     A     No.  No, I don't recall any discussions.

19            But I just knew it was somebody.  I

20  figured it was Fire.

21     Q     Were you curious as to who it might

22  have been?

23     A     It didn't matter to me.

24     Q     Why not?

25     A     Because it doesn't -- I didn't care.  It

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 63

1   didn't matter to me.  It -- I think it was part of

2   the pushback on McGinnis for the -- his

3   very aggressive, very aggressive attempt to

4   do reform.

5           And mind you now, he pushed

6   EMS ambulances into firehouses.  He was going around

7   changing people's shifts, taking them

8   off -- you know, he was messing with overtime.  He

9   was doing -- he was very aggressive on this.

10          And I think he had some hostile pushback

11  on that, even with people who -- in my opinion, who

12  would -- who wouldn't look at him as an enemy,

13  so to speak.

14          But Mr. McGinnis was an equal opportunist

15  in that regard.  It didn't matter to him who -- he

16  was going to do this, and it didn't matter who liked

17  it and who didn't like it.

18          And I think there was a significant

19  pushback, and a hostile pushback, in regards

20  to that.

21      Q    Did you ever come to learn who was

22  responsible for alerting the media about

23  Mr. McGinnis' training deficiencies?

24      A    I know now who people have said.  I was

25  reading the brief -- I mean reading the thing

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 64

1   here, yes.

2       Q      Who is it that you believe is

3   responsible?

4       A      I don't believe anything.  I'm talking

5   about --

6       Q      I'm asking you what your belief is.

7       A      My belief -- I don't know, and I don't

8   care.  I really don't.  I don't care.

9       Q      So if you don't know who made the call --

10      A      Right.

11      Q      -- you don't know what that person's

12  motivation might have been.

13             Are you -- do you agree with that?

14      A      That's correct.  That's correct.

15             You know, I would suspect, however, it is

16  probably the hostile reaction to his very, very,

17  very aggressive attempt to force some things,

18  in terms of operation and culture in the division.

19      Q      And given that you don't know who is

20  responsible, you can't say what that person's

21  motivations were, correct?

22      A      I can't.  I can't.  I can't.  No,

23  I can't.  You're right about that.

24             And then the other time, that I mentioned

25  this to a firefighter, there was -- this firefighter

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 65

1    came up to my office.  He had set up the meeting

2    with -- I had met him.  I was at a community event,

3    and he was there.

4             And so he came up to me -- this was right

5    after we had sequestered the records.  I'm trying

6    to -- and what happened was he came up to me.

7             And he said, mayor -- he said, can I ask

8    you something?

9             I said, yes.

10            You know, so we were talking.

11            And he said, you know, you made this

12   statement in the paper, in the media, the

13   Plain Dealer, and the statement you made implied

14   that it was all firefighters, that it was all -- the

15   statement you made was negative towards all

16   firefighters.

17            And he said, I want you to know that all

18   of us don't do the same thing.  We're all different.

19            And so as I talked to him, I said,

20   you know what?  You know, you're right.

21   You're right.

22            So I went back to my office -- I went

23   back to the office, and I drafted like a

24   little memo.  And I basically sent it to every

25   firefighter, saying that there was something I said

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 66

1    in the paper, and that I was informed that it was

2    something that -- something that some firefighters

3    took offense to, and I understand that.

4              And so I was just letting them know that,

5    in saying that, I was incorrect, that -- if it

6    implied that every firefighter behaved a

7    certain way.  And so my statement was incorrect in

8    that regard and should not be interpreted that way,

9    right?

10             So this same firefighter -- and I think I

11   may have said the same thing to him.

12             As we were talking, I said, then tell

13   me why -- you're a firefighter, you know --

14   why you -- you know, why do you throw your own chief

15   under the bus?

16             I said the same thing to him --

17        Q    To who?

18        A    -- in that same context.

19             Whoever this firefighter was --

20   it's -- I'll know him when I see him.  I forget his

21   name.  He's a gentleman.  He's a real gentleman.

22   He's a gentleman.

23             And he came to my office another time

24   with mister -- with Councilman Keane.  He asked

25   Councilman Keane to set up the meeting.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 67

1          So he came in, and we were talking.  And

2     he was concerned about some operational issues and

3     things like that, and he -- and the topic came up

4     again about, you know, that --

5          Q     About Mr. McGinnis' training hours?

6          A     About throwing him under -- about how

7     does it get under the bus?  How do you roll -- how

8     do you roll over your own chief, you know?  How do

9     you do that?

10          Because he was telling me about

11     these -- this in the spirit of -- traditional spirit

12     of Local 93, the culture of Fire, he's telling me

13     these things.

14          And I said, well, if that's the case, how

15     do you do this to him?  You know, that kind of

16     thing.

17          And the one thing -- this is what I

18     remember, one of the things I remember.

19          Towards the end of the meeting, he said

20     to me, you know what our problem is, mayor?

21          And I said, what?

22          He said, we don't have anybody to speak

23     for us in the mayor's office.

24          And I said, well, what do you mean?

25          I said, you know -- I said, you know, I

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 68

1    meet with Local 93 when your president's out there.

2              I said, what do you mean?

3              I said, if we're in negotiation,

4    you know, I don't negotiate contracts on things.  I

5    don't negotiate those things.  I don't deal with

6    grievances.  I leave that up to our legal team, the

7    law department, and our legal team on the --

8              I said, well, what do you mean?

9              He said, well -- he said, you do -- we do

10   not have the ability to express our side in the

11   mayor's office -- meaning to me.

12             He said, the only thing we have is

13   Mr. Eckart, and he is our problem.

14             That's what he said to me.

15       Q    Was that Mr. McCafferty,

16   Kevin McCafferty?

17       A    If that's what he -- yes, it might be

18   him.  If he -- if it -- I met with him in my office

19   once, and I met -- and I saw him out on -- in the

20   neighborhood.  He's a gentleman.  He's a gentleman.

21       Q    What did he -- what did he tell you about

22   why Mr. Eckart was a problem?

23       A    Well, he -- I think he viewed Mr. Eckart

24   as someone -- and I'm paraphrasing -- as someone who

25   is hostile to Fire, someone who does not fully

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 69

1   appreciate Fire, and that -- and that he is

2   promoting something that is more in line

3   with -- that would be more in line with his

4   previous job, which would be the

5   commissioner of EMS.

6               So I think that's what he meant by that,

7   and that Fire's side of that story is not being

8   told.

9               And I'm paraphrasing.

10              And so what I said to him -- I said,

11  look, I don't negotiate that.  If we're talking

12  about -- you know, I don't -- I leave that up to the

13  attorneys, you know, the unions and stuff.

14              Y'all -- I don't -- he said, but, yes, if

15  we had -- if the only thing you hear is from him,

16  then all you're going to have is that one side of

17  the story.

18              And I said to him, look, I'm the

19  administration.  I'm not a mediator.  You know, I'm

20  not -- I'm not the -- you know, I'm not the mediator

21  in this.  I'm not the arbitrator in this.

22              We have a position.  The unions have a

23  position.  I leave all that up to the attorneys.

24              And usually, if people in good faith,

25  they usually work it out.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 70

1      Q     Did you take any steps in response to

2   this individual --

3      A     Did I take any what?

4      Q     Any steps -- excuse me.

5            Did you take any steps in response to

6   this conversation with Mr. McCafferty, where he

7   raised the issue of Mr. Eckart being hostile

8   to Fire?

9      A     No, I didn't take any -- I think I told

10  Mr. Eckart that he -- that there was -- that I had a

11  meeting, and that they -- that there was not such a

12  good opinion of Mr. Eckart.  I think I told

13  him that.

14           But no, I didn't take any action.  I

15  didn't -- I didn't need to take any action.  The

16  issues he was raising with me were really around

17  what he felt.

18           And those issues that he raised, that

19  were specific, were collective bargaining kind of

20  things.  And I was not going to -- I told him I

21  don't negotiate -- I don't negotiate like that.

22           You know, you've got to go through

23  the lawyers.

24     Q     Has anyone, besides Mr. McCafferty,

25  raised an issue with you about Mr. Eckart's

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 71

1    potential hostility towards Fire?

2        A    No one that I can remember

3    specifically, no.

4            I think Mr. Eckart has also mentioned to

5    me that they don't always get along.

6        Q    Who?

7        A    Fire and Mr. Eckart.

8        Q    Did he say why?

9        A    No.  I think -- I think it's because

10   of -- remember, when you get -- when you're in

11   contractual negotiation, it's adversarial sometimes,

12   you know.

13           And he represents -- he represents the

14   administration's point of view on these things, and

15   we wanted integration.

16           This basically is around integration,

17   see?  This whole conversation was around integration

18   and operation.

19           The thing that I did follow up on was the

20   conversation that he had around operations, because

21   that was a valid -- to me, that was valid.

22           I forget specifically what his -- what

23   his conversation or complaint was, or request was

24   around operation, but I know I did follow up with

25   that, because that's -- that was -- I believe that

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 72

1    to be valid.

2            His opinion of Mr. Eckart, and whether or

3    not he had a -- Local 93 had a voice in the

4    mayor's office, that wasn't -- to me, wasn't a valid

5    concern of mine -- of his.

6        Q    Has anyone ever raised an issue with you

7    about Mr. Eckart, you know, not getting along with

8    or having hostility towards EMS?

9        A    He -- Mr. Eckart is an administrator.

10       Q    I'm asking if anyone's ever come to

11   you --

12       A    Yes.  And I'm -- and I'm putting it into

13   context.  And so no one has come to me, but I know

14   that he has had some pretty rugged encounters with

15   the collective bargaining union over at EMS.

