**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **SEAN DeCRANE,** | ) | **CASE NO. 1:16CV2647** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| **vs.** | ) | <u>**OPINION AND ORDER**</u> |
| | ) | |
| **EDWARD J. ECKART, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |


<u>**CHRISTOPHER A. BOYKO, J.**</u>:

   This matter comes before the Court upon Defendants' Second Motion (ECF DKT #139) for Summary Judgment.  For the following reasons, the Motion is granted in part and denied in part.

<u>**I. BACKGROUND**</u>

   Plaintiff Sean DeCrane is a retired City of Cleveland Division of Fire Battalion Chief. Plaintiff initiated this lawsuit on October 31, 2016.  The First Amended Complaint was filed on January 31, 2017.  Plaintiff amended again on April 1, 2019 (ECF DKT #120).  Plaintiff alleges that Defendants Edward J. Eckart, James Votypka, Christopher Chumita and others acting on behalf of the City of Cleveland repeatedly retaliated against him based on the

mistaken belief that Plaintiff disclosed to a reporter that a previous fire chief, Daryl McGinnis, lacked the required continuing education hours to maintain his professional certification.  Eckart is the Assistant Safety Director for the City of Cleveland.  Votypka is the former Manager of the City's Office of Integrity Control, Compliance and Employee Accountability ("OIC").  Chumita works as an investigator in the OIC.

The claimed instances of retaliation include:  repeated denials of promotions; wrongful seizure of Fire Training Academy ("FTA") records while Plaintiff served as Director of Training; false allegations against Plaintiff about deficient record-keeping; concocting false administrative charges against Plaintiff and delaying a state audit that would have cleared him; relaying false information to the media in a press release; trying to outsource training activities from FTA to Cuyahoga Community College and to oust Plaintiff from his role at FTA; unjustifiably neglecting to dismiss unsubstantiated administrative charges; shutting down Plaintiff's "last-day" event and damaging his reputation in the international firefighting community and his career in the private sector.

In early 2013, the Division of Fire conducted interviews for the position of Fire Chief. Plaintiff, Daryl McGinnis and Patrick Kelly were interviewed for the promotion.  On January 11, 2013, Eckart called and informed Plaintiff that McGinnis was selected.  Plaintiff responded that he respected the decision, but added that he was concerned because McGinnis was deficient in the necessary training hours.  Eckart and Mayor Frank Jackson followed up with McGinnis, who assured them both that he had the required continuing education training. McGinnis was sworn in as Fire Chief on January 18, 2013.

Individual firefighters entered their own continuing education training hours in the

Division of Fire's internal system known as SharePoint.  The posted information was accessible to all members of the Division of Fire.

On July 16, 2013, a *Cleveland.com* reporter made a public records request for "all of Fire Chief Daryl McGinnis' fire and EMT training records since 2000."  When Eckart questioned McGinnis this time, McGinnis admitted the deficiency.  McGinnis was removed as Chief and he retired shortly thereafter.

Following the McGinnis disclosure, Plaintiff alleges that the adverse treatment at the hands of the City, Eckart and others began.

Only two candidates from the civil service list were eligible to fill the McGinnis' position on an interim basis, Plaintiff and Patrick Kelly.  Although Plaintiff scored second out of three candidates in the January 2013 selection process, Kelly was named Interim Fire Chief instead in December of that year.

When Mayor Jackson was informed about the problem with McGinnis' records, he ordered Safety Director Martin Flask and Assistant Director Eckart to confiscate the records at the FTA and to institute an investigation.  (August 1, 2013 Press Release, ECF DKT #139-9).  The OIC conducted an audit and uncovered documentation that approximately forty-five firefighters failed to meet State training and/or records standards.  Eighteen Division members were disciplined as a result.  Although Plaintiff headed the FTA, he was not disciplined or removed from his position.  The OIC retained the FTA records in its offices until the following summer, months after the investigation concluded.

Around the time of McGinnis' retirement in August of 2013, the FTA graduated a class of cadets.  There was a graduation party with cadets and FTA supervisors in attendance.

Someone brought a picture of McGinnis and placed it in a urinal.  An individual photographed the picture of McGinnis in the urinal and distributed the photo by text message to a number of people, including McGinnis.  Discipline was handed down and the second-in-command at the FTA received a double-demotion.  Plaintiff was not formally disciplined, although he was in charge of the Academy at that time.  Effective February 24, 2014, Plaintiff was detailed out of the FTA for the next cadet training class.  He returned as head of the FTA four months later.

In 2014, Eckart solicited bids for outside sources of cadet training.  The only response was from Cuyahoga Community College ("Tri-C").  Tri-C had previously been cooperating with the Division of Fire by providing facilities and instruction  free-of-charge.  Its 2014 bid came in over $50,000.00, which required City Council approval.  In light of the delays that process would cause in conducting the next cadet training classes, Eckart abandoned the bidding process.  (Eckart Deposition 1, ECF DKT #140, pp. 235-36, *et seq.*).  In addition, when the request-for-bid process was publicized and Tri-C received criticism, the parties were persuaded  to return to their original arrangement.  (*Id*.).  Plaintiff alleges that Eckart dropped the outsourcing effort on the condition that Chief Kelly would reassign Plaintiff out of the FTA.  (Patrick Kelly 9/8/17 Declaration, ECF DKT #151-1, ¶ 18).