16       Q    But no one in that collective bargaining

17   agreement -- or in that collective bargaining unit

18   has ever come to you and raised an issue about

19   Mr. Eckart being hostile to EMS?

20       A    Not me personally -- but I've

21   been -- I've been at meetings where the hostility or

22   the difference of opinions was there.

23            I think I was -- I forget where I was

24   one time, when Director Eckart was the commissioner

25   of EMS, and I forget even why I was there.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 73

1          But what I do remember is the
2     confrontation between the head of the union with
3     Mr. Eckart, in terms of whatever we were talking
4     about at that moment.
5          And it was pretty clear that they
6     butted heads.
7     Q     But no one ever raised with you that
8     Mr. Eckart was potentially hostile toward EMS?
9     No one ever came to you with that complaint?
10    A     I don't think anybody -- no, not
11    towards EMS.
12          There were things that they said that
13    Mr. Eckart would not go along with, union demands or
14    what they wanted.  If there were budgetary things
15    and he had to deal with it, as the commissioner,
16    you know, that didn't always sit well with
17    the employees.
18          If he was changing shifts, if we didn't
19    have enough ambulances out to respond in an
20    appropriate way, he would change.  He would do
21    things, and that didn't sit well with them.
22    Q     Certainly administrators and employees
23    tend to have disagreements sometimes.
24    A     Right.  That's right.
25    Q     But my question is pretty simple:  Has

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 74

1    anyone ever come to you and complained that

2    Mr. Eckart had some hostility towards EMS?

3        A      Not EMS, as an organization, no.

4               Hostility, in terms of operations, yes,

5    I've witnessed it.

6        Q      Who is the person who came to you and

7    complained about that?

8        A      I witnessed it.  No one came to me.

9    I witnessed it.  I witnessed it.

10       Q      Right.  So my question is about did

11   anyone ever come to you --

12       A      No.  No.

13       Q      -- and raise the issue with you of

14   Mr. Eckart having --

15       A      No.

16       Q      -- hostility towards EMS?

17       A      No, no one.

18       Q      Who, besides Mr. Szabo and

19   Mr. McCafferty, did you speak with about

20   Mr. McGinnis being thrown under the bus, in terms of

21   the information about his training deficiencies

22   leaking out?

23       A      I don't recall anybody else.  I just

24   remember them, because they -- if they hadn't come

25   to my office, I wouldn't -- I wouldn't -- or I -- if

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 75

1   they hadn't -- if they hadn't have come to me, I

2   wouldn't have said it to them.

3       Q     If Patrick Kelly testified that you had

4   said the same thing to him, would you have reason to

5   dispute that?

6       A     No, I wouldn't, I wouldn't.

7             And that may -- that may be so.  I

8   wouldn't have -- no, I wouldn't.  I couldn't dispute

9   that, if he said it.

10      Q     You've said that to a number of people.

11            Is that fair?

12      A     I know the two.  And if Mr. Kelly said I

13  said it to him, then he's probably telling the

14  truth.  It wasn't a conversation I was having all

15  over the world.  No.

16      Q     Did you have that conversation with

17  Mr. Eckart about Mr. McGinnis being thrown under

18  the bus?

19      A     I probably have, yes.  Yes.  Probably

20  with Mr. Flask too, yes.  And when -- yes.

21      Q     Did you believe it was wrong for whomever

22  tipped off the media about Mr. McGinnis' training

23  deficiencies to have done so?

24      A     Leaks are -- no.  Leaks are leaks,

25  you know.  We -- in any organization, you attempt to

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 76

1   plug leaks, because it's not good for the

2   organization.

3           But City Hall is like washing spaghetti,

4   you know.  That's how much -- that's how it leaks

5   over there.

6           And so that's why our communications and

7   the communications network is so, so important,

8   because you have -- there's a protocol and policies

9   around how -- when a request comes in from media,

10  how do you -- how do you channel that, how do you

11  funnel that up to be responded to?

12          So leaks and -- are just everyday

13  occurrences.  It just happens.  It's the nature of

14  the beast.

15      Q     So do you know what the mechanics were of

16  the particular request about Mr. McGinnis' training

17  records coming in and what led to that?

18      A     No, I don't.  No, I don't.

19          I just know that they asked for it.

20      Q     And you didn't take any steps to

21  determine what had been the series of events?

22      A     No.  No, other than to find out -- to go

23  in depth to see if, in fact, it was accurate, which

24  they believed it was.  They believed there was some

25  credibility to it, but they were going to go

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 77

1    into depth.

2          I asked them to investigate it

3    thoroughly, and to relieve Mr. McGinnis from his

4    command, and to sequester all of the records in

5    training, so I can see what was the depth of the

6    problem.

7      Q    Why didn't you ask for such an

8    investigation when Mr. Eckart first notified you

9    that there might be an issue with Mr. McGinnis'

10   training records months earlier?

11     A    You know, I took him at his word, and

12   that's why he would have been fired if he hadn't

13   resigned.

14         And once I found out that he had not told

15   me the truth, then that's -- now it's a whole

16   different relationship.

17         And he would have been terminated, but it

18   indicated to me that we needed to check and see if

19   there was a more systemic issue here.

20     Q    Was Mr. McGinnis' management of the

21   Fire Training Academy, as its director -- did that

22   play at all into your decision about whether to

23   promote him in early 2013?

24     A    No.  No.  It gave -- the fact that he

25   had -- just like the other candidates were -- they

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 78

1    were well-experienced firefighters.  All of them
2    were.
3              The -- what made the decision was
4    Mr. McGinnis' willingness to make change and
5    to -- and to do it contrary to the culture, and to
6    look at where we believed we had collective
7    bargaining management rights, and to execute on
8    those rights.  That was the key.
9        Q    So when you were making the decision
10   about whom to promote, when McGinnis was ultimately
11   chosen, were you aware of internal -- two internal
12   audits and external audit regarding
13   poor record keeping at the Fire Training Academy
14   under McGinnis' watch?
15       A    I don't recall.  I would -- it was
16   internal?
17       Q    Two internal and one external was my
18   question.  Are you aware of any such audits?
19       A    No.  No.  But I -- I'm saying, no, to you
20   right now, but that would -- that would probably be
21   something that I should have been told about.  If I
22   wasn't, I should have been told about it,
23   particularly the external.
24              And I know that there was -- because I
25   had instructed several audits around overtime and

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 79

1    eventually what turned out to be shift trade issues

2    and things like that.

3             And so I know I had instructed a couple

4    of audits to occur, so I -- those I knew of.  Those

5    I knew of.

6        Q    Would you --

7        A    But I can't recall on the training side.

8        Q    Who would you have expected to share that

9    information with you about any --

10       A    The director.

11       Q    The director of Public Safety?

12       A    Yes, the director.  Uh-huh.

13       Q    Other than the individuals to

14   whom -- about whom you've already testified, did you

15   discuss the issue of the McGinnis leak with

16   anyone else?

17       A    Not that I recall.

18       Q    Do you believe -- the person who leaked

19   the information to the media, do you believe that

20   person should be disciplined?

21       A    You know, it -- they better watch it.

22   That's for sure.

23       Q    What do you mean?

24       A    Because you can't trust them.

25            They better watch it.  That's for sure.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 80

1              You know, but the discipline -- I don't
2       know.  How can you -- I don't know how you can
3       discipline your own people.
4              There are policies.  You can say somebody
5       violated a policy.  But, you know, what level of
6       discipline can you do?
7              You know, but it does factor in as to
8       whether or not you can trust them.
9              They better watch it.
10      Q      And does that same sentiment apply to
11      promotional decisions in the future?
12      A      Of course it does, because you have to be
13      able to trust a person, just like I trusted
14      Mr. McGinnis' word.  And he wound up lying to me, so
15      I was going to fire him, if he didn't resign, right?
16      Q      So it would be appropriate to consider
17      whether someone had leaked that information to the
18      media as part of a future promotional decision for
19      that individual?
20      A      If I had knowledge of it?
21      Q      (Nods head up and down.)
22      A      Yes.  I would factor that in.  Yes.  Yes,
23      I would.
24      Q      And was there anyone in particular whom
25      you suspected had caused the leak?

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 81

1      A     As I said, no.  I didn't care.  I just

2    knew -- I just knew that it -- but you have to

3    understand also, it's not an unusual occurrence in

4    Safety.

5            I'm telling you, sometimes I had to turn

6    on the news to find out what's going on.

7            You know -- you know, the police have

8    this relationship with Channel 19.  And if you want

9    to know what's going on, you know, you call

10   Channel 19, because sometimes they know

11   more -- they'll know it quicker than you know it,

12   you know.

13           Fire's connection is not specific to

14   anybody.  But in Safety, it's not -- that's not

15   unusual.

16      Q     If Mr. DeCrane leaked the information

17   about Mr. McGinnis' training deficiencies to the

18   media, should that prevent Mr. DeCrane from being

19   promoted in the future?

20      A     If I had to make the decision about it

21   and I knew about it, yes, it would have -- it would

22   have a serious impact, a negative impact, on him

23   being promoted, yes, because I couldn't trust him.

24      Q     So how did you go about deciding -- after

25   the media request came in regarding Mr. McGinnis'

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 82

1    training hours, how did you determine how to proceed

2    at that point?

3        A    I just gave instructions.

4            Again, I go on to other things.  I

5    just -- I'm not just focused on one thing, so I just

6    gave instruction:  Go over there.  Get all of the

7    records.  And then set up a -- do an investigation,

8    as to what transpired, audit of whatever it is.

9            So I just give the instructions, and then

10   I just go off and do what I'm going to do,

11   other things.  I do other things.

12       Q    And so did you make the decision to

13   relieve Mr. McGinnis of his duties and order that

14   the internal audit begin before the information

15   about his training deficiencies was released to

16   the media?