In January of 2015, Lawrence Moore, a firefighter stationed at the FTA, filed a formal complaint.  Moore complained about instances of race discrimination and additionally charged that Plaintiff, through Captain Patrick Corrigan, ordered Moore to record inaccurate training information into an FTA database.  In response to Moore's complaint, Safety Director McGrath directed Eckart to institute an OIC investigation.

While this investigation was underway, Plaintiff interviewed for the position of Assistant Chief of Fire. The four panelists ranked Plaintiff last out of eleven candidates and he was passed over for promotion in March of 2015.

The OIC investigation did not corroborate Moore's discrimination charges but did reveal missing and incomplete training records at the FTA. On April 30, 2015, the OIC recommended administrative charges against Chief Kelly, Assistant Chief Frank Chontos, Captain Corrigan, Captain Charles Kelley and Plaintiff.

Chief Kelly reviewed the recommendation, spoke with Plaintiff and Corrigan, and considered written materials submitted by Plaintiff. On July 16, 2015, Chief Kelly issued administrative charges against Plaintiff, Corrigan and himself. Chief Kelly also announced that he would be retiring to take a job in a suburban fire department.

The City of Cleveland issued a press release on September 15, 2015, which read as follows:

> The City of Cleveland Department of Public Safety Office of Integrity Control announced that an investigation into continuing education within the Division of Fire Training Academy has concluded. The investigation was initiated after the Integrity Control Office received a complaint from a firefighter assigned to the Fire Training Academy alleging possible falsification of official records.
>
> The investigation focused on the validation of training records and compliance to Ohio Revised Code 4765-7-09. Upon completion of the investigation, the matter was reviewed by the Department of Law and no criminal conduct was identified. The Department of Public Safety forwarded the investigative findings and recommendations of administrative charges to Chief Patrick Kelly for review and recommendation.
>
> On June 25, 2015, Chief Patrick Kelly recommended administrative charges for Battalion Chief Sean DeCrane, Captain Patrick Corrigan and himself. That recommendation was accepted by Director of Public Safety Michael McGrath and administrative charges were served.

Ultimately, Chief Kelly received a written reprimand based upon his oversight responsibilities at the FTA.  The City scheduled a joint pre-disciplinary hearing to be held on September 23, 2015, for Plaintiff and Captain Corrigan.  When the City, Plaintiff, Corrigan and union representatives met, they agreed to postpone the hearing and to allow time for FTA records to be brought into compliance ahead of Ohio's upcoming audit.  The City also agreed to the union's request to interview Plaintiff and Corrigan.  Votypka and Eckart conducted the interviews.

In October 2015, a two-person panel made up of Eckart and Ken Ledford, the City of Bedford Fire Chief, interviewed four candidates for Interim Fire Chief to fill the vacancy caused by Kelly's retirement.  The candidates were Anthony Messic, Wayne Naida, Angelo Calvillo and Plaintiff.  (Eckart Deposition 2, ECF DKT #141, pp. 27-28).  Plaintiff contends that Ledford was one of Calvillo's personal references, which tainted the process.  The Mayor and Safety Director considered the candidates and named Angelo Calvillo as Interim Fire Chief.

On December 11, 2015, the State of Ohio's auditors examined the FTA's records. The auditors concluded that:

> [T]he files and documents were very good, well maintained, and above and beyond what was expected.  They stated they were aware of the review and problems at the FTA and all the changes made were for the better and the FTA would be an excellent site for a charter and accreditation.  (ECF DKT #139-18, p.5).

Votypka turned the OIC investigative matter over to Eckart for final determination. Eckart recommended to Safety Director McGrath that the City dismiss the administrative charges against Plaintiff and Corrigan.  McGrath agreed.  However, Eckart neglected to draft

the letter for McGrath's signature formally dismissing the charges.

On December 11, 2015, the City posted a Civil Service Announcement for the permanent Fire Chief position. Interim Chief Calvillo, Gregory Glauner and Plaintiff applied. The three candidates were interviewed in March of 2016 by a panel consisting of Civil Service Commissioner Lu Ambrose, former Safety Director Flask, Assistant Safety Director Tim Hennessey, Chief of Public Affairs Natoya Walker Minor and Toledo Fire Chief Louis Santiago. At the interview, Plaintiff argued with panel member Flask and his score was negatively impacted. The City promoted Calvillo to the permanent Fire Chief position on April 6, 2016.

On January 15, 2016, Votypka sent Eckart an email with a spreadsheet highlighting that the administrative charges against Plaintiff were still pending. (ECF DKT #142-33).

In the first half of 2016, Eckart was heavily involved in the preparations for the Republican Convention to be held in Cleveland in July. The official dismissal of Plaintiff's charges continued to be neglected.