17       A    No, I didn't do that.  No, I didn't do

18   that.  No.

19       Q    Do you know when the information that had

20   been requested by the media was released to the

21   media --

22       A    No, I don't.

23       Q    -- in terms of whether it happened before

24   or after the records were seized from the

25   Fire Training Academy?

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 83

```
 1        A     No, I don't.

 2              I just know when my -- when I got the

 3     phone call, that there was this inquiry.  And the

 4     more I think about it, I think all of it happened on

 5     that one call, that there seems to be merit to it.

 6        Q     So in that call, you learned that there

 7     might be merit to the issue with the --

 8        A     Right.

 9        Q     -- with Mr. McGinnis' training

10     deficiencies?

11        A     That's right.  That's right.

12        Q     And you made the decision that you would

13     have an internal audit done of the Fire Training

14     Academy's records?

15        A     I made a decision to get all the records.

16     And then the process, as to what to do with them,

17     that developed.

18        Q     You were going to do something with them?

19        A     Yes.  I just wanted to -- I just --

20        Q     Somebody was going to look at them?

21        A     Right.  I wanted -- I know that we need

22     to do an investigation.

23              Who would do the investigation and

24     whether it would be an audit, whether it would be

25     Integrity Control or whatever it was, you know, that
```

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 84

1   came later -- not too much, like one, two -- but
2   that came later.
3           But my -- on that call, it was -- get the
4   records, just get the records.
5       Q     Did you give any instructions about how
6   to get the records?
7       A     Yes.  I said, go down there now and
8   get them.
9       Q     Did you indicate that armed
10  police officers should be accompanying the folks
11  getting the records?
12      A     I didn't care how they got them.  I just
13  know that I wanted them then and now -- I wanted
14  them now and then, right then -- go get the records.
15      Q     So you gave the instruction, and you
16  entrusted, you know, the director and the
17  assistant director to carry out that objective?
18      A     Yes.  Yes.
19          And I told them -- I said, go down there,
20  just go down there and get the records, and don't
21  wait until tomorrow to do it, or don't -- you know,
22  get it now, get all of the records now.
23          And I -- you know, how they make the
24  decision as to who picked them up and who got
25  them -- I imagine they were.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 85

1                    - - - - -

2          (Plaintiff's Exhibit No. 1 was marked.)

3                    - - - - -

4      Q      I'm going to hand you what I've marked

5    Exhibit 1.

6      A      Okay.  Certification records.

7      Q      And is Exhibit 1 marked 13543 of 44 at

8    the bottom there?

9      A      Uh-huh.  Uh-huh.

10     Q      Is that a "Yes"?  Is that a "Yes," sir?

11     A      Yes.  Yes.  Yes.  Uh-huh.

12     Q      Thank you.  Take a moment to take a look

13   at that, and let me know if you recognize that

14   August 1, 2013 press release.

15     A      Well, I don't remember it, but I'll

16   skim it.

17            Yes.  Now, if I may, see this line here,

18   "But the real problem is that this is another

19   example of a culture within the Division of Fire

20   that betrays the public's trust."

21            That's what the firefighter had a problem

22   with.  That's the line he had a problem with.

23     Q      Okay.  So you're reading a line from the

24   third paragraph in Exhibit 1, correct?

25     A      Yes.  Yes.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 86

1       Q    And you're referring back to your earlier
2    testimony about your meeting with Mr. McCafferty?
3       A    That's when we were out at the
4    community gathering, and his fire company was part
5    of the community event.
6            And that's what he -- that's what he was
7    talking about, that particular -- that sentence,
8    that's what he was talking about.
9       Q    And that quote, in this press release, is
10   attributed to you, correct?
11      A    Yes.  Uh-huh.
12      Q    And what led you to believe there was a
13   culture within the Division of Fire that betrays the
14   public's trust?
15      A    Because of a series of events.  I can't
16   remember exactly what they were, but it's -- see, I
17   don't know if the shift trades were materializing
18   then or some -- there was some overtime issues, and
19   a lot of things that were going on within the
20   division.
21      Q    And where would you have gotten your
22   information about those particular issues?
23      A    I would have gathered them from,
24   probably, my weekly meetings.
25      Q    The Thursday meetings with the director

CADY REPORTING SERVICES, INC. - 216.861.9270
www.cadyreporting.com

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 87

1    that you mentioned?

2        A      Right.  Right.  Or from audits that had

3    already been conducted and things that we had

4    already done.

5              There was something around someone taking

6    a screenshot of something and giving the answers to

7    a test, those kind of things.

8              There's a lot of little things, just a

9    lot of little things going on.  So there

10   were -- there were times when I would just have

11   people go check it out.

12       Q      When you ordered this internal review,

13   that's announced in the August 1, 2013

14   press release, did you have any reason to believe

15   that there was a firefighter, other than

16   Daryl McGinnis, who lacked the required continuing

17   education hours?

18       A      Did I have any reason to believe?

19              I suspect, yes; believe, no.

20       Q      So you hadn't heard that any other

21   specific individual might have an issue, just

22   Mr. McGinnis, correct?

23       A      That's what I had heard.  That was the

24   media thing.  My suspicions were different.

25       Q      Did you give any direction about how this

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 88

1    internal review should be conducted?

2        A     Uh-huh.  I just told them to investigate

3    it and to -- and to get to the bottom of it, get the

4    results, and they did.

5              And then they identified who was

6    deficient, and then we worked with the State to

7    attempt to get them current in their -- in their

8    certifications.

9        Q     This press release, marked Exhibit 1,

10   also announces that Mr. Kelly would become the

11   acting fire chief.

12             Did you make that decision?

13       A     Yes.  Uh-huh.  I think he was -- I don't

14   know what they call it in the division.  You've got

15   like the chief, and then you've got like a

16   number-two man.

17             So they -- there is a -- it's a chief,

18   assistant chief.  But in the assistant chiefs,

19   there's a pecking order kind of thing.

20             And I think he was in charge of

21   operations or something like that.  I forget exactly

22   what.  So it's just moving him into this.

23       Q     And that was your decision?

24       A     Yes.  Uh-huh.

25       Q     And did you communicate with anyone,

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 89

1    in terms of making that decision -- get any input
2    from anyone?
3         A    Yes.  I'd have to say, yes.  Exactly what
4    that input is, I don't know, but I'd have to say,
5    yes.
6              Because that would be another thing that
7    I would ask about -- well, all right.  He's -- who's
8    going to run the place now?  You know, what's the
9    chain of command, and all that?
10             That's what I would say.
11             And then -- and since I had already
12    interviewed Kelly, and I -- and he was in that
13    chain of command -- and I think he might have been
14    number-two man -- then I said, well, let's go
15    with him.
16        Q    You had also interviewed Mr. DeCrane as
17   part of that round of promotional interviews a
18   few months earlier, correct?
19        A    Right.  That's right.  Right.
20        Q    Why didn't -- did you consider
21   Mr. DeCrane as a potential replacement to move into
22   the acting chief role when Mr. McGinnis was relieved
23   of his duties?
24        A    Thinking about it, I wasn't willing to do
25   another -- I wasn't up to doing another -- I wasn't

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 90

1    trying to do another interview, so I was looking at

2    who to pick.

3              And since Kelly was up, in terms of the

4    pecking order of Fire, I just moved him in there.

5    So that's how I viewed it.

6              So no, I didn't -- I didn't consider

7    anyone else, in terms of, well, let me go down and

8    find a battalion chief or let me find another

9    assistant chief.  I didn't -- I didn't do that, no.

10   Q     So is it fair to say you were working off

11   the previous promotional list that included

12   Mr. McGinnis, Mr. DeCrane and Mr. Kelly, in terms of

13   who your options were to promote someone at

14   that time?

15   A     Uh-huh.  Yes.  Yes.  Well,

16   because -- yes.  They were the ones who I had talked

17   to, so I was familiar with them.

18             And as I had mentioned, that, in ranking

19   the ones who I believed would be more in line with

20   what I wanted done, then it would be Mr. McGinnis,

21   Mr. Kelly, then Mr. DeCrane.

22             In ranking, in terms of expertise and

23   knowledge, they were all -- they were all good.

24   They were --

25   Q     Do you recall how they scored,

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 91

1    relatively, on the interviewing portion of the

2    process?

3         A    I don't -- I don't even know.

4         Q    Is that information that's provided to

5    you as part of your promotional decisions?

6         A    I don't -- no.  I make it based on the

7    interview.  I don't -- but let me correct that,

8    though.

9              I don't recall, but I would not be

10   surprised if someone didn't tell me how they ranked.

11        Q    Why?

12        A    Well, because they just give me

13   information, but to remind you, now I'm doing the

14   interview.

15             So they may say to me -- and they'll give

16   me their -- I get the resumés and things like that.

17   They may say that, in the process, this person was

18   number one, this was two, this was three, this

19   was four.

20             So I would not doubt that that occurred,

21   but I don't recall it.  I don't recall it.

22             And that, to me, is not as important as

23   it would be for me to get the right person for -- to

24   do what I need to have done at that time.  That

25   becomes my priority.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 92

1          But I would -- I would suspect that

2    someone probably did tell me that, yes.

3          Q      So do you -- you suspect someone did tell

4    you where the candidates ranked on the list?

5          A      Uh-huh.  Right.  Uh-huh.

6          Q      So they would have then told you that

7    Mr. DeCrane ranked significantly higher than

8    Mr. Kelly, in terms of the outcomes of the

9    interview process?

10         A      If that was what happened, yes, they

11   would have told me that.  Yes.

12         Q      Did that play into your decision at all?

13         A      No.

14         Q      Because you didn't consider Mr. DeCrane

15   as part of that process?