On December 7, 2016, Eckart withdrew the administrative charges against Plaintiff and notified Local 93, attaching a letter dated October 18, 2016. Eckart attributed the delay to the threat and ultimate filing of Plaintiff's lawsuit. Plaintiff's Complaint was filed on October 31, 2016.

In August 2016, Plaintiff received and accepted a $100,000 a year job with Underwriters Laboratories. Plaintiff could no longer tolerate his treatment at the City Division of Fire; so, he notified the City that his last day would be September 11, 2016. Plaintiff offered to return and teach courses at the Academy but his offer was turned down.

Plaintiff's fellow firefighters planned a last-day tribute at his fire station.  Chief Calvillo arrived, congratulated Plaintiff, but then shut down the event for violation of a Division of Fire policy requiring written prior approval.

On November 1, 2019, Defendants filed their Second Motion for Summary Judgment in the captioned case.  Plaintiff filed his Opposition on December 2, 2019.  Defendants' Reply was submitted on December 16, 2019.

## II. LAW AND ANALYSIS

### Standard of Review

### Fed.R.Civ.P 56 Motion for Summary Judgment

Summary judgment shall be granted only if  "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed.R.Civ.P. 56(a).  The burden is on the moving party to conclusively show no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy. Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).  The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  *See* Fed.R.Civ.P. 56(c)(1)(A), (B).  A court considering a motion for summary judgment must view the facts and all inferences in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Once the movant presents evidence to meet its burden, the

nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347.

This Court does not have the responsibility to search the record *sua sponte* for genuine issues of material fact. *Betkerur v. Aultman Hospital Ass 'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404-06 (6th Cir. 1992). The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); and if the nonmoving party fails to make the necessary showing on an element upon which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distributors Benefits Ass 'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

## First Amendment Retaliation

Plaintiff alleges that Defendants retaliated against him for engaging in constitutionally protected expression. In determining whether a public employee's speech is protected under the First Amendment, the Court must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist.*, 391 U.S. 563, 568 (1968).

To determine whether an employee has established a First Amendment retaliation

claim, the courts utilize a burden-shifting analysis. *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014). "To establish a prima facie case, the employee must demonstrate that: (1) he was engaged in constitutionally protected speech or conduct; (2) he was subjected to an adverse employment action that would deter a person of ordinary firmness from continuing to engage in that speech or conduct; and (3) the protected speech was a substantial or motivating factor for the adverse employment action." *Stinebaugh v. City of Wapakoneta*, 630 F.App'x 522, 525 (6th Cir. 2015), quoting *Benison,* 765 F.3d at 658.

"If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Benison*, 765 F.3d at 658, quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294-95 (6th Cir. 2012).

Whether an employee engaged in constitutionally protected speech is a question of law. *Farhat v. Jopke*, 370 F.3d 580, 593 (6th Cir. 2004). The court must decide first whether the employee spoke as a "citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). If so, the court then must "balance the employee's free speech interest against the employer's justifications for restricting the employee's speech." *Stinebaugh*, 630 F.App'x at 526; *Garcetti, id.* The First Amendment will protect the public employee only if he was speaking as a citizen and not in his official capacity as a government worker. *Garcetti*. The Supreme Court has held that public employees should be able to speak out freely on questions of public concern without fear of retaliation. *Pickering*, 391 U.S. at 571-72. However, the public employer is not required to "tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working

relationships."  *Connick v. Myers*, 461 U.S.138, 154 (1983).

## Speaking as a "Citizen"

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti*, 547 U.S. at 421. "But where the speech ordinarily does not fall within the scope of the public employee's duties, he speaks in his role 'as a citizen even if his speech involves the subject matter of his employment.'"  *Stinebaugh*, 630 F.App'x at 526; *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015).

## On a Matter of Public Concern

"Speech which can be 'fairly considered as relating to any matter of political, social, or other concern to the community' touches upon matters of public concern."  *Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir. 2001); *Connick* 461 U.S. at 146.  "A public concern/private interest analysis does not require that a communication be utterly bereft of private observations or even expressions of private interest."  *Mosholder v. Barnhardt*, 679 F.3d 443, 450-51 (6th Cir. 2012); *see Bonnell*, 241 F.3d at 812.  "The relevant analysis here is whether the communication touches 'upon matters ***only*** of personal interest...'"  *Connick*, 461 U.S. at 147 (emphasis added).  "Speech is of 'public concern' if it involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government."  *Farhat,* 370 F.3d at 590.  The Sixth Circuit has held that speech concerning the "workings" of a fire department and "public safety" easily falls into the category, "comments on matters of public concern."  *Mattox v.*

-11-

*City of Forest Park*, 183 F.3d 515, 521 (6th Cir. 1999); *see Pickering*, 391 U.S. at 568.  The

Supreme Court has added that "public concern is a subject of legitimate news interest; that is,

a subject of general interest and of value and concern to the public at the time of publication."

*City of San Diego v. Roe*, 543 U.S. 77, 84 (2004).