16         A      No.  I didn't -- I did not go

17   through -- they picked who to send to me, and they

18   ranked them.

19         Q      Okay.  I'm sorry.  I'm talking about when

20   you chose who would become the acting chief as

21   Mr. McGinnis was resigning or --

22         A      Well, again -- my --

23         Q      -- being put on leave?

24         A      -- my desire and my need to have

25   integration, and to move the division in the

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 93

1    direction I wanted, that had not changed just

2    because Mr. McGinnis wound up doing something -- or

3    not doing what he should be doing.

4            That didn't change.  That didn't change

5    at all.  I was still focused on that.  And so the

6    world doesn't stop.  I still need to keep moving on.

7            And if I'm -- I can't -- I don't know for

8    sure, but I do believe that we were still in the

9    negotiation around the integration, at that time.

10           And I did not want things to fall back,

11   in terms of the progress, because Mr. McGinnis made

12   some significant policy and cultural changes.  They

13   were significant.

14           And some of those things are accepted

15   now, whereas they weren't then.  And they were

16   significant, and they did -- and so I didn't want

17   things to fall back, and so I -- that was my

18   priority.

19           How they ranked is an interesting thing,

20   in terms of who they send to me.

21           But in my determination, that didn't make

22   a difference.  If that made the difference, then I

23   wouldn't even do the interviews.  I would

24   just -- well, whoever ranked first, then make them

25   the chief.  Whoever ranked second -- you know,

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 94

1    that's like that.

2           But what makes the difference to me is

3    what did I need to have done at that

4    particular time.

5           McGinnis -- and I'll say even

6    today -- was the best choice.

7           Kelly, although needing prodding and

8    other things, was the second-best choice.

9           Mr. DeCrane, even though I would say

10   an expert, in terms of the operations and the

11   contracts and things like that, was more rigid.

12          And I did not want to have rigidness.  I

13   wanted someone who could move this thing forward.

14   Q     And when you say "rigid," you mean

15   in terms of, you know, adherence to the Local 93

16   cultures you described --

17   A     To culture, to the collective bargaining

18   agreement, intending to interpret the agreement.

19          If there's an area where there is

20   no comment on this particular area, it's silent,

21   then I believe Mr. DeCrane would default to 93's

22   position on that.

23          McGinnis would not.

24          And Kelly would not, if you work with

25   him, but you had to work with him.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 95

1       Q      What was your experience, if any, with

2    Mr. DeCrane, you know, in his various union roles

3    that he held over the years?

4       A      I've met Mr. DeCrane off and on, not for

5    long periods of time.  I know that he was part of

6    the union.  He was a strong union advocate.

7              And in those times, when he was part of

8    the union, he did his job.  He did his job.

9              And just like he does when he -- when he

10   was a battalion chief, he did his job.  As a

11   firefighter, he did his job.  He knows his job.

12   He's very good at his job.

13             MS. SLETVOLD:  Why don't we take a

14   quick break?

15             THE VIDEOGRAPHER:  Off the record.

16             The time is 10:54.

17             (Off the record.)

18             THE VIDEOGRAPHER:  Back on the record.

19             The time is 11:07.

20   BY MS. SLETVOLD:

21      Q      All right.  Your Honor, when you were

22   choosing whom to replace McGinnis, both on a

23   temporary and permanent basis, did you interview

24   Chief Kelly?

25      A      On the first time, not on the

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 96

1    second time.

2         Q    What do you mean by "first time"?

3         A    The first time is when I had McGinnis,

4    Kelly and DeCrane.

5         Q    So back in January of 2013?

6         A    Back in January, right.

7              And then on this one, the interim, no.

8              And then I don't know if I -- I don't

9    know for sure, but I cannot imagine me not having a

10   conversation with him before making him permanent.

11        Q    Meaning Kelly?

12        A    Meaning Kelly, right.  Right.

13        Q    Did you have any sort of interview with

14   Sean DeCrane before you made Mr. Kelly the

15   permanent chief?

16        A    No.  No.

17        Q    What was your role in creating the

18   Office of Integrity; Control, Compliance and

19   Employee Accountability, if any?

20        A    None.  I mean it comes out of the

21   Safety Administration, I think.

22        Q    Whose idea was that?

23        A    It was in -- it's in -- been in place.  I

24   don't know who started it.  It might have been

25   under Flask.  It might have been under Flask.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 97

1          So I don't know.  It's -- I don't know
2     who created it.
3          Q     So you didn't have any involvement in how
4     that was created or implemented?
5          A     No.  No.  Huh-huh.
6          Q     Do you have any reason to doubt that that
7     was created on the heels of McGinnis' resignation
8     and the beginning of the internal review of the
9     Fire Training Academy's records?
10         A     I don't know.  I really don't know.  I
11    had assumed it was already an internal -- the police
12    have many different internal reviews; they have the
13    Intelligence Unit.  They have Internal Affairs,
14    you know.
15         And depending on what they believe the
16    situation is -- if it's civilian, if it's a
17    police officer, if it's criminal, if it's
18    civil -- so they have these various levels of
19    things.
20         Q     So you didn't know before 2013 that there
21    was no Office of Integrity Control?
22         A     No, I didn't know that.  No, I didn't
23    know that.
24         Q     Do you know who's in charge of
25    that office?

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 98

```
 1       A     Now, I think it's under one of the
 2   commanders.
 3       Q     Do you know who?
 4       A     But no.  Back then, no.
 5             I think -- was it -- it comes to my mind
 6   Votypka or somebody like that.  I remember -- no.
 7             The quick answer is, no, I don't know
 8   for sure.
 9       Q     Do you know to whom the person in charge
10   of the OIC directly reports?
11       A     Ultimate -- direct report, I don't know.
12   I know it's -- if I'm not mistaken, it comes out of
13   Safety Admin, which would be the director.
14             If it were the other, the criminal side,
15   it would go to the chief.
16       Q     Have you had any involvement in the
17   investigations conducted by the OIC?
18       A     No.
19       Q     You rely on the director and
20   assistant director to handle that?
21       A     Yes.
22       Q     Did you ever discuss the leaking of
23   McGinnis' training deficiencies with
24   Angelo Calvillo?
25       A     The leaking of it?
```

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 99

1     Q     Or the media tip, or however you would
2  like to characterize it.
3     A     No, I can't -- I don't recall.  I don't
4  recall.
5           I'm not saying that I didn't, in terms of
6  the leaks -- leak kind of stuff, in general, but no,
7  I don't -- I don't recall.
8     Q     In deciding to make Mr. Kelly the interim
9  and then permanent chief, after Mr. McGinnis was
10  relieved of his duties and retired, did you
11  communicate with the director of Public Safety about
12  making that promotion?
13     A     Uh-huh.
14     Q     Is that a "Yes"?
15     A     Yes.
16     Q     Anyone -- did you communicate with
17  Mr. Eckart about making that promotion?
18     A     Not directly, but I imagine -- I
19  imagine so.  I imagine so, because Fire and EMS is
20  in his cluster, so I imagine so.  But primarily, it
21  would have been with the director.
22     Q     And so, because Fire and EMS are in
23  Mr. Eckart's cluster, you would typically
24  communicate with him about promotional decisions?
25     A     Through the director, not -- I

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 100

1    wouldn't -- I wouldn't bypass the director to talk
2    to Mr. Eckart.
3         Q    Right.  You would expect to get
4    Mr. Eckart's input through Mr. Flask or Mr. McGrath,
5    as the director?
6         A    I would -- in this case, I would tell him
7    what my intent is, and ask them what they thought
8    about it.  Yes.
9         Q    And what did Mr. Eckart think about it?
10        A    I don't recall him saying anything
11   negative.  I don't recall anything at all, to be
12   honest with you.
13             I just recall making the decision.
14        Q    Was Mr. Flask also in agreement?
15        A    Yes.  Yes.
16        Q    Why did Mr. Kelly leave his position, as
17   fire chief, as far as you know?
18        A    He had another job.
19        Q    Did you consider that other job a
20   promotion?
21        A    No.  His other job was with another city,
22   so he's -- in terms of -- I guess, if you want to
23   look at -- if you're -- I think he went to another
24   city to be a fire chief.
25             And if you're ranking fire chiefs in a

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 101

1    small suburban community, compared to a fire chief

2    in an urban center, you know, it's a big difference.

3    The bigger plum would be the urban center.

4            But in terms of the demand on time and

5    the type of work and stuff like that, the

6    smaller community would be more relaxing.

7        Q    Did Mr. Kelly explain to you why he

8    decided to leave the city and move to a smaller

9    suburban community?

10       A    He just said, you know, he thought about

11   it, that he -- the opportunity came up, and

12   he -- and he wanted to take it.

13       Q    Did he give any other reasons?

14       A    Not that I recall.

15       Q    What was your working relationship like

16   with Mr. Kelly as fire chief?

17       A    It was pretty good.

18            As I said, he -- all chiefs come to

19   cabinet, so that's when -- the most interaction I

20   have with the fire chief would always be at cabinet,

21   because I would always go through the

22   administrative side.

23            Whereas, with the police chief, I have a

24   meeting with the police chief and the director every

25   week.  And the fire chief would come in,

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 102

1   periodically, depending on what's going on.

2           But every Wednesday, in cabinet, they

3   would be there, and so I got to know him better.

4           And then if there were things that were

5   pressing and decisions that had to be made, whether

6   it was in collective bargaining or furthering what

7   Chief McGinnis had already begun -- or adding,

8   you know, that kind of stuff -- and as I said,

9   Chief Kelly was not as aggressive in that regard,

10  but he would be -- he's willing.  But you'd have to

11  talk to him a little bit more than with

12  Chief McGinnis.

13          Chief McGinnis, you sometimes would find

14  out after the fact.  Yes.