**Plaintiff's Prima Facie Case**

The Sixth Circuit has instructed that speech concerning fire department operations and

public safety unquestionably fits the "public concern" category.  *Mattox*, 183 F.3d at 521.

Defendants do not dispute that information concerning the training qualifications of the Fire

Chief would be a matter of public concern.  Furthermore, Defendants do not contend that

informing the media of the Fire Chief's training deficiencies, while embarrassing to the

Division, would somehow undermine efficiency or cause dissension in the ranks.  Thus, the

Court need not engage in the *Pickering* balancing analysis.

Rather, Defendants point out that Plaintiff unequivocally denies being the "tipster."

(Plaintiff's Deposition 1, ECF DKT #145, p. 240).  In addition, Defendants argue that even if

Plaintiff did leak the information to the press, his speech would be part of his official job

duties as head of the FTA.  Therefore, his speech would not be protected.  *Garcetti*, 547 U.S.

at 421 (public employees who make statements pursuant to their official duties are not

speaking as citizens for First Amendment purposes).  Defendants point to Plaintiff's

testimony that he was occasionally given permission to talk to the media and specifically had

approval to discuss training issues.  (Plaintiff's Deposition 1, ECF DKT #145, pp. 151-52).

Plaintiff counters that while  it is true that he was not the tipster, the City and the

individual Defendants *believed* he was the person who told the media about McGinnis.

-12-

Plaintiff adds (without further development) that his other protected activities include labor union advocacy and filing the within lawsuit. Plaintiff insists that Defendants' conduct arising from a mistaken belief is actionable and that conclusory denials do not warrant judgment in their favor. *Thaddeus-X v. Blatter*, 175 F.3d 378, 400 (6th Cir. 1999).

Plaintiff moreover demonstrates that communicating with the media was not part of his official job duties. Plaintiff received the *Cleveland.com* public records request for McGinnis' records; but rather than respond to it, Plaintiff directed the request to the City Law Department - Public Records Administrator.

Plaintiff offers a Fire Division organizational chart which distinguishes the job obligations of his position as Battalion Chief from those of the Public Information Officer and the Director of Communications. (ECF DKT #145-3). The latter two positions specifically encompass interactions with media representatives.

As head of the FTA, Plaintiff had oversight of cadet training and he constantly sought to bring training methods up to date. He did receive permission to talk to reporters about that aspect of training; however, he did not discuss continuing education hours because current firefighters were responsible for tracking and logging their own time. (Plaintiff's Deposition 1, ECF DKT #145, pp. 155-56).

The Court finds that Plaintiff's speech or perceived speech was exercised as a private citizen on a matter of public concern and warrants First Amendment protections as a matter of law. Thus, Plaintiff satisfies the first element of his prima facie case of First Amendment Retaliation.

The next factor the Court must address is whether Plaintiff can demonstrate that he

was subjected to any adverse employment actions on the part of Defendants that would deter a person of ordinary firmness from continuing to engage in that speech or conduct.

Defendants correctly note that Plaintiff's First Amendment Retaliation claim is brought pursuant to 42 U.S.C. § 1983 and is subject to a two-year statute of limitations. *Browning v. Pendleton*, 869 F.2d 989 (6th Cir. 1989). Thus, the Court must restrict its review to challenged actions occurring between October 31, 2014 and October 31, 2016. The following are relevant incidents raised by Plaintiff in support of his contention that he faced retaliation for the McGinnis leak:

In the fall of 2014, Eckart was instrumental in efforts to outsource cadet and continuing education training away from the Academy and to Tri-C. The requests for bids for outsourcing and interactions with Tri-C, though ultimately unsuccessful, took place while Plaintiff was the head of the FTA. (Eckart Deposition 1, ECF DKT #140, pp. 241-42).

Firefighter Moore's January 2015 complaint prompted Safety Director McGrath to order Eckart to launch an OIC investigation into FTA records during Plaintiff's tenure at the FTA. Moore's complaint was found to be unsubstantiated.

The interview process for the Assistant Fire Chief position was conducted in March of 2015. Plaintiff was ranked last out of eleven candidates and was passed over for promotion.

On April 30, 2015, the OIC recommended administrative charges against Plaintiff and others for possible falsification of records and improper logging of data regarding FTA training classes. Plaintiff was not interviewed for the investigation.

Chief Kelly performed his own review and interviewed Plaintiff. On July 16, 2015, Kelly issued administrative charges against himself and Plaintiff. Administrative charges are

a prelude to discipline.  Kelly received a written reprimand and Plaintiff was scheduled to face a pre-disciplinary hearing.

On September 15, 2015, the City of Cleveland issued a press release publicizing that the OIC investigation resulted in administrative charges against Plaintiff.  Eckart assisted in drafting the release along with Daniel Williams, Director of Media Relations, and Daniel Ball, Assistant Director of Media Relations, in the Mayor's Office.