15      Q    How long did Chief Stubbs serve as the

16  fire chief?

17      A    He was chief under Mayor Campbell, for

18  about half of her term, I believe, and then until

19  acting Chief O'Toole took over.

20          And I think O'Toole was just like Kelly.

21  He was the number-two man, and then he just

22  moved -- we just moved him right on up in there.

23      Q    And so Mr. McGinnis served for less than

24  a year, obviously, in his fire chief position?

25      A    Yes.  Yes.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 103

1      Q     And then Mr. Kelly served for less than

2   two years?

3      A     Yes.  If that's the way it went, yes.

4      Q     Okay.  And so then the next promotional

5   process for fire chief, who made the decision to

6   promote Mr. Chontos to acting chief?

7      A     I did.

8      Q     And why did you make that --

9      A     No, not acting chief.  No.  No.

10            I apologize for that.

11            When I interviewed -- I think he was one

12   of the interviews I had with Calvillo when -- after

13   Kelly left.

14            And then they went through the process

15   again, and then they sent me a couple of people.

16   And I think --

17      Q     Who did?

18      A     That process -- whoever that -- the same

19   ones who had done the original one.

20      Q     So the director and the

21   assistant director?

22      A     Yes, whoever it was.  I think McGrath

23   might have been the director then.

24            And then -- and so I interviewed, and I

25   picked Calvillo.  And I believe that as -- the chief

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 104

1    then has some kind of authority over the process as

2    to who becomes assistant chief and how do they get

3    picked, all that -- because remember, all that's

4    controlled by collective bargaining, so --

5        Q    Just let me make sure I understand your

6    answer.

7             I asked about the decision to promote

8    Frank Chontos to acting chief before Mr. Calvillo.

9        A    Acting chief?  Do you know what --

10       Q    Do you remember anything like that?

11       A    -- I don't -- no, I don't remember, to be

12   honest with you.

13            I'm -- I think I -- I think when Kelly

14   left, I thought it was Calvillo that got

15   into acting.

16       Q    So I guess my understanding is that there

17   are a couple of different positions you can have;

18   you can be acting chief, interim chief or

19   permanent chief, for lack of a better word?

20       A    Uh-huh.

21       Q    Yes?

22       A    Right.

23       Q    Is that your understanding?

24       A    Yes.  I thought -- I think acting and

25   interim are interchangeable.  I -- no, acting --

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 105

1    oh, I -- let me -- if I'm correct, if somebody is

2    acting is acting for that moment, so you don't need

3    to swear them in, because they're acting as chief,

4    because the chief is unavailable for

5    whatever reason.

6            Then you have interim.  And that interim

7    chief is somebody you have to swear in, because

8    there's nobody holding the position.

9        Q    Got you.  So you would have never sworn

10   in Frank Chontos as acting chief?

11       A    No.  No.  No.

12       Q    And so -- and you don't remember

13   Mr. Chontos serving in that position?

14       A    No, I don't.  To be honest with you, no,

15   I really don't.  I don't.

16       Q    But you do remember appointing

17   Mr. Calvillo as the interim chief, correct?

18       A    As the interim, right.

19       Q    Okay.  Tell me about that process when

20   you made that decision.

21       A    I'm trying to recall.  I don't know if I

22   interviewed for that, for the interim.

23            I know I interviewed for the

24   permanent chief position.  I don't -- and so I

25   don't -- I don't really remember how he got to be

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 106

1    acting -- interim, because I don't believe I
2    interviewed for that.
3         Q    Was that unusual not to interview for an
4    interim chief position?
5         A    Not for interim, not for interim, no.
6         Q    So on what would you base a decision to
7    promote someone to interim chief, if not an
8    interview process?
9         A    Well, since I -- I rely on the
10   administrative side, you know, the director of
11   the -- Director Eckart, director -- it would be
12   McGrath now or something like that, because it's
13   only for a period of time while they're going
14   through a process -- while they're going
15   through a process.
16        Q    And so you relied on Director McGrath and
17   Assistant Director Eckart, in terms of the decision
18   to promote Mr. Calvillo, to interim chief, after
19   Mr. Kelly retired?
20        A    I would -- I would suspect so, because I
21   don't believe I did an interview, and I -- as
22   I said, I don't -- I didn't -- I just -- I don't
23   know them.  I don't know the personnel that well.
24             I get to know them, based on my
25   interaction, once they become chief, they're sitting

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 107

1    in cabinet, things like that.

2              So I don't go in -- I don't go -- I don't

3    tell them who to pick.  I don't go into the division

4    and tell them who to pick.

5        Q    And so you rely on, you know, what you

6    call the administrative side --

7        A    Right.  That's right.  Right.

8        Q    -- meaning Mr. McGrath, Mr. Eckart, to

9    set up a fair interviewing process and conduct that?

10       A    Yes.  They would -- they would probably

11   have recommended to me who would be the interim, and

12   then they would convene the process for

13   the permanent.

14       Q    So you then accepted, I guess,

15   Mr. McGrath's and Mr. Eckart's recommendation that

16   Mr. Calvillo be the interim chief, and then

17   you put --

18       A    Uh-huh.

19       Q    Is that a "Yes"?

20       A    Yes.

21             MR. DILENO:  And I want to clarify, for

22        the record, that he spoke that's the way it

23        would work.  He didn't state that was the way

24        it did work.

25             Because your question is assuming that.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 108

```
 1              THE WITNESS:  What's that?

 2              MS. SLETVOLD:  He's not supposed to

 3       do that.

 4              But let me make sure that you're clear on

 5       what my question is.

 6              MR. DILENO:  Don't -- hold on a minute.

 7       Hold on a minute.  Hold on a minute for the

 8       record.

 9              Don't start -- let me finish.

10              MS. SLETVOLD:  He's doing great.

11              MR. DILENO:  Let me finish.

12              MS. SLETVOLD:  I think he's doing a

13       good job of answering my questions.

14              MR. DILENO:  Let me finish.  Let me

15       finish.

16              Don't instruct my witness on me violating

17       the rules.  Okay?  I'd appreciate that.

18              I know the rules perhaps better than

19       you do.  Okay?

20              MS. SLETVOLD:  Maybe.

21              MR. DILENO:  So I just wanted to make

22       sure that your record was not assuming

23       something that wasn't in evidence.  That's it.

24              You may answer, mayor.

25              MS. SLETVOLD:  I appreciate your
```

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 109

1          help, Jon.

2                  Okay.  Let me make sure I understand

3          your testimony.

4                  Can you read back my last question, so we

5          can all make sure that the mayor understood and

6          was responding to my last question?

7                      (Record was read.)

8              MR. DILENO:  Same objection.

9                      (Record was read.)

10             MR. DILENO:  Same objection.

11             You may answer, mayor.

12             THE WITNESS:  Yes, if I didn't do the

13         interview.  I don't recall doing the interview.

14     BY MS. SLETVOLD:

15         Q    So if you didn't do an interview --

16         A    Then I would have accepted their

17     recommendation, because I don't know the personnel.

18         Q    And that's based on your experience of

19     going through this process several times with these

20     same folks.

21             Is that right?

22         A    It's based on the fact that I don't know

23     the personnel inside -- I don't know them that well.

24         Q    Right.  And then if you didn't interview

25     them --

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 110

1       A     And so if I'm -- so if I'm not

2    interviewing them, then I would take

3    recommendations, with the understanding that I would

4    interview permanent, if I didn't interview them.  I

5    don't recall if I interviewed them or not.

6       Q     Do you recall there being any

7    disagreement amongst you, Mr. McGrath, Mr. Eckart,

8    regarding your decision to promote Mr. Calvillo to

9    interim chief?

10      A     No.  That's -- no.

11      Q     And then what do you recall about the

12   decision to make Mr. Calvillo the permanent chief?

13      A     That there was an interview with him and

14   the other man, and that -- Chontos, is that who the

15   other man was?

16            I forget his name.  I'm not good

17   on names.

18      Q     Who do you -- you recall interviewing

19   with Calvillo and someone else?

20      A     On the permanent?

21      Q     (Nods head up and down.)

22      A     Yes.

23      Q     Okay.  Who -- and you don't recall who

24   that other person was?

25      A     I don't recall who it was.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 111

1          And so -- but he was -- he was -- again,
2     just as usually the recommendations come to me,
3     they're all very qualified.  All of them, they're
4     very qualified and with a lot of experience
5     and things.
6          But again, I picked Chief Calvillo,
7     based, again, on my need and desire to continue
8     moving reform and things like that.  And I believe
9     that he was the best candidate for that.
10     Q     And you don't recall interviewing
11     Sean DeCrane for the fire chief promotion that
12     ultimately went to Angelo Calvillo?
13     A     No, I don't think -- no, I don't -- no, I
14     didn't interview him.
15     Q     And who would have decided who you would
16     have interviewed?
17     A     I don't think it's -- the process did,
18     whatever that process was.
19     Q     And the process that you described
20     earlier similarly --
21     A     Right.  That's right.  It was a process.
22     Q     -- with the McGinnis promotion, that you
23     trust your director of Public Safety and
24     assistant director to handle that?
25     A     That's right.  And then they send to me

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 112

1    at least two.  Sometimes they send three.

2         Q    Are you involved in the decisions

3    regarding promotions of assistant chiefs or

4    battalion chiefs within the Division of Fire?

5         A    No.

6         Q    Who's in charge of that?

7         A    The collective bargaining agreement,

8    basically, and the chief and -- because their

9    rules -- as a matter of fact, I think we wound up in

10   court in regards to picking some promotions, in

11   regards to battalion chiefs and assistant chiefs.

12             And there was a grievance filed as to

13   whether or not we did it according to the

14   union contract, and it's still up in the air.  It's

15   still up in the air.