Shortly afterward, the Interim Fire Chief vacancy was announced.  In October 2015, Angelo Calvillo was named Interim Fire Chief over Plaintiff.  The interview panel was comprised of only two individuals –  Eckart and Ken Ledford, a personal reference for Calvillo.

In mid-December of 2015, Eckart recommended to Director McGrath that the administrative charges be dismissed against Plaintiff.  McGrath agreed.  However, Eckart failed to draft the letter formally dismissing the charges for McGrath's signature.

On January 15, 2016, Votypka reminded Eckart in an email that the charges were still pending against Plaintiff.  The administrative charges were not formally dismissed until December 7, 2016, following the filing of the within lawsuit.

Plaintiff participated in the interview process for the Permanent Fire Chief position.  Calvillo was promoted over Plaintiff on April 6, 2016.

On September 11, 2016, Plaintiff's last-day tribute was shut down by Chief Calvillo.

The Court determines that conduct, including repeated denials of promotions, internal investigations and administrative charges which were publicized yet not cleared for a substantial time period, can constitute actions which would chill the exercise of protected

-15-

speech. The gravity of the adverse action is not key. When addressing adverse actions in the First Amendment retaliation context, courts have often repeated that something as trivial as refusing to hold a birthday party for a public employee is actionable when intended to punish for exercising free speech rights. *See Rutan v Republican Party of Illinois*, 497 U.S. 62, 76 fn.8 (1990).

Upon review of all the evidence submitted on this aspect of Plaintiff's prima facie case and drawing all inferences in his favor, the Court holds that Plaintiff has failed to prove liability on the part of the individual Defendants Votypka and Chumita for First Amendment Retaliation. They conducted OIC investigations at Eckart's direction. As Manager of the OIC and investigator for the OIC respectively, Votypka and Chumita were not authorized to issue charges, only recommendations. Moreover, the evidence demonstrates that Votypka, specifically, acted in a non-retaliatory manner toward Plaintiff. He reminded Eckart that administrative charges were pending against Plaintiff well after the time they should have been dismissed as being unsubstantiated. In their sworn Declarations, moreover, both Chumita (ECF DKT #139-22) and Votypka (ECF DKT #139-3) deny any intent to force Plaintiff out of the Division of Fire.

However, the Court holds that Plaintiff has successfully established that he was subjected to adverse employment actions on the part of Defendants Eckart and the City of Cleveland that would deter a person of ordinary firmness from continuing to engage in protected activity.

At this juncture, the Court must ascertain whether Plaintiff has presented sufficient evidence to create a genuine issue that protected speech was a substantial or motivating

-16-

factor for Defendants' adverse employment actions. *See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir. 2007).

Defendants argue that Plaintiff cannot prevail on the causal connection prong of his prima facie case.

Defendants contend that they could not have been motivated by the McGinnis leak because they did not know who the tipster was. Over seven hundred individuals in the Division of Fire had access to training records. Eckart assumed someone from the Division tipped the media, but he did not know or care who it was. (Eckart Deposition 1, ECF DKT #140, pp. 154-55, 164). Votypka understood that Plaintiff was one of many with access but did not think Plaintiff was the source. (ECF DKT #142, p. 70). Chumita could speculate but he had no proof of the tipster's identity. (ECF DKT #147, p. 67). Mayor Jackson and Safety Director McGrath did not know; and the Mayor commented that leaks occurred all the time. (Jackson Deposition, ECF DKT #146, p. 75-6, 80-1; McGrath Deposition, ECF DKT #143, p. 131).

Defendants also insist that Plaintiff cannot link alleged adverse actions to the purported mistaken belief that he was the source of the leak because incidences of supposed retaliation are too temporally distant to evidence a causal connection. For instance, Plaintiff's failed promotions took place two years after the July 2013 tip to the media. Furthermore, Plaintiff admits that Eckart targeted the entire Division of Fire, not just him personally. (Plaintiff's Deposition 2, ECF DKT #149, pp. 337-38).

For his part, Plaintiff argues that he was denied multiple promotions because Eckart and the Mayor believed he tipped the press to McGinnis' training deficiencies. This incident

was an embarrassment to the City Administration.  Eckart conducted a number of the promotion interviews himself.  In the selection process for the Interim Fire Chief vacancy, for example, the interview panel consisted of only two individuals.  One was Eckart.

In May of 2015, Plaintiff wondered why he was falling from favor and asked Eckart whether he believed that Plaintiff tipped off the media about McGinnis.  Plaintiff paraphrases Eckart's response as:  "You have to admit it's pretty coincidental."  (Plaintiff's Deposition 1, ECF DKT #145, pp. 260-61).

The ultimate decisionmaker on promotions is the Mayor.  Mayor Jackson described the atmosphere in City Hall "like washing spaghetti...that's how it leaks over there."  (ECF DKT #146, p. 76).  In addition, Mayor Jackson testified that he did not know or care who the McGinnis tipster was.  (ECF DKT #146, pp. 80-1).  However, the Mayor did say that he would be unable to trust such an individual.  (ECF DKT #146, p.79).  Final promotion decisions rested with the Mayor; and he acknowledged that if Plaintiff were the one who leaked the McGinnis training issue to the press, that would negatively impact Plaintiff's prospects for promotion.  (ECF DKT #146, pp. 79-81).