16             So I have nothing to do with picking

17   assistant chiefs, battalion chiefs.  It's all by the

18   collective bargaining agreement.

19        Q    When did you first learn that

20   Sean DeCrane had complained that Mr. Eckart was

21   retaliating against Mr. DeCrane?

22        A    When he sued us, when he sued the City.

23        Q    So that was the first time you caught

24   wind of anything related to that?

25        A    Yes.  Yes.  You know -- you know, when

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 113

1    they -- when the -- when we got sued and my

2    law director mentioned to me there was a lawsuit,

3    and it was around discrimination against

4    Mr. DeCrane, in terms of promotion and

5    other activities, I guess.

6         Q     So before you learned that a lawsuit had

7    been filed, is it your testimony that no

8    city employee or administrator had raised with you

9    the issue that Mr. DeCrane thought he was being

10   retaliated against by Mr. Eckart?

11        A     I do not recall that.  I don't

12   recall that.

13        Q     And just for the record, Mr. McGrath

14   never reported that to you?

15        A     No, I don't recall it.  If he did, I

16   don't recall it.

17        Q     Did Mr. Eckart ever report that to you?

18        A     That?

19        Q     That Mr. DeCrane was complaining that

20   Mr. Eckart was retaliating against him?

21        A     I will say this, in terms of Mr. Eckart,

22   that there was this ongoing conversation about

23   friction between the Division of Fire and

24   Mr. Eckart, and -- but I don't recall him saying

25   that Mr. DeCrane had accused him of doing something.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 114

1            But I know that it was this
2    ongoing conflict that -- oil-and-water kind of thing
3    going on.
4        Q    So I'm asking really specifically about
5    whether Mr. Eckart ever reported to you that
6    Mr. DeCrane had complained --
7        A    Not that I recall.  Not that I recall.
8        Q    -- about being retaliated against?
9        A    Not that I recall.
10       Q    And how about Mr. Votypka?  Did
11   Mr. Votypka ever report to you that Mr. DeCrane had
12   complained about Mr. Eckart retaliating against him?
13       A    And Votypka was the -- was the policeman?
14       Q    I believe he was the manager of the
15   Office of Integrity Control.
16       A    Okay.  No.  No.  See, I would not talk to
17   someone like Votypka.
18            They would -- I would -- they would
19   report up, and then I would get whatever they
20   reported.  I wouldn't call in there and ask them
21   those kind of things.
22       Q    So if Mr. Votypka, as the manager of the
23   Office of Integrity Control, received a complaint
24   from Mr. DeCrane that Mr. Eckart was retaliating
25   against Mr. DeCrane, what would Mr. Votypka be

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 115

1    expected to do with that complaint?

2        A    I don't know.  You'd have to ask the

3    safety director.  I would assume -- and this is just

4    my assumption -- that he would report it.

5        Q    To whom?

6        A    To whoever his immediate report is,

7    direct report is -- that's what I would

8    assume -- and particularly if it was involving

9    anything ongoing.

10           If it was just a conversation somebody

11   was having, he might report it.  He may not,

12   you know.  People just say stuff.

13           But if he was doing it in an

14   official capacity, I would assume he would report it

15   to whoever his supervisor was.

16       Q    You certainly wouldn't expect a manager,

17   of the Office of Integrity Control, to disregard a

18   complaint about retaliation by a firefighter?

19       A    If it -- if it's in his official

20   capacity, no, I would not expect that.  If it's just

21   walking down the street and saying, this man don't

22   like me, that's another story.

23       Q    Do you know what Mr. DeCrane was

24   complaining about being retaliated against for?

25       A    I know now, after reading and skimming

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 116

1   the complaint.  It's that he was denied an

2   opportunity for promotion, based on dislike or

3   whatever of him personally.

4          That's my interpretation of it.

5      Q    Are you aware of whether the -- whether

6   anything regarding the McGinnis leak is part of that

7   discussion?

8      A    Yes.  Yes.  Yes, you're right.  Yes.

9          That's the basis of the complaint, yes,

10  and that -- and that it was based on Mr. Eckart

11  believing that Mr. DeCrane had -- in some way was

12  undermining the -- Mr. McGinnis.

13     Q    And are you aware of Mr. DeCrane -- and I

14  guess, from your testimony, it's fair to say you

15  weren't aware of Mr. DeCrane making complaints to

16  various individuals, within the City, about that

17  retaliation before filing the lawsuit?

18     A    Not that I recall, no.

19     Q    Whose idea was it to outsource a portion

20  of the Fire Training Academy's cadet training

21  to Tri-C?

22     A    Mine.

23     Q    And what led to that idea?

24     A    Because after the report came back, about

25  what was apparently a systemic kind of thing going

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 117

1    on with the certification and stuff, we were having

2    a conversation around -- when I say -- you know,

3    this is me and the director having a conversation

4    around, well, you know, we need to address this.  We

5    need to address this.

6              And so what I said, well, have -- let's

7    have it contracted out, until such a time as we feel

8    comfortable that everything is going the way it

9    should be going over there.

10             So it was -- it was my idea to contract

11   it out, and Tri-C was the one that was picked to

12   do it.

13        Q    Had there been -- you know, before the

14   idea to try and outsource cadet training to Tri-C,

15   had there been problems with the management of the

16   cadet training, as opposed to the certification, or

17   recertification, of firefighters?

18        A    Well, all of it was the same to me,

19   because when we looked, we were looking at the

20   whole thing.

21             Now, we were looking at the

22   cadet training side -- and there were rumors.  There

23   were rumors everywhere about everything, and again

24   the leaks.  Sometimes leaks go this way; sometimes

25   they go that way.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 118

1          And so one of the rumors was -- is that
2     there was some -- how should I say? -- some
3     pre-training of certain cadets, while other cadets
4     didn't get the same opportunity to understand what
5     was going to happen on the physical agility, all
6     these kinds of conversations going on all the time.
7          So we're in the midst of all this stuff
8     going on about the dysfunctionality of the
9     record keeping and the certification and then all
10    this other stuff.
11         So what -- I said, well, then we'll
12    contract the whole thing out, not just the cadet
13    training, but also the issue around keeping up with
14    the certification of things and proper
15    record keeping.
16         And then the notion was that whenever a
17    firefighter's credentials were -- he needed to renew
18    them, there would be notification.  They'd come in.
19    They'd do what they had to do.
20         Then we knew everything was going to be
21    done correctly, and that was the notion for doing
22    that.  Doing the whole thing is what my goal was.
23    Q    Had Mr. DeCrane been trying to implement
24    a similar system within the Fire Training Academy
25    after he took over as director of training?

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 119

1      A      I don't know.  In reading the complaint,
2   that's what I read.
3      Q      But you didn't know at the time?
4      A      No, I didn't know that.  No.
5      Q      Did mister -- or did Fire Chief Kelly, at
6   the time, support your outsourcing idea?
7      A      Ultimately, yes.  I don't know if he did
8   at first, but ultimately, yes.
9      Q      What do you mean you don't know if he did
10  at first?
11     A      Well, because, as I said, if that would
12  have been Mr. McGinnis, it -- he would have probably
13  come up with the recommendation himself.
14             If it was Mr. Kelly, he probably would
15  have -- had said, well, you know, this would be a
16  good idea.
17             But then he would -- you would have
18  to -- he would have to actually do it, and so yes.
19     Q      So your understanding is that Chief Kelly
20  supported the outsourcing idea?
21     A      Uh-huh.  Yes.  He -- yes,
22  he supported it.
23     Q      Would outsourcing the academy's training
24  to Tri-C have diminished the academy's role in
25  training members -- you know, incoming members of

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 120

1    the Cleveland Division of Fire?

2         A      It would have replaced them, the academy,

3    the -- because there wouldn't be any need for the

4    internal training, because it would be contracted

5    out.  It would be replacing it.

6                Now, if I may, one of the things

7    that -- with Chief Calvillo, is that -- is that

8    he -- him moving in that direction, where now

9    we're going to -- he's moving into certification, so

10   you have a -- like a national certification of the

11   internal process.

12               And in order to get that, you have to put

13   process and procedures in place, that pretty much

14   guarantee that the things, that happened in the

15   past, would no longer happen, and that there's good

16   record keeping and there's good -- all this stuff

17   would be in place.

18               So once we get -- and we're in the

19   process of attempting to do that now.

20               So once that's done, then it would just

21   be like contracting out.  It would be -- it would be

22   certified as a training center.

23               Right now, the Division of Fire is not

24   certified.  That's why there's certain things you

25   have to contract out, because they're not certified,

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 121

1    right?

2            Calvillo wants it -- them to be certified

3    and everybody to be -- Fire to do all of this

4    stuff internally.  Okay?

5            And just like police, police are

6    certified in their training, so they can actually do

7    cadet training.  In all aspects, they can do it.

8    They can do it.  They can contract out portions.

9    They can do portions.  They can do it all

10   themselves.

11           Fire is unable to do that is my

12   understanding.

13   Q     And where did you gain that

14   understanding?

15   A     Well, just from talking to the director

16   or Chief Calvillo or people like that, who --

17   Q     Are those the same sources of your

18   information regarding, you know, issues with

19   record keeping at the training academy?

20   A     The source of the information around that

21   was through the investigation.

22   Q     Which investigation?

23   A     The one that happened once Chief McGinnis

24   was relieved of command.