Eckart's attempt to outsource cadet and continuing education training to Tri-C directly impacted Plaintiff's job at the FTA.  In Chief Kelly's first Declaration (ECF DKT #151-1), Kelly says that Eckart agreed not to outsource training if Plaintiff were removed as head of the FTA.  (¶ 18).  Kelly further stated that Eckart was running the fire department.  (¶ 12). Plaintiff's efforts to modernize and improve the Academy recordkeeping were stymied when the records were seized and removed from the premises after the McGinnis incident.  (¶ 13). Kelly also found it unusual that Plaintiff's Last-Day tribute was disbanded; nothing like that

happened while he was Chief.  (¶ 20).

The September 15, 2015 Press Release, drafted in part by Eckart, was released while Plaintiff was applying for the Interim and Permanent Fire Chief posts.  Although Eckart says he had no part in deciding when the Press Release went out, the timing prejudiced Plaintiff's chances for promotion.

The unsubstantiated administrative charges against Plaintiff remained pending for over a year.  Eckart obtained Director McGrath's approval to dismiss the charges in December 2015.  Eckart has offered shifting explanations for why he delayed drafting the formal dismissal.  First, Eckart explained that the delay was due to the intense preparations for the Republican National Convention in July of 2016.  Then, Eckart blamed his distraction on  the "litigation hold" for Plaintiff's threatened and ultimately filed lawsuit on October 31, 2016.  In any event, Eckart did not publicly dismiss the administrative charges that had been hanging over Plaintiff's head until December of 2016.

The Court finds that Plaintiff has met his burden of proof that the adverse actions of Defendants Eckart and the City of Cleveland were motivated in meaningful part by his exercise of free speech.

Once Plaintiff meets his prima facie burden, Defendants must establish by a preponderance of the evidence that the employment decisions would have been the same absent the protected conduct.  *Benison*, 765 F.3d at 658.

Defendants point out that the City explored the possibility of outsourcing training before the information about McGinnis was leaked to the media.  In addition, the outsourcing never occurred.

Plaintiff admitted that improvements to FTA logs and records were needed and changes had to be made in order to pass muster with the State of Ohio.

Administrative charges were brought against Plaintiff regarding poor recordkeeping, but he was never disciplined.

Plaintiff had a history of fierce loyalty to Local 93, sometimes putting him at loggerheads with the Division of Fire and the City Administration.  Plaintiff reached out to other fire departments inside and outside of the State of Ohio to garner support for blocking the Safety Director's and the City's efforts to institute change.  While Plaintiff was in a leadership role at the FTA, issues arose such as the defiling of McGinnis' photo at a cadet graduation party, dozens of firefighters failing to meet state-required training hours and poor recordkeeping that necessitated multiple internal and state audits.  In view of all this, a rational evaluator might be persuaded against considering Plaintiff for promotion.

Plaintiff, in response, points out that Chief Kelly submitted two Declarations.  In the first (ECF DKT #151-1), Kelly describes Plaintiff as passionate about his work and technically skilled.  He comments that the Administration has vendettas, that the Mayor is a bully and that Eckart is disingenuous.  Kelly sided with Plaintiff on the outsourcing issue and asked him to prepare a counterproposal to keep training in-house.  Kelly states that Eckart agreed to drop the outsourcing plan if Plaintiff was removed from his position at the FTA.

In his second Declaration (ECF DKT #151-3), Kelly has a different tenor to his statements.  Kelly states that after the "heinous" incident at the cadet graduation party, he was not comfortable with Plaintiff heading the FTA.  He alone made the decision to reassign Plaintiff and if he suggested in his prior sworn statement that it was a "quid pro quo" for

-20-

Eckart to abandon outsourcing training, that was inaccurate.  Kelly states it was solely his decision to bring Plaintiff up on administrative charges.  Kelly swears that all decisions were made for business reasons and were not retaliatory nor improper.

Plaintiff reminds the Court that the Mayor would not trust him or promote him if he thought Plaintiff leaked information about McGinnis to the media.  (ECF DKT #146, pp. 79-81).

The evidence shows that Eckart shifted his reasons for why he delayed the dismissal of charges against Plaintiff – from the Republican National Convention to Plaintiff's lawsuit. Yet, Eckart received a written reminder in January of 2016 that the unsubstantiated charges were still pending against Plaintiff.

Defendants have the burden of demonstrating by a preponderance of the evidence that their actions would have been taken, and their employment decisions made as regards Plaintiff, even in the absence of his constitutionally protected conduct.  Preponderance of the evidence is the greater weight of the evidence  –  evidence that is more probable, more persuasive, or of greater probative value.  If the weight of the evidence is equally balanced, the party who has the burden of proof has not established such issue by a preponderance of the evidence.