25   Q     Okay.  So back in 2013?

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 122

1      A     Yes.  That's -- that became the source of
2   understanding that we've got a problem over here.
3      Q     Were you aware -- or who did you task
4   with, you know, implementing your outsourcing idea?
5      A     No one.  I mean it's -- you have to do it
6   in a legislative form.
7      Q     Meaning?
8      A     Meaning that you have to have legislation
9   to allow us to enter into contract with Tri-C.
10     Q     So you have to go through council?
11     A     Yes.  Uh-huh.  Yes.
12     Q     Is there any way to avoid council
13  involvement in such a contract?
14     A     No.  No.  You can't do that.
15           I mean it requires a -- it requires a
16  contract, and you just can't -- I just can't -- the
17  administration just can't sign contracts, because
18  you want to.  You have to be authorized to
19  sign contracts.
20           And then there has to be money
21  appropriated for those -- for that contract, and
22  there has to be the agreement itself.
23           See, all of these things are part of
24  what -- and you do it through legislation, to get
25  authorized to enter into a contract with Tri-C,

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 123

1    for this purpose, for this amount.

2        Q     So it would have been inappropriate to

3    try and avoid city council's involvement in any sort

4    of outsourcing plan where --

5        A     Well, they're not part of the discussion.

6    They're not the administration.

7              They're legislators.

8        Q     But they have to be involved in terms

9    of approving it?

10       A     Passing it -- passing it, yes.  Yes.

11   Yes.

12       Q     So it's your understanding that, without

13   council passing some sort of legislation, the

14   training couldn't have been outsourced?

15       A     That's right.  That's right.

16       Q     And what is the source of

17   that understanding?

18       A     The charter.

19       Q     Do you have any family members who work

20   for Tri-C?

21       A     Uh-huh.

22       Q     Is that a "Yes"?

23       A     Yes.  Yes.

24       Q     And who is that?

25       A     My brother, Anthony.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 124

1       Q      And what is his role?

2       A      Right now, he's involved in the

3    Homeland Security aspect.

4              Back then, he was with the training

5    academy in regards to police.

6       Q      Okay.  Was your brother involved in any

7    discussions about outsourcing the Fire Training

8    Academy's activities to Tri-C?

9       A      Well, he wasn't in charge of Fire.

10      Q      Well, was he involved in the discussions

11   at all?

12      A      I don't -- I don't know.  I don't know.

13   I don't know.  You'd have to ask him or Tri-C that.

14             But I know he worked there, but he was in

15   charge of the police training, because he was a

16   former police officer.  He wasn't a firefighter.

17      Q      So you weren't involved in any

18   discussions with Tri-C, personally, about

19   outsourcing --

20      A      No.  No.  No.

21             That would happen through

22   Director McGrath or whoever the director was then.

23      Q      And do you know who was marshalling

24   that effort?

25      A      Who was?

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 125

1      Q      Yes.

2      A      Whoever the director was.

3             They -- the conversation -- again, I task

4      people.  I don't -- I don't do the work.  I don't

5      have that luxury anymore, and sometimes I wish

6      I did.

7             But I task people, and then there are

8      people whose responsibility is to do those things,

9      and this would be the director.

10             Now, who the director tasked to do the

11      details of that, I mean that's -- I don't know.

12      That's not -- I don't get that deep in the weeds

13      with that.

14      Q      What happened to the outsourcing effort?

15      A      I think it -- I don't think it passed

16      council.  I think it got held.

17      Q      Was there a decision made, you know, to

18      stop trying to do the outsourcing for some reason?

19      A      Well, you have to -- do you mean as to

20      why they didn't pass it?

21      Q      Well, I guess, you can ask them again

22      to --

23      A      No.

24      Q      -- pass it, right?

25      A      Huh?

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 126

1        Q     You could go back and try again, right?

2        A     Well, no, we're going to be -- we're

3    going to certify the training academy.  We don't

4    need to outsource it now.  We're going to certify

5    it.

6              They'll be -- they'll be

7    legally and -- bona fide to do training and

8    certified that their training meets all of the

9    requirements that deal with the training, the

10   record keeping, the bookkeeping, the certifications,

11   all that kind of stuff.

12       Q     So your first idea was to outsource that

13   work to Tri-C, correct?

14       A     Right.  Right.  And that was the

15   immediate solution.  That's right.

16       Q     And then, at some point, you made the

17   decision to just get the training academy certified,

18   so they could do that themselves?

19       A     Well, at some point, when council did not

20   pass the legislation to do it, then we still had to

21   get the training academy up to speed and make it

22   legitimate.  We still had to do that.

23             So if you can't do it one way, you have

24   to do it another way.  I would -- if you're asking

25   me would I have preferred to have contracted out

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 127

1    back then -- yes.

2            Right now, Chief Calvillo's efforts to

3    get the training academy certified, in and of

4    itself, is a great idea.

5            And we're resourcing that.  And if

6    he -- we're able to do that, then it solves the

7    problem for us.

8        Q    And your understanding is that that was

9    Chief Calvillo's idea?

10       A    He brought it to me.  He brought it

11   to me.  Yes.

12       Q    And was him bringing that idea to you the

13   thing that led to you not choosing to further pursue

14   the outsourcing?

15       A    No.  The -- what led me not to further

16   pursue the outsourcing, council wouldn't pass the

17   legislation.

18            No.  If they'd passed it, I'd have

19   did it.  You can't -- I can't do it if they don't

20   pass it.

21       Q    Who told you council didn't pass the

22   outsourcing legislation --

23       A    It's obvious.  I mean the legislation

24   didn't get heard.  It's sitting there.

25       Q    Didn't get heard?

CADY REPORTING SERVICES, INC. - 216.861.9270
www.cadyreporting.com

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 128

1        A      Yes.  There's no -- there's no -- there's

2    no vote on the legislation to proceed to the floor

3    for a vote of council, to authorize the

4    administration to contract with Tri-C, to provide

5    this service for this amount of money.

6        Q      So there was -- it never went up for a

7    vote is what you're saying?  It was just --

8        A      Yes, that's right.  That's right.

9               So that was the end of that.

10       Q      And so you found another way?

11       A      Well, the chief found another way.

12              I hadn't thought about the -- I know that

13   we were still concerned about the integrity of the

14   training, and that I know that there was work being

15   done on it.

16              But with Chief Calvillo's approach, it

17   would -- they would be certified just like Tri-C is

18   certified to do it, just like the police are

19   certified to do their cadet -- just like the

20   State of Ohio is certified, so they'll be certified.

21              And that requires, on an annual basis or

22   a semi- -- you know, every other year or so, people

23   coming in to ensure the integrity of it.  They'll

24   look at your records.  They'll see if you're keeping

25   it correctly, and all of this other kind of stuff.

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 129

1           And so the concern then is gone, because

2     they're certified, and there's a constant review of

3     that certification.

4           And if they fall short, they take the

5     certification away from them.

6      Q     So is it your understanding that the

7     Fire Training Academy is currently not certified to

8     provide training on its own?

9      A     In all -- in all aspects, that's my

10    understanding.  Right.  That's my understanding.

11     Q     Okay.  Do you expect the director of

12    Public Safety to promptly adjudicate administrative

13    charges against members of the Division of Fire?

14     A     After appropriate due process and

15    appropriate investigation.

16          The one thing I instruct all of my people

17    is to ensure -- even though -- even though we get

18    pushback sometime, from the public and the media, as

19    to why we're slow.  I instruct them to do --

20    process, due process -- you just can't, because you

21    think somebody did something wrong, discipline them.

22          When -- and then, because there are times

23    when we get grieved on things, not just in Safety,

24    but throughout the City.

25          An arbitrator determines that we skipped

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 130

1    a step, or we didn't provide ample or reasonable

2    time for whatever.

3              So we -- so I make a concerted effort to

4    tell them to, you know, if -- to quickly review,

5    investigate, come up with a decision, and then hold

6    administrative hearings, if that's appropriate

7    and necessary.

8        Q    Is part of that due process giving

9    employees an opportunity to respond to allegations

10   that they've engaged in wrongdoing?

11       A    It's due -- it's due process, yes.

12       Q    So you'd expect that --

13       A    I would expect all that to happen, yes.

14       Q    You'd expect that, as part of

15   investigating any claim that an employee engaged in

16   wrongdoing, that the employee would be interviewed,

17   for example?

18       A    You cannot discipline people and hold

19   them accountable without due process.

20       Q    And an interview would be part of that?

21       A    I would imagine so.

22              You'd have to have -- and I believe, in

23   doing the pre-dis hearing, that's what the

24   pre-dis hearing is about.

25              And many times, the unions may waive

Deposition of Mayor Frank Jackson, taken December 5, 2017

                                                    Page 131

1    that.

2              MS. SLETVOLD:  Let's take a quick break.

3              THE VIDEOGRAPHER:  Off the record.

4              The time is 11:46.

5              (Off the record.)

6              THE VIDEOGRAPHER:  Back on the record.

7              The time is 11:52.

8    BY MS. SLETVOLD:

9         Q     In the round of promotions, where you

10   selected Chief Calvillo for the permanent position,

11   was Sean DeCrane interviewed -- or considered as

12   part of that process?

13        A     He was not sent to me.

14        Q     Are you aware of administrative charges

15   being filed against Sean DeCrane related to

16   academy record keeping?

17        A     Off the top of -- no.  No, not really.

18              I mean maybe it's one of those things

19   that, when it happened, I would have been told about

20   it.

21              But no, I don't recall anything right

22   now.  But I -- it wouldn't -- I wouldn't say that,

23   when it was happening, someone didn't say that

24   to me.  And that would have come from the director.

25        Q     It would have come from the director of

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 132

1    Public Safety?

2        A    Uh-huh.  Yes.

3                    - - - - -

4        (Plaintiff's Exhibit No. 2 was marked.)

5                    - - - - -

6        Q    I'm going to mark Exhibit 2,

7    Bates stamped -- Bates stamped 613 through 617.

8        A    Yes.  Is "OICCEA" -- that's "Office

9    of" -- what is that?