Upon examination of the evidence provided, the Court cannot say whether or not Defendants have successfully established that their motivations were non-retaliatory. Determining Defendants' credibility, discerning Defendants' intent and weighing the evidence to decide if it is more probable, more persuasive, or of greater probative value in Defendants' favor is the jury's sole function.

-21-

**Municipal Liability**

A city or municipality may only be held liable for the constitutional violations of its employees under 42 U.S.C. § 1983 if those actions are the result of a practice, policy, or custom of the municipality itself.  *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  There are four types of municipal action that, if they cause the underlying constitutional violation, can establish liability under a *Monell* claim:  1) legislative enactments or official policy; 2) actions by officials with final decision-making authority; 3) a policy of inadequate training or supervision; or 4) a custom of tolerance of rights violations. *France v. Lucas*, No. 1:07CV3519, 2012 WL 5207555, at *12 (N.D. Ohio Oct. 22, 2012), aff'd, 836 F.3d 612 (6th Cir. 2016).

In a one-paragraph response to Defendants' request for judgment in their favor on the *Monell* claim, Plaintiff states, without reference to evidence, that the City is liable for a pattern of retaliating against him for exercising his First Amendment rights.  Plaintiff outlines the following as support:

> The City engaged in a years-long pattern of retaliation against DeCrane, fueled by Eckart's and Mayor Jackson's irritation with DeCrane's protected activity, both real and suspected.  Jackson made clear his feelings about the McGinnis leak, leading Defendants to then act against DeCrane with impunity.  The City's failure to train most officials on employees' First Amendment rights contributed to the retaliatory activity as well.  And the retaliation's length – in terms of time and the measures taken – demonstrates the City's deliberate indifference to DeCrane's rights.  (ECF DKT #151, p.27).

The Court finds that Plaintiff cannot prevail.  Plaintiff makes blanket assertions without pointing to specific facts to support one or more of the four municipal actions that can establish *Monell* liability.

Plaintiff complains that the City's retaliation against him personally continued for an

-22-

intolerable length of time; yet, he offers no evidence of a persistent pattern of illegal retribution for City employees' exercise of First Amendment rights.

Plaintiff cites to a lack of across-the-board training on First Amendment rights; but does not direct the Court to training manuals nor provide an expert report on appropriate municipal employee training.  A municipality may be liable under §1983 for failure to train its employees, but only where such failure reflects a deliberate or conscious choice.  *City of Canton v. Harris*, 489 U.S. 378 (1989).

A plaintiff can demonstrate that the inadequate training was the result of deliberate indifference by providing prior instances of unconstitutional conduct reflecting that the municipality ignored a history of abuse, and was on notice that the training in this particular area was deficient and likely to cause injury.  *Fisher v. Harden,* 398 F.3d 837, 849 (6th Cir. 2005).  Also, a plaintiff can show that such a training failure has the "'highly predictable consequence' of constitutional violations of the sort Plaintiff suffered."  *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006)(citation omitted).

Since Plaintiff *must* present specific facts from the record that support his *Monell* claim and since Plaintiff has failed to do so, he cannot survive summary judgment.  It is not the Court's role to "wade through" the record to find specific facts which may support the nonmoving party's claims.  *United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993).

**<u>Qualified Immunity Defense</u>**

The individual Defendants contend that their liability is barred by qualified immunity because Plaintiff cannot satisfy his burden of identifying a case <u>clearly establishing</u> that their actions violated the First Amendment.  (Defendants' added emphasis).  Defendants are in

-23-

error.  The prohibition against employer retaliation for an employee's exercise of constitutionally protected speech is well established.  It is not necessary for Plaintiff to identify a case on factual "all-fours" where Defendants' particular conduct was held unlawful.

The Court's conclusion that Plaintiff's speech addressed matters of public concern was dictated by established law and common sense.  "All public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern, and no reasonable public official understanding this charge could conclude that [DeCrane's] speech did not address such matters."  *See Chappel v Montgomery County Fire Protection District No. 1*, 131 F.3d 564, 580 (6th Cir. 1997).

In conclusion, Defendants' Motion for Summary Judgment as to Plaintiff's First Claim of First and Fourteenth Amendment Retaliation under 42 U.S.C. § 1983 against all Defendants is granted in favor of Defendants Votypka, Chumita and the City of Cleveland but denied as to Defendant Eckart.

**False Light Invasion of Privacy**

Plaintiff brings a claim for False Light Invasion of Privacy against Defendant Eckart. Plaintiff complains about Eckart's role in ordering the OIC investigation resulting in administrative charges against him, and also about the issuance of the September 15, 2015 Press Release.  Plaintiff asserts that Eckart left him bathed in the "false light" until after the instant lawsuit was filed in October of 2016.

To assert a claim for false light "[i]n Ohio, one who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed

-24-

would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."  *Welling v. Weinfeld,* 113 Ohio St.3d 464, 473 (2007).