10       Q    Is your understanding --

11       A    -- "Integrity Control"?  Is that what

12   that is?

13       Q    Is that your understanding?

14       A    I don't -- I want to be sure.  I'm

15   assuming it is.

16       Q    Sure.  So take a look at the "To," "From"

17   there.

18            "To:  Edward Eckart, Assistant Safety

19   Director."

20       A    Right.  I see.

21       Q    "From:  Jim Votypka, Manager, OICCEA."

22       A    I see.  I see.  Okay.  Yes.  Okay.  Okay.

23       Q    Have you seen this document before?

24       A    No.  Huh-huh.

25       Q    Does this refresh your recollection about

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 133

1    whether there were any administrative charges filed

2    against Sean DeCrane?

3         A    Obviously, there was.  You know, again, I

4    still don't recall anyone telling me that.  But yes.

5              But I wouldn't say that they had not told

6    me.  I just don't recall.

7         Q    So looking at this December 17, 2015

8    memo, from Mr. Votypka, to Mr. Eckart, if you go to

9    the last page --

10        A    Okay.

11        Q    -- you can see, at the top, where

12   Mr. Votypka is reporting on the conclusions and

13   recommendations of State EMS auditors.

14             Do you see that?

15        A    Yes.

16        Q    Okay.  Where they state -- or where

17   Mr. Votypka characterizes it as, "All three stated

18   the files and documents were very good,

19   well-maintained, and above and beyond what was

20   expected."

21             Did I read that correctly?

22        A    Yes.

23        Q    And then down in the final paragraph, in

24   the second sentence, Mr. Votypka recommends that,

25   "The charges be disposed of as the safety director

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 134

1    determines."

2              Correct?

3        A     Okay.

4        Q     So from the time that Mr. Votypka made

5    this recommendation to -- you know, that the charges

6    should be disposed of, by the safety director, on

7    December 17, 2015, do you know how long it took for

8    the charges to actually be disposed of?

9        A     No.

10       Q     Okay.  Well, how long would you expect

11   that something like that would take, based on your

12   experience with the City?

13       A     Well, this is -- this is an

14   investigation, this -- and a review -- and I don't

15   know.  I don't know.

16             If the recommendation came down that

17   there's nothing done wrong, it shouldn't take

18   too long.  It shouldn't take too long, because it's

19   not asking for further investigation into anything.

20                        - - - - -

21        (Plaintiff's Exhibit No. 3 was marked.)

22                        - - - - -

23       Q     I'm handing you what's marked Exhibit 3.

24       A     Uh-huh.  Yes.

25       Q     And Bates stamped 610 to 612 in the

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 135

1    bottom-right?

2         A    Yes.

3         Q    Take a look at that.

4         A    That's -- what? -- one year?

5         Q    (Nods head up and down.)

6         A    Okay.  Okay.

7         Q    Do you recognize the -- well, there are

8    two letters here as part of Exhibit 3, correct?

9         A    Yes.

10        Q    An October 18, 2016 letter from

11   Mr. Eckart, to the Local 93 president, and then, on

12   top, a December 7, 2016 letter, same sender and

13   recipient, correct?

14        A    Okay.  Yes.

15        Q    Okay.  Do you know why it took nearly

16   a year, after Mr. Votypka's recommendation for the

17   administrative charges against Mr. DeCrane to

18   be dismissed?

19        A    No.

20        Q    Do you agree that's an unreasonable

21   amount of time for charges to be pending after an

22   investigation's concluded and a recommendation has

23   been made that they be disposed of?

24        A    It seems like a long time, yes.

25        Q    Can you think of any reason that that

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 136

1    might have occurred?

2        A      No.

3        Q      Has anyone been disciplined as a result

4    of this delay?

5        A      I don't know.  No.  No, I don't know.

6               I know I have not.

7        Q      Well, I assume you haven't been

8    disciplined.

9        A      Right.  I meant I have not

10   disciplined anybody is what I'm saying.

11       Q      Okay.  Do you think that discipline might

12   be appropriate for waiting nearly a year to dismiss

13   administrative charges pending against an employee?

14       A      Well, it would certainly take some

15   explanation as to why, you know, because there may

16   be situations or circumstances that I'm not -- that

17   it's not on the face, but it certainly begs an

18   explanation why.

19       Q      Do you intend to take any actions in

20   response to learning that this delay occurred?

21       A      I'm going to ask why.

22       Q      Who are you going to ask?

23       A      I'm going to ask whoever was responsible

24   at that time.  I'm assuming it's -- was it Flask or

25   McGrath?

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 137

1            And then it would be -- I imagine I would
2    ask Flask or McGrath, whoever the director is, at
3    this time.
4        Q    So you didn't have any involvement in any
5    aspect of the administrative charges against
6    Mr. DeCrane?
7        A    No.  I do not -- I do not interfere in
8    these things, you know.
9            Due process is very important to me,
10   because I do not believe that there should be
11   political consideration in the operation of or the
12   accountability of people, and that it should -- it
13   should stand on its own merit.  So I don't
14   interfere.
15           Now, will I instruct sometimes -- I need
16   for you to -- just like on the records -- go down
17   and get the records and investigate.
18           I'll do that, but I don't interfere with
19   the investigation.
20       Q    Is it the City's practice to announce
21   that administrative charges are pending before
22   employees have been interviewed about those charges?
23       A    Sometimes, yes.
24       Q    What would be an occasion where that
25   would be appropriate?

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 138

1      A      There have been times when

2  we've disciplined police officers and firefighters

3  as part of the process, particularly if it becomes

4  like a public thing, and there is -- there are

5  media inquiries, there are leaks around it, whatever

6  it may be, and they're asking, asking, asking.

7            And a lot of times, we just -- we just

8  announce that, yes, we're doing this or we're doing

9  that, that kind of stuff.

10     Q      So were you involved in any discussions

11 about whether, or when, to release information about

12 Sean DeCrane being the subject of

13 administrative charges?

14     A      No.  No.  No.  No, that I don't remember.

15            That would probably be something around

16 communications and the head of the -- whatever

17 department it is.

18     Q      What do you mean, "The head of whatever

19 department it is"?

20     A      Well, the release of those kind of

21 information would be discussions between law,

22 communications and the director, who -- if it's in

23 Public Works, if it's in Utilities, if it's

24 in Safety, the airport -- it doesn't -- you know.

25     Q      If it's in Fire, who would you expect to

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 139

1    be involved in a discussion about whether and when

2    to release information about pending

3    administrative charges?

4        A    Law and the director and communications.

5        Q    The director of Public Safety?

6        A    Yes.  Uh-huh.

7             MS. SLETVOLD:  All right.  I've got

8        nothing for you.

9             Thank you.  Your Honor.

10            THE WITNESS:  Thank you.  Thank you.

11            THE VIDEOGRAPHER:  Off the record.

12            The time is 12:03.

13   (The videotaped deposition concluded at 12:03 p.m.)

14                      - - -

15

16

17

18

19

20

21

22

23

24

25

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 140

1    THE STATE OF OHIO,  )     SS:

2    COUNTY OF CUYAHOGA. )

3

4         I, Kristin L. Fryman, a Notary Public within

5    and for the State of Ohio, duly commissioned and

6    qualified, do hereby certify that

7    MAYOR FRANK JACKSON, was first duly sworn to testify

8    the truth, the whole truth and nothing but the truth

9    in the cause aforesaid; that the testimony then

10   given by him was by me reduced to stenotypy in the

11   presence of said witness, afterwards transcribed on

12   a computer/printer, and that the foregoing is a true

13   and correct transcript of the testimony so given by

14   him as aforesaid.

15        I do further certify that this videotaped

16   deposition was taken at the time and place in the

17   foregoing caption specified.

18        I do further certify that I am not a relative,

19   counsel or attorney of either party, or otherwise

20   interested in the event of this action.

21        IN WITNESS WHEREOF, I have hereunto set my

22   hand and affixed my seal of office at Cleveland,

23   Ohio, on this 19th day of DECEMBER, 2017.

24

              Kristin L. Fryman, Notary Public

25            within and for the State of Ohio

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 141

1   THE STATE OF                    )
                                    )    SS:
2   COUNTY OF                       )

3

4

5        Before me, a Notary Public in and for said

6   state and county, personally appeared the

7   above-named MAYOR FRANK JACKSON, who acknowledged

8   that he did sign the foregoing transcript and that

9   the same is a true and correct transcript of the

10  testimony so given.

11       IN TESTIMONY WHEREOF, I have hereunto affixed

12  my name and official seal at

13                              this      day of

14             , 2017.

15

16

17

18                  MAYOR FRANK JACKSON

19

20

21                  Notary Public

22  My Commission expires:

23

24

25

Deposition of Mayor Frank Jackson, taken December 5, 2017

Page 142

VIDEOTAPED DEPOSITION ERRATA SHEET

Page No.        Line No.        Change to:
Reason for change:
Page No.        Line No.        Change to:

Reason for change:
Page No.        Line No.        Change to:
Reason for change:
Page No.        Line No.        Change to:

Reason for change:
Page No.        Line No.        Change to:
Reason for change:
Page No.        Line No.        Change to:

Reason for change:
Page No.        Line No.        Change to:
Reason for change:
Page No.        Line No.        Change to:

Reason for change:
Page No.        Line No.        Change to:
Reason for change:
Page No.        Line No.        Change to:

Reason for change:
Page No.        Line No.        Change to:
Reason for change:
Page No.        Line No.        Change to:

Reason for change:
Page No.        Line No.        Change to:
Reason for change:
Page No.        Line No.        Change to:

Reason for change:
Page No.        Line No.        Change to:
Reason for change:
SIGNATURE:                      DATE:
          MAYOR FRANK JACKSON