Ohio courts "ha[ve] defined a false statement as a statement that sets forth matters which are not true or statements without grounds in truth or fact.  A statement is not a 'false statement' if, even though it is misleading and fails to disclose all relevant facts, the statement has some truth in it.  Moreover, a statement that is subject to different interpretations is not 'false.'"  *Serv. Emp. Int'l Union Dist. 1199 v. Ohio Elections Comm'n*, 158 Ohio App.3d 769, 822 N.E.2d 424, 430 (2004); *see also Nat'l Medic Serv. Corp. v. E.W. Scripps Co.*, 61 Ohio App.3d 752, 573 N.E.2d 1148, 1150 (1989).

To sustain a false light claim," there must be a showing that false statements were made with a high degree of awareness of their probable falsity ... [and] sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."  *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 119 (1980).

There is no dispute that the September 15, 2015 Press Release is a publication.  Also, Eckart acknowledges that he assisted in drafting the release.  Plaintiff insists that the release is false and places him in a false light because it states that the OIC investigation is concluded; while Eckart, on September 25, 2015, asked the OIC to complete the investigation.  Plaintiff felt highly offended by these accusations which smeared his professional reputation and which were ultimately broadcast on the internet.

Eckart's position is that the investigation was indeed closed; but following Plaintiff's scheduled pre-disciplinary hearing, the OIC investigation was re-opened.  (Votypka

Deposition, ECF DKT #142, pp. 237-38).

There was an investigation by the OIC and Plaintiff did face administrative charges as a result.  At best, the statement that the OIC investigation concluded was misleading.  That does not make it a false statement.  *Serv. Emp. Int'l Union Dist. 1199 v. Ohio Elections Comm'n*, 158 Ohio App.3d 769, 822 N.E.2d 424, 430.

The publication did reflect negatively on Plaintiff and was issued at a time that coincided with Plaintiff's applications for promotion.  However, Plaintiff cannot show that the publication was made with a high awareness of its falsity.

Defendant Eckart is entitled to judgment in his favor on Plaintiff's False Light Invasion of Privacy Claim.

**<u>Intimidation Claims</u>**

In his Third Claim, Plaintiff alleges Intimidation (using materially false or fraudulent writings to attempt to hinder public servants) under R.C. § 2921.03(A) and (C) against Defendants Eckart, Votypka and Chumita.  In his Fourth Claim, Plaintiff alleges Civil Liability for Criminal Acts under R.C. § 2307.60(A)(1) against Defendants Eckart, Votypka and Chumita.

Defendants argue that Plaintiffs' Third and Fourth Claims fail as a matter of law.  The Third Claim is for Intimidation under a criminal statute and the Fourth Claim seeks civil recovery for damages arising from Defendants' commission of the crime of Intimidation. Defendants insist that they have not been convicted of a crime and therefore, Plaintiff's claims are defeated by the absence of a condition precedent.

On October 24, 2018, the Ohio Supreme Court (#2018-1209) accepted certified

questions from the Northern District of Ohio in *Rebecca Buddenberg v. Robert Weisdack*,

Case No. 1:18CV522:

> 1. Does O.R.C. § 2307.60's creation of a civil cause of action for injuries
> based on a "criminal act" require an underlying criminal conviction?
>
> 2. Is a criminal conviction a condition precedent to a civil claim pursuant to O.R.C.
> § 2921.03?

The Ohio Supreme Court held oral arguments on November 13, 2019, and a decision

is forthcoming.  Since these questions are the exact ones facing the Court here, the decision of

the Ohio Supreme Court will be determinative of the Defendants' dispositive motion on

Plaintiff's Third and Fourth Claims.

The Court finds that this issue is not ripe for federal court adjudication.  Interpretation

of R.C. § 2307.60 and R.C. § 2921.03 is an unsettled matter of state law which is soon to be

resolved by the highest court in the State of Ohio.  The Court can only act as a forecaster of

what the State of Ohio would rule.  Thus, it would serve neither judicial economy nor judicial

efficiency for the Court to make a decision at this juncture.

Defendants' Motion for Summary Judgment on the Third and Fourth Claims of

Plaintiff's Third Amended Complaint (ECF DKT #120) is denied.

### III. CONCLUSION

For these reasons, Defendants' Second Motion (ECF DKT #139) for Summary

Judgment is granted in part and denied in part.  Defendants' Motion regarding Plaintiff's First

Claim of First and Fourteenth Amendment Retaliation under 42 U.S.C. § 1983 is granted in

favor of Defendants James Votypka, Christopher Chumita and the City of Cleveland, and is

denied as to Defendant Edward Eckart.  Defendant Eckart's Motion for Summary Judgment

on Plaintiff's Second Claim for False Light Invasion of Privacy is granted.  The Motion of

Defendants Eckart, Votypka and Chumita on Plaintiff's Third and Fourth Claims for

Intimidation under Ohio law is denied.

Within fourteen days of the issuance of this Opinion and Order, the parties shall

confer and file a joint notice proposing three dates for a telephone status conference to discuss

further scheduling.


**IT IS SO ORDERED.**

**DATE: May 13, 2020**


 **s/Christopher A. Boyko**          

**CHRISTOPHER A. BOYKO**

**Senior United States District Judge**